UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA,

Case No. 08-Cr-20574-LENARD/TURNOFF

Plaintiff,

vs.                                      MIAMI, FLORIDA
                                         DECEMBER 9, 2009

AEY, INC., RALPH MERRILL,
EFRAIM DIVEROLI, et al.,

Defendants.


MOTION & EVIDENTIARY HEARING TRANSCRIPT
BEFORE THE HONORABLE WILLIAM C. TURNOFF,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

                    UNITED STATES ATTORNEY'S OFFICE
                    99 N.E. 4th Street
                    Miami, Florida 33132
                    BY: ADAM SCHWARTZ, A.U.S.A.
                    BY: ELOISA D. FERNANDEZ, A.U.S.A.


FOR THE DEFENDANT RALPH MERRILL:

                    STIRBA & ASSOCIATES
                    215 S. State Street
                    Suite 750
                    Salt Lake City, UT, 84111
                    BY: PETER STIRBA, ESQ.


REPORTED BY:        JERALD M. MEYERS, RPR-CM
                    J.M. Court Reporting, Inc.
                    1601 N.W. 109 Terrace
                    Telephone: 954-431-4757
                    Pembroke Pines, Florida 33026-2717
                    E-Mail Address: CRJM@AOL.COM

Page 2

1                          INDEX

2   Witnesses:                    Direct  Cross Redirect Recross

3   Luis Perez .................... 15       49       67       73

4

5   Luis Perez ...................................... 74

6

7   Ferdinand Vazquez .............. 75       87       92       93

8

9   Ralph Merrill .................. 97      124      167

10

11  Reporter's Certificate ................................. 170

12                      INDEX TO EXHIBITS

13

14  Exhibits                   Marked for        Received

15                             Identification   in Evidence

16

17  Description               Page     Line    Page     Line

18

19  Government Exhibits D-1 &  ..... 30      5       34       15

20  D-2

21  Government Exhibit K ........... 34      19

22

23  Government Exhibits H and  .... 161     20

24  H-1

25  Government Exhibit CX-18 ...... 162      9

1

2   Government Exhibits H-1 and CX-18 ............... 162        21

3

4   (Call to order of the court)

5          THE COURT:  Good morning everybody.  Please have a

6   seat.

7          MR. SCHWARTZ:  Good morning.

8          MS. FERNANDEZ:  Good morning, Your Honor.

9          MR. STIRBA:  Good morning, Judge.

10         THE COURT:  Okay.  This is United States versus

11  Aey Incorporated, et al, case number 08-Cr-20574-Judge

12  Lenard.

13         Can we have appearances, please, starting with the

14  United States.

15         MR. SCHWARTZ:  Good morning, Your Honor.  Adam

16  Schwartz and Eloisa Fernandez on behalf of the United States,

17  and we are joined at counsel table by Special Agent Robert

18  Koontz of the Defense Criminal Investigation Service.

19         MS. FERNANDEZ:  Good morning, Your Honor.

20         THE COURT:  Okay.  And for the defense?

21         MR. STIRBA:  Good morning, Your Honor.  Peter

22  Stirba appearing on behalf of defendant Ralph Merrill, and

23  this is Mr. Merrill, Your Honor.

24         THE COURT:  Mr. Merrill, state your name and age

25  for the record, please.

1          THE DEFENDANT:  Ralph G. Merrill, age 67.

2          THE COURT:  Okay.  You look very young for --

3          THE DEFENDANT:  I am 66.  I am just turning 67.

4          THE COURT:  See, I told you that you look young

5     for 67, but you do look 66.  Have a seat, please.

6          Now, Mr. Stirba, my recollection is these matters

7     were recently referred to me, okay, and so I just got them

8     and I set them down as soon as I had my first opportunity.

9          There is a trial date the beginning of January.

10    If my recollection is correct, Mr. Stirba, you may have

11    filed a motion to continue, or something like that, and I

12    will simply say I normally always accommodate, but in this

13    case it was a question of the trial date, the need to rule

14    on these motions and my schedule because, for example, I

15    believe it is next week I am in court every day.

16         I am in court every day through the end of the

17    year.  So this was the date that I set.  And if, in fact, my

18    memory is correct that you wanted a continuance, either

19    telephonically or something else we couldn't accommodate you,

20    that is the reason why, if my recollection is correct.

21         MR. STIRBA:  No.  I appreciate that, Judge.

22    That's fine.  I should tell you, though, we had a hearing

23    before Judge Lenard on Monday.

24         The trial has now been specially set for March

25    2nd, so I think that helps in terms of essentially the

1   pressures and the speed at which things need to be done, if

2   that is helpful.

3          THE COURT:  Well, I appreciate that information,

4   but it is just as well that we have whatever we need in

5   court done now.

6          MR. STIRBA:  Sure.

7          THE COURT:  Okay.  So, yes, that is helpful.  I

8   was looking forward to seeing, I see local counsel is Atlee

9   Wampler's firm and Joe Buchanan.

10         MR. STIRBA:  Yes, Your Honor, that is correct.

11         THE COURT:  And they are looking out for you?

12         MR. STIRBA:  They have tried, yes, Your Honor.

13         THE COURT:  Yes.  Good.  Well, Atlee Wampler was

14  the first U.S. Attorney that I worked for many, many years

15  ago.  He is a great man.  He is one of the finest people I

16  have ever met, and, of course, I worked with Joe Buchanan.

17         That's many, many, many, years ago before I think

18  the present AUSA's were born.  Certainly in the case of

19  Eloisa.  So give my regards to them as well.

20         MR. STIRBA:  I will, Your Honor, and I am proud to

21  associate with them.  Thank you.

22         THE COURT:  They are wonderful people.

23         Now, this is what has been referred to me recently

24  in different stages, okay, and I am doing you all a favor as

25  well by taking care of these so that our computer gets it

1  right, and you don't keep getting notices for things that

2  are pending.  Do you follow what I am saying, particularly

3  since you are coming from Utah, and I also see that you have

4  already been met by the local Miami Federal Courthouse

5  hospitality with respect to your luggage and things like

6  that, but I am looking in the back and I see what looks my

7  condo living room when my grand kids were just here; your

8  local Costco, but I take it that has been resolved, correct?

9          MR. STIRBA:  Yes, Your Honor, it has.

10         THE COURT:  Okay.  And you can thank my law clerk

11  Lizbeth Michele Escandal for expediting things.  She only

12  weighs 85 pounds, but 800 hundred pounds of CSO's listen to

13  her.  Okay?

14         MR. STIRBA:  She was very helpful, Your Honor.  I

15  appreciate it.

16         THE COURT:  All right.  Then we will just deal

17  with your motions then, but we appreciate that.  I just want

18  you to know, and I am sorry you had any problems.

19         Okay.  Here is what is pending that has been

20  referred to me:  Docket entry 412, defendant Ralph Merrill's

21  motion to suppress.

22         A request for hearing on this motion was filed on

23  October 30th.  That is docket entry 414, but it was not part

24  of the referral, but we will just go ahead and grant that

25  okay.  You are here.  Fair enough, everybody?

 1          MR. SCHWARTZ:  Yes.

 2          MS. ESTIVAL:  Yes, Your Honor.

 3          MR. STIRBA:  Yes, Your Honor.

 4          THE COURT:  Docket entry 418, defendant Ralph

 5   Merrill's motion to compel all preserved handwritten

 6   memoranda and rough notes.

 7          We have docket entry 406, defendant Ralph

 8   Merrill's motion to compel discovery.  That was just

 9   referred.  I added that today, just to see what we could do

10   with it since you were coming in here.

11          Normally I would not have.  I would have set it

12   little bit later, but 418, I believe that's before me, too,

13   as well that I just read today.

14          403 is defendant Ralph Merrill's motion for oral

15   argument on motion to compel discovery filed on October

16   27th.  It was referred December 4th at docket entry 471.

17          It was added to this hearing today.  So obviously

18   that motion is granted, 403, okay, because you are here.

19          Then we have docket entry 462, motion to seal

20   exhibit Y to defendant Ralph Merrill's reply memorandum in

21   support of motion to compel.

22          We just got that.  I looked at that quickly.  I

23   didn't really understand what was the significance, but does

24   the government have any motion to sealing exhibit Y?

25          MS. FERNANDEZ:  Just a moment, Your Honor.

 1              THE COURT:  My recollection is, and I looked at

 2    this last night, that was the Congressional testimony?

 3              MR. STIRBA:  It was submitted to us subject to a

 4    protective order, Judge.  So out of an abundance of caution,

 5    we thought we ought to file it under seal.

 6              THE COURT:  What I read, was there more to it?

 7              MR. STIRBA:  No.

 8              THE COURT:  This transcript was them making

 9    appearances by telephone, but who is making appearances?

10              MR. STIRBA:  Well, there was some Congressional

11    testimony by I think it is Lieutenant Colonel Harrison.

12              THE COURT:  Okay.

13              MR. STIRBA:  But that's why we requested it under

14    seal.  We wanted to be fair to the protective order, Judge.

15              THE COURT:  Any objection from the government?

16              MS. FERNANDEZ:  No, Your Honor.

17              THE COURT:  Okay.  We will seal that.  So that

18    leaves us with 406.  The motion to compel was filed on

19    October 28th and referred on December 4th, let the record

20    reflect.

21              Okay.  And docket entry 418, a motion to compel all

22    handwritten memoranda and preserve handwritten memoranda and

23    rough notes.  That was filed October 30th and referred

24    November 4th, and then the motion to suppress, docket entry

25    412.

1            Okay.  Now, with respect to the motion to

2    suppress, I have reviewed everything, okay, certainly with

3    respect to the motion to suppress.

4            The motion to seal, the last one we talked about, I

5    just glanced at what Y was, but when motion to, suppress

6    let's start with that, 412.

7            I have reviewed everything.  I have reviewed the

8    motion.  I have referred to the response and then to the

9    reply, and let me ask you this:

10           I am not one of those that let's throw in the

11   kitchen sink and everybody testify and we will sort it out.

12           I have reviewed everything, and I have reviewed

13   the law, and I think the law again before we do anything and

14   we apply it, we will look again, but I know what is before

15   me, and this is not a traditional, you know, the local

16   police slugged somebody and strangled a confession out of

17   him.

18           This is a different scenario, and so my question

19   is do you want me to address this on the state of the record?

20           In other words, take, in effect, the government's

21   motion.  You make factual proffers there or you summarize

22   factual proffers in response to the defendant's able motion,

23   and I understand you made every argument that you can, and

24   some I have not seen before, but there is the

25   representation, but it seems to, me and I am just throwing

1  this out to get to the point that I could resolve this on

2  the state of the record and the pleadings, first of all, if

3  I take it in the light most favorable to the defense.  Are

4  you with me so far, counsel?

5              MR. SCHWARTZ:  Yes.

6              THE COURT:  The government does not dispute some of

7  your factual allegations, but then what they are saying is

8  even if it is believable, there was no violation here.

9              Then the second thing is, in fairness to them,

10 they dispute some of the facts and say that even aside from

11 the fact that there is no violation of the law, no Miranda

12 warnings were required, it was voluntary, there were no plea

13 discussions for the statements in question, do follow me?

14              As a matter of fact of Constitutional suppression,

15 let me leap ahead and say there is stuff there that you can

16 have fun with on cross-examination, and this is part of your

17 case.  Do you follow me?

18              MR. STIRBA:  Yes.

19              THE COURT:  But as a matter of Constitutional law,

20 I really see nothing here that requires suppression, both in

21 terms of worse case scenario; in other words, alleged

22 violations of the, for example, the DOJ manual which they

23 denied they did, but I see nothing at all that requires

24 suppression, and my thinking is to call the agent, but,

25 again, it is your client's liberty that is at stake, but I

Page 11

1    am trying to save time.

2              I just don't see that there is a real problem here,

3    understanding that you could argue whatever you want, and we

4    will get to this with respect to the motion to compel or the

5    motions to compel, but with respect to the motion to

6    suppress, I have got to say it does not look like, while I

7    have considered your arguments, even on a good day I don't

8    see anything that is suppressible.  Counsel?

9              MR. STIRBA:  Judge, may I speak to that?

10             THE COURT:  I am done, yes.  I was trying to get to

11   the point.

12             MR. STIRBA:  I mean, I appreciate what the court is

13   saying, and trust me, I am a cut to the chase kind of guy

14   too, but the presupposition I think in what you just said

15   was a certain acceptance of facts and a rejection of other

16   facts.

17             THE COURT:  First of all, you have to stand by the

18   microphone.

19             MR. STIRBA:  Oh, I am sorry.

20             THE COURT:  Because everything is being recorded.

21             MR. STIRBA:  I am sorry.

22             THE COURT:  What I was saying is that even in the

23   light most favorable to you and your factual proffer, I

24   don't see a problem.  Do you follow?  And that you may

25   dispute.

1          MR. STIRBA:  Let me raise one thing which I think

2     clearly --

3          THE COURT:  In other words, even if you are right

4     in what you are arguing, I don't see it as a Constitutional

5     matter there is any constitutional grounds for suppression.

6          MR. STIRBA:  Okay.  Two things, just so I

7     understand better.

8          THE COURT:  Yes.

9          MR. STIRBA:  Assuming what Mr. Merrill is prepared

10    to testify to, and essentially proffer in his submissions --

11         THE COURT:  Right.

12         MR. STIRBA:  -- that is on the 7th of May, in

13    consultation with Mr. Koukios, an Assistant United States

14    Attorney.

15         THE COURT:  Right.

16         MR. STIRBA:  There was a discussion whereby

17    Mr. Koukios said to Mr. Merrill, "In exchange for your

18    cooperation and in exchange for you appearing the next day

19    before the grand jury and telling everything you know about

20    Aey, we will give you a misdemeanor, and we will also talk

21    about probation."

22         THE COURT:  Okay.  You say that is what occurred.

23    That is a good point.  The government denies that is what

24    occurred.

25         MR. STIRBA:  But if you accept that factual

Page 13

1   scenario, I think the law is quite clear.

2            THE COURT:  Okay.  I don't disagree with you.

3            MR. STIRBA:  Okay.

4            THE COURT:  I don't agree with or disagree with

5   you, but I understand your point.  So that is your big

6   factual argument that he was offered that plea deal.

7            MR. STIRBA:  I think that is certainly

8   quintessential to a decision on whether or not, first of all,

9   that were plea negotiations.

10           THE COURT:  I understand that, but that's the

11  factual system.

12           MR. STIRBA:  Absolutely.

13           THE COURT:  That he was offered that plea deal.

14           MR. STIRBA:  Absolutely, in conjunction with other

15  things that were deceptive, in our view, in terms of the

16  reasons why he was there and what happened when he got

17  there, and you couple that with basically a promise and you

18  have an involuntary statement or a voluntary confession.

19  That is the law.

20           THE COURT:  Okay.  Here is what we are going to

21  have to do then:  I take it you are going to call your case

22  agent, government?

23           MR. SCHWARTZ:  We are prepared to call -- we cut it

24  down, Your Honor.  We can call just two witnesses to get the

25  full story.

Page 14

1          THE COURT:  Okay.

2          MR. SCHWARTZ:  Or one.

3          THE COURT:  You want to call your client, right?

4          MR. STIRBA:  Yes, Your Honor.

5          THE COURT:  Okay.  All right.  Government?

6          MR. SCHWARTZ:  Your Honor, the United States calls

7   Special Agent Luis Perez.

8          MR. STIRBA:  And, by the way, before anyone

9   testifies, Your Honor, I invoke the exclusionary rule with

10  respect to witnesses if there is anyone sitting out here, so

11  the witness does not hear the testimony.

12         THE COURT:  Well, the case agent will be allowed to

13  remain.  Is that Perez?

14         MR. SCHWARTZ:  Actually it is Mr. Koontz; Special

15  Agent Koontz is not testifying today.

16         THE COURT:  I am sorry.  It was Koontz who you

17  introduced?

18         MR. SCHWARTZ:  Right.  Correct, Your Honor.

19         THE COURT:  He is the fellow who just went outside,

20  right?

21         MR. SCHWARTZ:  Yes, sir.

22         THE COURT:  What witnesses are you calling?

23         MR. SCHWARTZ:  We are going to call Special Agent

24  Perez, Special Agent Vazquez, and we were going to call

25  Special Agent Barrett if the Court feels like he needs more

Page 15

1   an understanding of the facts, but I think we can limit it

2   to two witnesses, Your Honor.

3           THE COURT:  Okay.  And if there is a problem, you

4   can call them in rebuttal.  I will allow it.

5           Now, you are Agent Perez?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  And who is the second witness?

8           MR. SCHWARTZ:  Ferdinand Vazquez.

9           THE COURT:  Vazquez.  And the third?  I want

10  Vazquez and the third one outside.

11          MR. SCHWARTZ:  Yes, Your Honor.  They are all

12  outside.

13          THE COURT:  There is an order of sequestration.

14          THE CLERK:  Please raise your right hand.

15      LUIS B. PEREZ, GOVERNMENT'S WITNESS, SWORN.

16                  DIRECT EXAMINATION

17  Q.  Good morning.

18  A.  Good morning, sir.

19  Q.  Could you, please, state your full name and spell it for

20  the record?

21  A.  Sure.  It is Luis, middle initial B, last name Perez;

22  P-e-r-e-z.

23  Q.  And where do you work, sir?

24  A.  I am a special agent with the Department of Defense,

25  defense criminal Investigative Service.

1    Q.    Where are you currently stationed

2    A.    I am currently stationed at Bagram Airfield in

3    Afghanistan working in the International Contracting

4    Corruption Task Force.

5    Q.    When did you come back to the United States?

6    A.    This weekend.

7    Q.    For this hearing?

8    A.    Yes, sir.

9    Q.    And what do you investigate in Afghanistan?

10   A.    We are doing contract major procurement fraud and

11   bribery kickbacks in Department of Defense contracts.

12          THE COURT:  Now, I want you to remember everything

13   is being recorded for transcription.  So speak as slowly as

14   you can and into the microphone.

15          THE WITNESS:  Yes, sir.

16   BY MR. SCHWARTZ:

17   Q.    How long have you been in Afghanistan, sir?

18   A.    I have been in Afghanistan for about 4 months.

19   Q.    Prior to that, where were you stationed?

20   A.    Here in Fort Lauderdale with the Defense Criminal

21   Investigative Service local office; the Ft. Lauderdale field

22   office.

23          THE COURT:  Which is more dangerous, Ft.

24   Lauderdale or Afghanistan?

25          THE WITNESS:  It is very close.  Both of them.

 1    BY MR. SCHWARTZ

 2    Q.    Let me ask you how long have you been with the Defense

 3    Criminal Investigative Service?

 4    A.    It is going to be three years in March of next year.

 5    Q.    And prior to that, where did you work?

 6    A.    I was a special agent with the Food & Drug

 7    Administration Office of Criminal Investigation, and that  was

 8    that was for about 7 years.

 9    Q.    Okay.  Now, when did you first become involved with the

10    Aey investigation?

11    A.    It was late March or early April, 2008.

12    Q.    And is DCIS the only investigative agency involved in

13    the investigation, or are there others?

14    A.    There are others, sir.  There was Immigration & Customs

15    Enforcement, ICE and the U.S. Army Criminal Investigation

16    Division Major procurement Fraud Unit.

17    Q.    And back in April, you were new to the case, right.  So

18    what were you doing at that time in March and April of '08?

19    A.    At the beginning of the investigation I was getting all

20    of the information from the prior case agent, and we were in

21    the middle of interviewing Aey employees.

22    Q.    And when did the name Ralph Merrill first come up?  In

23    what context?

24    A.    It first came to my knowledge during some of the

25    interviews of the Aey employees.

1   Q.   What did they say about Ralph Merrill and his role with

2   respect to Aey?

3   A.   Some of them said that he was a silent partner of Aey,

4   the financier for Aey.

5   Q.   Was there any indication that he was involved in the

6   concealment of the origin of the Chinese ammo?

7   A.   No, sir.

8   Q.   Now, were you asked to serve a subpoena on Mr. Merrill?

9   A.   Yes, sir, I was.

10  Q.   Okay.  What was the purpose of issuing the subpoena?

11  A.   To get the bank records and financial records between

12  Mr. Merrill, his company Vector Arms and Aey.

13  Q.   And why were you sent?  Did you go to Utah?

14  A.   Yes, sir.  I went to Utah.

15  Q.   Okay.  Why were you sent to Utah?

16  A.   Because I was the new kid on the block, and I had the

17  least to do list.

18  Q.   At that time was Mr. Merrill a target of the

19  investigation?

20  A.   No, sir.

21  Q.   A subject to the investigation?

22  A.   No, sir.

23  Q.   Now, at that time were you aware of any e-mails drafted

24  by Mr. Merrill suggesting that he might have concealed the

25  origin of the Chinese ammunition?

Page 19

```
 1   A.   No, sir.

 2   Q.   When you were going to Utah, were you advised of a plan

 3   to dupe Mr. Merrill to come to Miami to force a confession?

 4   A.   No, sir.

 5   Q.   And who issue that subpoena?

 6   A.   It was AUSA Fernandez.

 7   Q.   Okay.  And did you go to Utah alone?

 8   A.   Yes, sir.

 9   Q.   When did you go?

10   A.   I went in --

11   Q.   What date?

12   A.   24th.

13   Q.   Okay.  And did you serve the subpoena by yourself or

14   with others?

15   A.   No.  I was with another agent from the local DCIS office

16   there; Special Agent David Barrett.

17   Q.   Okay.  And when you arrived in Utah, what happened?

18   A.   When I landed, Agent Barrett picked me up at the

19   airport, and we drove straight to Vector Arms.

20   Q.   And once you arrived, what kind of business is Vector

21   Arms?

22   A.   Vector Arms is a manufacturer that sells weapons,

23   semi-automatic weapons.  Fully automatic weapons.

24   Q.   And when you and Special Agent Barrett arrived, walk us

25   through what happened?
```

Page 20

1   A.   Well, we parked.  We got out and went into the reception

2   area and identified ourselves to the reception lady and let

3   her known we wanted to see Mr. Ralph Merrill.

4           At that time I believe it was Mr. Merrill's brother

5   came and introduced himself and told us that Mr. Merrill was

6   not available at the time, and we told him if he could reach

7   out to him, that we needed to talk to him, which he did.

8           And while we were waiting for Mr. Ralph Merrill to

9   arrive, we were talking to the other Mr. Merrill about the

10  weapons that they manufactured since it was in his office

11  there were some weapons around.  We were curious about the

12  weapons.

13  Q.   And did Mr. Ralph Merrill appear?

14  A.   Yes.  5, 10 minutes after we go got there he arrived.

15  Q.   Is he in the courtroom here today?

16  A.   Yes, sir.

17  Q.   Can you identify him?

18  A.   Yes, sir.  Right there.  The gentleman sitting next to

19  the other, I believe his attorney.

20          MR. STIRBA:  Mr. Stirba.

21          THE WITNESS:  Mr. Stirba.

22          MR. SCHWARTZ:  Your Honor, let the record show

23  reflect that the witness identified the defendant Ralph

24  Merrill.

25          THE COURT:  Yes.

1  BY MR. SCHWARTZ:

2  Q.   Now, at that time when you first met Mr. Merrill, what

3  did you do first?

4  A.   We identified ourselves as Department of Defense agents,

5  and that we needed to talk to him relating to his

6  relationship with Aey.

7  Q.   And did he ask if you were from a different agency?

8  A.   Yes.  He was asking if we were from ATF.  I guess he

9  told us that he gets visited by the ATF frequently.

10 Q.   Okay.  And when he learned that you were not from the

11 ATF and from DCIS, what was he his reaction?

12 A.   He was like very cooperative.  Very friendly, and

13 actually invited us to take a tour of his facility.

14 Q.   Did you take a tour?

15 A.   Yes, sir, we did.

16 Q.   And after the tour, what happened next?

17          MR. STIRBA:  Your Honor, I am going to interpose an

18 objection as to relevancy.

19          We are not challenging the statements that were

20 made on the 24th.  And to the extent that it has any

21 relevance to our motion, the substance and the content of

22 what was discussed on that day is really irrelevant.

23          THE COURT:  Well, I will let the government

24 proceed.

25          MR. SCHWARTZ:  Thank you, Your Honor.

1    BY MR. SCHWARTZ:

2    Q.   So where did you go next?  What happened next?

3    A.   We told him we needed to talk to him in private, and he

4    took us to a room.  It looked like a break room cafeteria

5    type of setting.

6         We sat down, and I told him that I had come all the

7    way from Florida because we were investigating Aey, and can

8    he talk to us about it; his relationship with Aey.

9    Q.   Did you go into the detail explaining the background of

10   his relationship with Aey?

11   A.   Yes.  I asked him how he met Efraim Diveroli, the owner

12   of Aey.  He told me how they met; when Efraim was working in

13   L.A. with a company Botec and how they built that

14   relationship.

15        Then Mr. Diveroli opened Aey and asked Mr. Merrill

16   for some finance help and how they started working jointly.

17        Efraim would get the contracts and Mr. Merrill

18   would provide some of the financing.

19   Q.   Okay.  And did you ask him about the Afghanistan

20   contract?

21   A.   Yes, sir, we did.

22   Q.   What did Mr. Merrill say?

23   A.   That he had provided a million dollars to Aey to and a

24   collateral of $35,000,000 land that he had in Utah.

25   Q.   And did you then go and ask him what he knew about the

1    origin of the ammunition, the Chinese origin of the

2    ammunition was supplied to the Department of Defense under

3    the contract?

4    A.   Yes, sir.  He said that he didn't know after the fact

5    that the e-mail -- excuse me -- that the ammo was Chinese.

6    He said that he had learned about it in April of the year

7    before the interview.  So April OF 2007.

8    Q.   Okay.

9             THE COURT:  The interview that he is talking about

10   now took place on what date?

11            THE WITNESS:  April 24th of 2008.

12            THE COURT:  Okay.

13   BY MR. SCHWARTZ:

14   Q.   So did you ask him also if Efraim Diveroli decided to

15   repackage the ammunition to conceal the Chinese ammunition?

16   A.   Yes, we did.  He said, no.  He said it was done to save

17   money on the freight for the ammo for where it was to be

18   shipped to Afghanistan because the freight had doubled in

19   price.

20   Q.   And let me ask you did Mr. Merrill mention anything at

21   some point here about a ATF regulation?

22   A.   Yes.  He said that he had provided Mr. Diveroli with an

23   ATF regulation that stated that if an ammo from an embargoed

24   country was in a friendly country for over 4 or 5 years, then

25   that ammo could be imported into the U.S.

Page 24

1    Q.    And did he provide you with a copy of this regulation?

2    A.    Yes.  He provided a copy of the front page and the exact

3    page where it stated what he was talking about.

4    Q.    And you addended that to your report, correct?

5    A.    Yes, sir.

6    Q.    Now, what was Mr. Merrill's demeanor at this time?

7    A.    Very friendly.  Cooperative.

8    Q.    Let me ask you, what Mr. Merrill told you about his

9    knowledge of the Chinese ammunition, was that consistent with

10   what he said on May 7, 2008?

11   A.    It was.  It was consistent that he didn't know that the

12   ammo was Chinese until after it had been shipped and

13   delivered to Afghanistan.  What changed was the dates that he

14   knew about it.

15            THE COURT:  Let me stop you there.  Okay.  The

16   interview that you are talking about is April, 2008, right?

17            THE WITNESS:  Yes, sir.

18            THE COURT:  And your question now is what?

19            MR. SCHWARTZ:  Later in the May 7th interview.

20            THE COURT:  Let's be very clear.  We are making a

21   record here.  The interview we are talking about that you

22   are describing now is what date?  April what?

23            THE WITNESS:  24th, sir.

24            THE COURT:  2008?

25            THE WITNESS:  Yes, sir.

1          THE COURT:  Okay.  Continue, please.

2          MR. SCHWARTZ:  Yes.

3          THE COURT:  Or back up.

4    BY MR. SCHWARTZ:

5    Q.   And just to be clear, Special Agent Perez, when you said

6    that there is a consistency, were you talking about before

7    the events at issue here took place and Mr. Merrill changed

8    his tune?

9          MR. STIRBA:  Your Honor, that's way too leading.  I

10   mean, he can ask him about what happened, but he is leading

11   him.

12         MR. SCHWARTZ:  I will rephrase it.

13         THE COURT:  You are leading, and the rules of

14   evidence are a little flexible here.  There is no jury, but

15   it is confusing.

16         MR. SCHWARTZ:  Yes.

17         THE COURT:  In other words, your wear asking him to

18   draw a conclusion about something that he has not testified

19   about yet, right?

20         MR. SCHWARTZ:  Yes, Your Honor.

21         THE COURT:  So you are in the April interview now,

22   right?

23         MR. SCHWARTZ:  Yes.

24         THE COURT:  Okay.  So back up, and then you will be

25   able to get to that, maybe, after he talks about the May

Page 26

1    interview.

2              MR. SCHWARTZ:  Yes, sir.

3              THE COURT:  So go ahead.  Now we are still in the

4    April, 2008 interview where he is at Mr. Merrill's business.

5              MR. SCHWARTZ:  Yes, Your Honor.

6    BY MR. SCHWARTZ:

7    Q.   So at the end of the interview did you serve him a

8    subpoena?

9    A.   Yes, sir, I did.

10   Q.   Okay.  And what was his reaction to that?

11   A.   He was asking, you know, how is he going to get to

12   Florida.  Who is going to pay for his trip.

13             THE COURT:  What kind of subpoena?  You are making

14   a record.

15   BY MR. SCHWARTZ:

16   Q.   What kind of subpoena?

17   A.   It was a grand jury subpoena.

18   Q.   One or two?

19   A.   It was two, sir.  One for Mr. Merrill and one for Vector

20   Arms.

21   Q.   And what were the subpoenas for?

22   A.   Financial records between Mr. Ralph Merrill, Vector Arms

23   and Aey.

24   Q.   And did Mr. Merrill ask you anything about --

25             THE COURT:  Let me ask you a question.  A subpoena

Page 27

1   for Mr. Merrill and a subpoena for those records, correct?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  That was a grand jury subpoena that was

4   returnable for when?

5            THE WITNESS:  I am sorry, sir?

6            THE COURT:  It was returnable for when?  When was

7   he to appear?

8            THE WITNESS:  I believe it was two weeks after the

9   April 24th.

10           THE COURT:  Okay.  And let me ask the government is

11  this the proper question, the subpoena for documents speaks

12  for itself.

13           The subpoena for Mr. Merrill, did it have his name

14  on it or did it say something like custodian, or something

15  else?

16           MR. SCHWARTZ:  Your Honor, I believe that the two

17  subpoenas which are defense exhibit A, one was addressed to

18  Mr. Merrill and had an attachment asking for his personal

19  financial records with respect to Aey, and one was for Vector

20  Arms asking for documents and other items with respect to the

21  involvement with Aey.

22           THE COURT:  Would you characterize that as was it a

23  personal and a subpoena duces tecum, or just how would you

24  describe it?

25           MR. SCHWARTZ:  I think it was for testimony and to

1    bring documents, Your Honor.

2           THE COURT:  Okay.  Next question.

3    BY MR. SCHWARTZ:

4    Q.   Now, do you remember any discussion about or did you ask

5    Mr. Merrill or did Mr. Merrill ask anything about needing an

6    attorney for when he came down to Miami to testify at the

7    grand jury?

8    A.   No, sir.  I don't remember.

9    Q.   Okay.  And do you remember any discussion about having

10   Mr. Merrill come a day before his grand jury testimony was

11   scheduled?

12          THE COURT:  I am sorry.  Were you starting to say

13   he had some discussion?  When you handed him the subpoenas,

14   you had some discussion with him?

15          THE WITNESS:  Yes, sir.  What I remember is

16   Mr. Merrill asking who was going to pay for his flight to

17   Miami; where he is going to stay; the logistics part of

18   getting to Miami.

19          THE COURT:  Okay.

20   BY MR. SCHWARTZ:

21   Q.   Do you remember anything about Mr. Merrill asking about

22   a lawyer?

23   A.   No, sir.

24   Q.   Okay.  Was there any discussion about coming a day in

25   advance to review the documents he would bring?

1   A.   No.  I don't remember.

2   Q.   Okay.  Now, then after that, what did you do?  Did you

3   leave?

4   A.   Yes, sir.

5   Q.   Okay.  Now, between that April 24th meeting and May 6th,

6   did you receive any phone calls from Mr. Merrill?

7   A.    I remember one phone call where he tells me, hey, he is

8   arriving at X time in Miami, and I forwarded an e-mail to  one

9   of the AUSA's to let him know what time he wanted Mr. Merrill

10  to be at the United States Attorney's Office the next day.

11  Q.   Do you remember and in that phone call or any other

12  phone conversation discussing the issue of whether or not

13  Mr. Merrill should bring an attorney with him down to Miami?

14  A.   No, sir.

15  Q.   Now, when you were preparing for Mr. Merrill's grand

16  jury testimony, what was it set for, May 8th?

17  A.   Yes, sir.

18  Q.   What types of preparation did you and the other agents

19  do?

20  A.   We had one agent that was reviewing the e-mails and

21  printed them out and providing us some of the e-mails for a

22  person that we would be interviewing.

23   [Government Exhibits D-1 & D-2 marked for identification].

24  Q.   Now, I am going to hand you government exhibits D-1 and

25  D-2 which are attachments to exhibit D the government filed

1  with the court.

2          They are attachments here.  Take a look at D-1 and

3  D-2.  Do you recognize those documents, sir?

4  A.   Yes, sir.

5  Q.   What are they?

6  A.   They are e-mails from Mr. Merrill to Aey.

7  Q.   And at the time were these the e-mails you later showed

8  Mr. Merrill on May 7, 2008?

9  A.   Yes, sir.

10 Q.   Okay.  And when did you first see these e-mails?

11 A.   It was right before we did the interview of Mr. Merrill.

12 Q.   Okay.  And at the time when you looked at them, well,

13 D-1, what sort of information is listed on there?  Just

14 describe it to the court.

15 A.   It says, "To whom it may concern.  Attached are 3 photos

16 showing suggested methods of cleaning wood crates.

17          The first two photos shows scraping with a variety

18 of scraping tools.  The third shows a small air sander.

19 Either method should be reasonable, easy and quick."

20 Q.   Okay.  And the second e-mail, generally speaking, what

21 sort of information is provided or listed or described in the

22 e-mail?

23 A.   Basically how to leverage pricing on the ammo.

24 Q.   And at the time when you first saw these e-mails a few

25 days before the grand jury testimony was scheduled, did that

Page 31

1    change your view of Merrill at the time?

2    A.    No, sir.  It just peaked our interest in what are these

3    e-mails about.

4    Q.    Did you make any conclusions about Mr. Merrill's

5    participation based upon those e-mails?

6    A.    No, sir.

7    Q.    Now, let's turn to May 6, 2008.  Did you pick Mr.

8    Merrill up from the airport that day?

9    A.    Yes, sir.

10   Q.    Okay.  Why did you pick him up?

11   A.    Just trying to be nice to him since he flew all the way

12   from Utah, and we were doing that with other witnesses coming

13   into testify.

14            THE COURT:  Please keep your voice up.

15            THE WITNESS:  I am sorry, sir.

16            MR. SCHWARTZ:  You can pull the mike up probably.

17   That will help a little bit.

18   BY MR. SCHWARTZ:

19   Q.    And did you discuss anything in the car ride with

20   Mr. Merrill at that time?

21   A.    What I remember is how was his flight; you know, the

22   weather difference between Utah and Miami.

23   Q.    Okay.  Now, the following day did Mr. Merrill come --

24   this is May 7, 2008 -- did Mr. Merrill come to the United

25   States Attorney's Office?

Page 32

1    A.    Yes, sir.

2    Q.    Okay.  And how did he get there?

3    A.    I picked him up.

4    Q.    Okay.  And where was he brought to?  Where did the

5    interview take place?

6    A.    The interview took place at the United States Attorney's

7    Office on the 8th floor in one of the conference rooms there

8    on the 8th floor.

9    Q.    Okay.  Just describe the conference room?

10   A.    The conference room was a small medium-sized conference

11   room.  It was in one of corners of the 8th floor.  On one

12   side of the wall was all windows.  It seated 6 to 8 people.

13   Q.    And who attended the interview that morning?

14   A.    In the morning it was myself, AUSA James Koukios and

15   Special Agent Detrick from Customs Enforcement.  ICE.

16   Q.    Okay.  And that morning how would you describe

17   Mr. Merrill's demeanor at that time?

18   A.    The same when I met him in Utah.  Cooperative.

19   Friendly.

20   Q.    Where did he sit in the conference room?

21   A.    He was sitting at the head of the table Koukios was to

22   one side.  I was to another side at the table.  Actually, he

23   was closest to the door.

24   Q.    Was the door locked?

25   A.    No, sir.

1    Q.    Did the agents have their guns present?

2    A.    No, sir.  We have got to lock our weapons downstairs.

3    Q.    Was Mr. Merrill detained in any way whatsoever?

4    A.    No, sir.

5    Q.    And at the beginning, led the interview that day?

6    A.    It was between Koukios and myself.

7    Q.    Okay.  And at the beginning did Mr. Merrill have any

8    questions about whether he needed an attorney?

9    A.    No, sir.

10   Q.    Okay.  Did Mr. Merrill exhibit any hesitation at the

11   beginning of the interview?

12   A.    No, sir.

13   Q.    Did Mr. Merrill have any question about his status in

14   the investigation at the beginning of the interview?

15   A.    No, sir.

16   Q.    Okay.  Now, what issues or subjects were discussed first

17   during this interview?

18   A.    We went over basically the same items that we went over

19   back on April 24th; how did he meet Mr. Diveroli; his

20   relationship with Aey started; how did that continued and how

21   did it get to the Afghanistan contract.

22   Q.    And then what did you go over or go through after you

23   went through those basic background explanations?

24   A.    After that we asked him about the documents that he had;

25   that he brought to show the grand jury, and then we went over

Page 34

1  them basically line by line because he had made some

2  annotations into them.  We wanted him to explain what that

3  meant.

4           MR. SCHWARTZ:  Your Honor, I think I forget to ask

5  to move D-1 and D-2 into evidence at this time.

6           MR. STIRBA:  No objection, Your Honor.

7           THE COURT:  Without objection, it is admitted.

8      [Government Exhibits D-1 & D-2 received in evidence].

9  BY MR. SCHWARTZ:

10  Q.   I am going to present to you now government exhibit K.

11  A.   Thank you.

12      [Government Exhibit K marked for identification].

13  Q.   Take a look at it.  Are those the documents that he

14  brought, a selection of the documents that Mr. Merrill

15  brought with him that day?

16  A.   Yes, it is.

17  Q.   Okay.  And the first page that we are looking at that you

18  have on you in front of you, what is that?

19  A.   It is a spread sheet that he completed and states Aey

20  transactions 2006 through the present.

21  Q.   And in the bottom right hand corner is there a certain

22  special notation?

23  A.   Yes.  It says, "Principal outstanding.  No profit

24  included," and it is 1. 3 million dollars.

25  Q.   And who is the principal that he is referring to?

Page 35

1    A.    That's the money that he invested in Aey.

2    Q.    And still it was owed?

3    A.    And it still was owed, yes, sir.

4    Q.    Now, the other documents provided in government exhibit

5    K, what type of documents are those?

6    A.    They are printouts of his bank records that he had in

7    his bank.  The Wells Fargo Bank.

8    Q.    Okay.  And were they annotated in any way?

9    A.    Yes.  He had arrows and some annotations next to some of

10   the wire transfers.  Payments.

11   Q.    And how did you go through those documents with him?

12   A.    For example, there is one that says "Mis-wire.  Later

13   refunded.  BAGH.  We asked him what that meant.  He stated

14   that belonged to the Bagdad or Iraq contracts that he had

15   helped Aey with.

16          There were also some arrows indicating wire

17   transfers.  Money that he got paid back.  There was Colombia

18   and Afghanistan.

19   Q.    Did you go through this stuff in pretty excruciating

20   detail?

21   A.    Yes, sir.

22   Q.    And what was the purpose of that?

23   A.    To prepare for the next day grand jury.

24   Q.    Okay.  And how long did the beginning interview talking

25   about how he met and began to work with Aey and the documents,

1   how long did that take that morning?

2   A.   A couple of hours.

3   Q.   And at that point, at some point later did anyone ask

4   Mr. Merrill about what his knowledge with respect to the

5   origin of ammunition that was provided under the Afghanistan

6   contract?

7   A.   Yes, sir.

8   Q.   Okay.  And what did Mr. Merrill say then?

9   A.   At the time of the May interview, he said that he didn't

10  know the Chinese ammo, the ammo -- excuse me -- was of Chinese

11  origin until the fall of 2007.

12  Q.   Okay.  And what happened in the fall of 2007?

13  A.   There was a search warrant that was conducted at Aey.

14  Q.   Okay.  And did he say that he knew that the Chinese, the

15  ammo, the Chinese ammo was being provided under the contract

16  when that was going on?

17  A.   No.  Just like he said in the April interview that we

18  had with him, he said that he didn't know it was Chinese

19  origin until after it had been shipped.

20  Q.   Okay.  At that time did AUSA Koukios ask Mr. Merrill if

21  he had any discussions with Aey about scraping ammo crates?

22  A.   Yes.

23  Q.   And what did Mr. Merrill say?

24  A.   He said he had no such communications with him.

25  Q.   Then AUSA Koukios asked if he had any communications

1    with Aey about using the origin of the ammunition as leverage?

2    A.    Yes, sir.

3    Q.    What was his response?

4    A.    Mr. Merrill said, "No."

5    Q.    What happened next?

6    A.    Well, AUSA Koukios took out the two e-mails that I

7    talked about earlier.

8    Q.    Are those D-1 and D-2?

9    A.    D-1 and D-2.

10   Q.    Okay.

11   A.    I provided them to Mr. Merrill.

12   Q.    And wen Mr. Merrill first saw these documents, what was

13   his reaction?

14   A.    Mr. Merrill's initial action said these were false

15   e-mails.  They were not true.  Then we asked him, "Are you

16   sure?  Do you want to look at them again?"

17              He looked at them; took a deep breath and just put

18   kind of his head down and then said, "Yes.  These are, I

19   authored those e-mails."

20   Q.    And at that moment what did you think was happening?

21   A.    That he had lied to us; that these e-mails were, he

22   initially said they were not his and now he said, yes, they

23   were.  So if he lied to us about these two e-mails, he must

24   be lying about something else.  Is he lying about something

25   else?

1    Q.   At that moment, after he admitted those e-mails were, in

2    fact, correct what happened?  What did AUSA Koukios do?

3    A.   Told him that we had reached a new level in the

4    interview, and that he would not have to continue talking to

5    us.

6    Q.   I am sorry.  He did have to continue or did not have to

7    continue?

8    A.   Did not have to continue talking to us, and basically

9    told him his 5th and 6th Amendments.

10   Q.   What do you mean?  Like explain it as best you can, sir.

11   A.   It was his right not to incriminate himself.  He could

12   continue talking to us with a lawyer present or without a

13   lawyer.

14         He could leave the interview at this time and then

15   don't come back.  He could stay.

16         Mr. Merrill had several questions over and over and

17   over again about the judicial process.

18         We told him, you know, AUSA Koukios and I told him

19   how the process is if he cooperates; if he doesn't cooperate;

20   if he has a lawyer; if he doesn't have a lawyer.

21   Q.   Well, let's break it down.  When Assistant United States

22   Attorney Koukios explained what could happen on his options

23   cooperating versus not cooperating, what is your best

24   recollection of what was said?

25   A.   He was explained if he cooperated and we went in front

1    of the judge and we came to the judge and told the judge

2    Mr. Merrill helped us on A, B, C would you think that, you

3    know, he should get leniency on his sentence or cut the

4    sentence.

5            I think he talked about page the 5K Rule, and also

6    told him that we had no power over the judges to say, you

7    know, we want this and this, this reduction, X-amount of

8    reduction in Mr. Merrill's sentence; that it is always up to

9    the judge to decide to go with the government or go against

10   the government for that recommendation.

11   Q.   And with respect to the question about Mr. Merrill

12   asking about whether he should have a lawyer or shouldn't

13   have a lawyer, what was the response?

14   A.   That it was always Mr. Merrill's decision.  If he wanted

15   a lawyer, and actually we were telling him, you know, it

16   would be best for you have to have a lawyer so you can

17   navigate the judicial system.

18   Q.   Okay.  At any time did anyone in the room make a promise

19   of leniency?

20   A.   No, sir.

21   Q.   Okay.  Did anyone at any time, did Koukios say that he

22   or you say that you could make a promise of a reduced

23   sentence  at that time?

24   A.   No, sir.  I think I used the analogy of, you know, going

25   to bat for him in and getting in front of the judge, and

Page 40

1    sometimes we can get ahead and the judge will agree with us

2    and sometimes we strike out, and the judge might even

3    increase the penalty.

4    Q.   Okay.  And at that time did anyone in the room make a

5    promise for a Class A misdemeanor in exchange for his

6    continued cooperation that day?

7    A.   No, sir.

8    Q.   Did anyone make any sort of promise whatsoever for his

9    continued cooperation that day?

10   A.   No, sir.

11           THE COURT:  Was he ever told that he did not have

12   to talk to you; that he could stop talking to you?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Do you recall the word "misdemeanor"

15   coming up at all?

16           THE WITNESS:  No, sir.  I don't.

17           THE COURT:  Okay.  Go ahead.

18   BY MR. SCHWARTZ:

19   Q.   Now, were there any promises made whatsoever during this

20   period?

21   A.   No, sir.

22   Q.   By anyone in the room?

23   A.   No, sir.

24   Q.   Okay.  And was there any plea agreement provided to

25   Mr. Merrill at that time?

Page 41

1  A.   No, because we didn't know what charges to plead because

2  we didn't know.  We just stopped, you know.  You know, we

3  thought he was lying to us about the e-mail, so there is no

4  plea agreement because there is no charges.  We didn't know

5  what was a head.

6  Q.   And was there any talk about specific charging about,

7  "well, we could charge you with X, Y and Z, but not A and B if

8  you cooperate," or anything like that?

9  A.   Remember, we are talking about some of the charges that

10 we were looking at Aey, but not at Mr. Merrill at that

11 moment.

12 Q.   Okay.  And how long did this period last for?

13 A.   It took a while.  About an hour.

14 Q.   And why did it take so long?

15 A.   Mr. Merrill kept asking the kind of same questions.  We

16 kept repeating the questions and explaining it a little  bit

17 different to see if he understood.

18 Q.   Let me ask you --

19          THE COURT:  You say an hour after he was confronted

20 with the e-mails?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Go ahead.

23 BY MR. SCHWARTZ:

24 Q.   Was there any time did anyone in the room say or mention

25 that the Attorney general of the United States would have to

1    be involved in a plea agreement, or anything like that?

2    A.   No, sir.

3    Q.   Were the words "attorney general" ever used?

4    A.   No, sir.

5    Q.   Now, at that period of time did you think you were in

6    plea negotiations with Mr. Merrill?

7    A.   No.  No, sir.

8    Q.   Why not?

9    A.   There is nothing to plead to because we didn't know what

10   charges there is.  I mean, we stopped him when we confronted

11   him with the e-mails, and he said that he lied to us at the

12   beginning, and now he said, "Yes.  These are mine."

13   Q.   And after this hour period of being advised of his

14   rights, advised of his options, what did Mr. Merrill do?

15   A.   Mr. Merrill agreed to continue talking to us without a

16   lawyer present.

17   Q.   Okay.  And what did Mr. Merrill tell you next?

18   A.   That the e-mails, the D-1 was a suggestion that he had

19   for Aey to scrape the Chinese marking out of the ammunitions

20   crate that they were going to be shipping to Afghanistan.

21   That way they could hide the origin of the ammo being Chinese,

22   and he could protect his investment in Aey.

23   Q.   Okay.  What about D-2?  Did he explain that e-mail to

24   you?

25   A.   Yes.  He said that that was to help Aey renegotiate the

Page 43

1   price of the ammo, now that they knew that the ammo was

2   Chinese.

3   Q.   And what did he say about his financing after that

4   moment or his money after that time?

5   A.   That, you know, he had a lot of money invested in Aey and

6   had not gotten paid back by Aey.

7   Q.   And was there a lunch break then around that time?

8   A.   Yes.  We kind of broke off for lunch after that.

9   Q.   And before the break and you left for lunch, was

10   Mr. Merrill advised of anything?

11   A.   Yes.  We told him that, you know, he didn't have to come

12   back.  Did he want to; that he could get a lawyer if he

13   wanted to; that he didn't have to continue the interview;

14   that he didn't have to come back at all.

15          THE COURT:  You are going to have to enunciate.

16          THE WITNESS:  Yes, sir.  I am sorry.

17          THE COURT:  You used the word "didn't?"

18          THE WITNESS:  Did not.

19          THE COURT:  Didn't.

20          THE WITNESS:  Did not.  I am sorry, sir.  Yes.  We

21   told him he did not have to come back if Mr. Merrill did not

22   want to continue talking to us.

23   BY MR. SCHWARTZ:

24   Q.   But did Mr. Merrill return after the lunch break?

25   A.   Yes, sir, he did.

Page 44

1   Q.   Okay.  And then in the afternoon where did he come back?

2   A.   The same conference room that we were talking to him in

3   the morning.

4   Q.   Okay.  And who was present in the afternoon?

5   A.   AUSA Koukios was in and out.  Now, there was myself,

6   Agent Detrick from ICE, and then Special Agent Ferdinand

7   Vazquez from the U.S. Army CID.

8   Q.   Okay.  And did Koukios stay in the meeting?

9   A.   For the first 5 minutes.  I believe he had some kind of

10  calendar call or had some kind of court appearance that he

11  had to do.

12  Q.   And did you stay to the entire end of the interview?

13  A.   Not to the end.  I had to leave later that afternoon.

14  Q.   Okay.  Well, let me ask you, did you ask him why he

15  decided to clean the crates or propose that idea in D-1, in

16  that D-1 e-mail in the afternoon?

17  A.   Yes.  It was to protect his investment in Aey.

18          THE COURT:  Let me stop there, just so I understand

19  the record is clear, and it relates more to the trial than to

20  this matter, but you say he was concerned with his investment

21  because now it was disclosed that the weapons were of Chinese

22  origin, correct?

23          THE WITNESS:  The ammo was Chinese origin, yes,

24  sir.

25          THE COURT:  And how would that affect his

Page 45

1  investment?

2          THE WITNESS:  The contract that Aey had with the

3  Department of Defense had a stipulation that no Chinese

4  weapons or ammunition or military items could be used.

5          THE COURT:  So if they went through, because they

6  were Chinese weapons, he was concerned that with Aey would

7  not make the sale and that would affect his investment in

8  Aey?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Is that it in a nutshell?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Go ahead.

13  BY MR. SCHWARTZ:

14  Q.   Let me ask you in the afternoon was there anything

15  related with respect to a Henry Tomay and a scheme to bring

16  him down to New Jersey to interrogate him?

17  A.   No, sir.  We talked about if he could help us who was

18  Henry Tomay, but not a scheme or anything like that to bring

19  him to the states.

20          THE COURT:  In other words, you said he would help

21  you identify this man?

22          THE WITNESS:  Yes.  We just had a name.  We didn't

23  know who he was.

24          THE COURT:  You had information concerning the

25  name?

Page 46

1          THE WITNESS:  Correct.

2          THE COURT:  Government.

3    BY MR. SCHWARTZ:

4    Q.   And did you bring Mr. Merrill back to his hotel that

5    night?

6    A.   No, sir.

7    Q.   Okay.  Now, that night did you receive any phone calls

8    from Mr. Merrill?

9    A.   No, sir.

10   Q.   The following morning did you receive any phone calls

11   from Mr. Merrill?

12   A.   No, sir.

13   Q.   Now, the following day, May 8th of 2008, were you in the

14   United States Attorney's Office that morning?

15   A.   Yes, sir.

16   Q.   Okay.  And what were you doing that morning?

17   A.   We were getting ready for Mr. Merrill's testimony in

18   front of the grand jury.

19   Q.   Okay.  And where did Mr. Merrill go?

20   A.   He was back in the same conference room that we had the

21   interview conversations with him the day before.

22   Q.   Okay.  And were people moving in and out of that room?

23   What was going on that morning in that room?

24   A.   Yes.  We are getting ready with the other case matters,

25   and plus his testimony.  I believe Agent Vazquez was with him

1   in the room while we were doing other things.

2            You know, AUSA Fernandez and Koukios came in and

3   out and introduced themselves to Mr. Merrill.  It was just a

4   flowing day.

5   Q.   And were you present for any discussion with Mr. Merrill

6   regarding his other legal matters?

7   A.   No.  I don't remember.

8   Q.   Okay.  And were you in the room at any time?

9   A.   Yes.  I was in the room some of the times.  I remember

10  talking about those legal issues.

11  Q.   Like what legal issues?  What are we talking about?

12  A.   He said that he had some legal issues back in Utah.

13  There was 3 or 4 cases that he was a witness into.  We didn't

14  know whether it was civil, criminal or what they were in

15  nature.

16  Q.   Okay.  And was there any discussion, at least when you

17  were there, about the origin of the Chinese ammo or anything

18  with respect to that?

19  A.   No, sir.

20  Q.   Okay.  Was there an ultimate decision with respect to

21  whether Mr. Merrill would testify in the grand jury that

22  morning or not?

23  A.   Yes.  After he told those issues in Utah, it was decided

24  that for him just to go in front of the grand jury and

25  testify about the documents that he brought for his financial

Page 48

1   involvement with Aey and maybe come back later and testify to

2   what he told us on the day before at a later date.

3   Q.   Okay.  And did that testimony take place in the morning?

4   A.   Yes, sir.

5   Q.   Let me ask you, after the May 8th, after May 8th, did

6   you take Mr. Merrill to the airport?

7   A.   I did.

8           THE COURT:  After his grand jury testimony was

9   completed?

10          MR. SCHWARTZ:  Yes.

11   BY MR. SCHWARTZ:

12   Q.   After his testimony was completed, sir?

13   A.   Yes, sir, I did.

14   Q.   Okay.  Did you have any discussions with him then?

15   A.   Not relating to the case, no, sir.

16   Q.   Okay.  And between that period of time and May 15th, did

17   you ever receive a phone call from Mr. Merrill?

18   A.   No, sir.  I don't remember.

19   Q.   From May 15th until today, have you ever seen or spoken

20   to Mr. Merrill?

21   A.   No.  This is the first day I have seen him since that

22   day.

23          MR. SCHWARTZ:  One moment, Your Honor.

24   BY MR. SCHWARTZ:

25   Q.   And did you ever receive a phone call from an attorney

Page 49

1    saying that represented Mr. Merrill?

2    A.   I don't remember if I did or not.

3         MR. SCHWARTZ:  No further questions, Your Honor.

4         MR. STIRBA:  Thank you, Your Honor.

5                    CROSS EXAMINATION

6    BY MR. STIRBA:

7    Q.   Special Agent, Good morning.

8    A.   Good morning, sir.

9         THE COURT:  Counsel, I am sorry.  Did you say that

10   the only thing now you are contesting at this motion to

11   suppress, now if it is not the case, on problem, is whether

12   or not there were plea negotiations and possibly him being

13   promised a specific plea?  Is that what you are now

14   contesting?

15        MR. STIRBA:  It is broader than that, Judge,

16   because the law is broader than that.

17        THE COURT:  Okay.  Go ahead.

18        MR. STIRBA:  It is the totality of the

19   circumstances that I think Your Honor has to consider.

20        THE COURT:  Okay.

21        MR. STIRBA:  But I will try to focus it.

22        THE COURT:  No.  I just want to know.  Proceed as

23   you had planned.

24        MR. STIRBA:  Thank you.

25   BY MR. STIRBA:

1    Q.   Special agent, you testified about what occurred, at

2    least in part in the interview on the 7th of May.

3              Do you remember that being asked questions about

4    that?

5    A.   Yes, sir.

6    Q.   And one of the things you told us was that there were

7    discussions about leniency, right?

8    A.   Yes, sir.

9    Q.   And, in fact, there were discussions also about, as you

10   put it, your baseball analogy, that sometimes going to the

11   judge, sometimes you hit a home run and maybe sometimes you

12   don't.  Do you remember that?

13   A.   Yes, sir.

14   Q.   In other words, you clearly remember there were

15   discussions about leniency for Mr. Merrill.  True?

16   A.   And the totality of what powers we have.

17   Q.   Sure.  And that would be premised upon the fact that

18   there was a discussion of leniency because leniency would

19   occur if Mr. Merrill entered a plea of guilty to something,

20   right?

21   A.   To something.

22   Q.   And, in fact, isn't it true that this word "cooperation"

23   was used in that meeting, correct?

24   A.   Yes, sir.

25   Q.   In fact, it was used by AUSA Koukios.  True?

1  A.   Yes, sir.

2  Q.   It was presented to Mr. Merrill, "Do you want to

3  cooperate," correct?

4  A.   Yes, sir.

5  Q.   And Mr. Merrill said, "yes," right?

6  A.   Correct.

7  Q.   And, in fact, it was envisioned, was it not, that on the

8  8th of May, after the interview on the 7th, that Mr. Merrill

9  would go and testify before the grand jury.  True?

10  A.   Yes, sir.

11  Q.   And at least as of the 7th, the expectation was that

12  Mr. Merrill would go to the grand jury and testify about the

13  very things that you had interviewed him about on the 7th;

14  isn't that right?

15       MR. SCHWARTZ:  Your Honor, I object to whose

16  expectation, just to clarify.  Vagueness.

17       MR. STIRBA:  Well, let me do it this way:

18  BY MR. STIRBA:

19  Q.   You remember your report, right?

20  A.   Could I get a copy of it so I can go over it with you?

21  Q.   Well, you may if I ask you the question first and see if

22  you remember it.

23       You put in your report, did you not, the events of

24  the 7th, "AUSA Koukios told Merrill that if he cooperated, he

25  would need to provide the information he provided to the

Page 52

1    grand jury hearing this investigation."  True?

2    A.    May I see it?

3    Q.    Do you remember putting that in your report?

4    A.    If it is in the report, I put it, but I would like to

5    see it to make sure that is what I put.

6              MR. STIRBA:  May I approach, Your Honor?

7              THE COURT:  Sure.

8              MR. STIRBA:  Apparently he does not remember.  And

9    if I may assist the witness, Your Honor, I am referring to

10   this special agent.  You can read it and see if that

11   refreshes your recollection.

12             THE WITNESS:  Yes, sir.

13             MR. STIRBA:  Okay.

14   BY MR. STIRBA:

15   Q.    That was said by Koukios, right?

16   A.    Yes, sir.

17   Q.    And, in fact, that was not the only time the word

18   cooperation was used in that interview.  True?

19   A.    Correct, sir.

20   Q.    In fact, isn't it true that the reason why cooperation

21   was discussed and grand jury testimony was discussed is

22   because there was a negotiation that in exchange for

23   providing cooperation and in exchange for going before the

24   grand jury the next day and testifying Mr. Merrill would get

25   something, right?

1  A.   I would say that was in general terms.

2  Q.   Sure.  And, in fact, you would not be talking about

3  leniency, as you have already testified occurred in that

4  interview if certain charges of a criminal nature Mr. Merrill

5  was going to plead to, right?

6  A.   Correct, but we didn't know what charges.

7  Q.   Sure.  You did didn't know specifically what charges

8  there were going to be, but you talked about a plea, correct?

9           If he pled guilty, you would provide some leniency

10  recommendation, right?

11  A.   In general terms, yes, sir.

12  Q.   And isn't that the reason why then, special agent, the

13  concept of cooperation and the concept of testifying before

14  the grand jury because it was envisioned that Mr. Merrill

15  would, in fact, enter a plea, and in exchange for the

16  leniency recommendation of the government he would, A,

17  cooperate and be testifying before the grand jury; isn't that

18  true?

19  A.   Yes, sir.

20  Q.   And that all occurred on the 7th, correct?

21  A.   Yes, sir.

22  Q.   And it is true, is it not, that when you met with

23  Mr. Merrill on the 24th, you served him two different grand

24  jury subpoenas, correct?

25  A.   Yes, sir.

1   Q.   And it is true, is it not, one is actually directed to

2   Vector Arms, correct?

3   A.   Yes, sir.

4   Q.   And one was directed to Mr. Merrill personally.  True?

5   A.   Yes, sir.

6   Q.   And you may or may or not remember this, but there are

7   little boxes in those subpoenas.  And if you check one, it

8   says "person."  And if you check the other it says,

9   "documents."  Do you know what I am referring to?

10  A.   Yes.  I know what you are talking about, sir.

11  Q.   Do you remember, sir, that actually both of the

12  subpoenas that were served on Mr. Merrill on the 24th had the

13  boxes "person" and "documents" checked?  Do you remember

14  that?

15  A.   No, sir.

16  Q.   Let me see if I can get that.

17       THE COURT:  There were two subpoenas, right?  One

18  was for Vector and one was for Merrill, right?

19       MR. STIRBA:  That's exactly correct, Your Honor.

20       THE COURT:  So there would have been two possible

21  boxes you are saying on each procedure?

22       MR. STIRBA:  Right.  I am just trying to clarify.

23  I don't think it was clear in his earlier testimony the

24  nature of them, and if I may, they are exhibit A to our --

25       MR. SCHWARTZ:  Here you go, counsel.

Page 55

1    MR. STIRBA:  I have them.  Thank you, counsel.

2    They are exhibit A to our memoranda, Judge and, I would offer

3    them.  They are attached to our memoranda as exhibits, but if

4    I may approach the witness?

5    Let me show you, special agent, there is one

6    subpoena and there is another subpoena.  Those are the

7    subpoenas you have been testifying about, right?

8    A.  Yes, sir.

9    Q.  Do you see the little boxes there on each one?

10   A.  Yes, sir.

11   Q.  And they are both checked for person and documents,

12   correct?

13   A.  Yes, sir.

14   Q.  So, in other words, the Victor subpoenas at least as you

15   served them that day called for the testimony of Mr. Merrill

16   on the 8th of May in person and also for him to bring

17   documents with him.  True?

18   A.  Yes, sir.

19   THE COURT:  I am sorry.  I missed that.  Each of

20   the subpoenas had both boxes checked?

21   MR. STIRBA:  Yes, sir.

22   THE COURT:  Okay.

23   MR. STIRBA:  Thank you.

24   BY MR. STIRBA:

25   Q.  Now, it is also true the subpoenas you served did not

1    have anything appended to them called advice of rights or

2    advice of rights; is that right?

3    A.   I don't remember if they were attached or not, sir.

4    Q.   Let me show them to you.

5                THE COURT:  They did or they didn't, counsel?

6                MR. STIRBA:  They didn't.

7                THE COURT:  They didn't?

8                MR. STIRBA:  They didn't.  Okay.

9    BY MR. STIRBA:

10   Q.   Now, if I understood what you said that you were just

11   assigned to this investigation in March of 2008; is that

12   right?

13   A.   Yes, sir.

14   Q.   And so when you went to see Mr. Merrill, you had not

15   seen the two e-mails exhibits, I think D-1 and D-2; is that

16   right?

17   A.   Yes, sir.

18   Q.   You didn't have any knowledge of those, correct?

19   A.   Yes, sir.

20   Q.   And you testified that you went and you talked to a

21   bunch of Prisons or interviewed some Aey employees.

22            Mr. Merrill's name came up, and that was the

23   purpose for which you went to Vector Arms on the 24th to

24   interview him.  True?

25   A.   Correct.

1   Q.   In fact, isn't it true that as of that time, when you

2   saw him on the 24th, your testimony would be that you

3   considered him a fact witness, right?

4   A.   Correct.

5   Q.   So someone who was going to provide information about

6   the investigation by the grand jury of Aey, correct?

7   A.   Correct.

8   Q.   But you did not consider him a criminal suspect or a

9   subject or a target, right?  That is your testimony?

10  A.   That's correct, sir.

11  Q.   Now, it is true, is it not, that you told Mr. Merrill on

12  the 24th, in answer to one of his questions, that you

13  considered him a fact witness; isn't that correct?

14  A.   I don't remember if I did or not.

15  Q.   And it is true, is it not, that after the 24th before he

16  came to Miami on the 6th of May, you had some telephone

17  conversations with him; isn't that true?

18  A.   I don't remember talking about the case.  I remember one

19  call where I put in an e-mail that he had called saying that

20  he was coming in.

21  Q.   Okay.  You have no recollection then of having telephone

22  conversations or a telephone conversation with him between

23  the 24th and the 6th where you discussed whether or not he

24  was a fact witness with Mr. Merrill, correct?

25  A.   No, sir.  All I remember is when I saw one of the

1    e-mails that I made a comment that Mr. Merrill was coming in

2    on the 6th, and I was telling that one to one of the AUSA's.

3    Q.   Okay.  So he comes in on the 6th, and you pick him up,

4    right?

5    A.   Yes, sir.

6    Q.   And then on the 7th, he is there for this interview.

7    And you also picked him up; is that right?

8    A.   Yes, sir.

9    Q.   Okay.  Now, did you explain to him before the 7th what

10   the purpose was for him going to the U.S. Attorney's Office

11   on the 7th?

12   A.   Yes.  To go over the documents that he was bringing.

13   Q.   Okay.  And that is what you told him.  Did you tell him

14   that it was also to explain the grand jury process?

15   A.   No.  I don't remember if I did or not.

16   Q.   Did you tell him that he could also orient himself to

17   what he could expect the next day on the 8th?

18   A.   I can't remember if I did or not.  I remember telling

19   him we needed to go over the documents he was bringing so he

20   knows what is going to go on the next day.

21   Q.   Very well.  Now, it is true, is it is not, that when the

22   interview first started, what time did it start?  Do you

23   recall?

24   A.   No, sir.  Some time have 9:00.

25   Q.   Okay.  And I noticed in your interview summary of the

1   7th you don't have any time indicated on that report; is that

2   correct?

3   A.   Yes, sir.

4   Q.   Tell me what is your best approximation of when

5   Mr. Merrill first started until the interview terminated?

6   How long did it take?

7   A.   We started sometime after 9:00, and I left later in the

8   afternoon, 4:00.  So I don't know what time it ended.

9   Q.   Mr. Merrill was still there when you left?

10  A.   Yes, sir.

11  Q.   Okay.  Now, when the interview first started, it was you,

12  Koukios and Detrick?

13  A.   Yes, sir.

14  Q.   And it is true, is it not, that nobody told Mr. Merrill

15  when they started the interview that, one, you are entitled

16  to have a lawyer present.  You didn't tell him that at the

17  beginning, right?

18  A.   No, sir.  I don't remember.

19  Q.   And nobody told him that anything he might say in this

20  interview could be used against him in some later proceeding;

21  isn't that right?

22  A.   I don't remember saying anything because there was

23  nothing to tell us that he was doing anything illegal.

24  Q.   I am sorry.  But the fact of the matter is that was not

25  said at the beginning of the interview.  True?

1    A.   I don't remember if we said that specifically at the

2    beginning.

3    Q.   Now, you also had those e-mails, though, as you

4    testified before you started that interview, right?

5    A.   I saw them about 5 minutes before we did the interview.

6    Q.   Okay.  But Koukios had them before that, right?

7    A.   Yes, sir.  Maybe a day or two before.

8    Q.   How do you know a day or two?

9    A.   I think that is what he commented because there was one

10   agent that was printing them out as we were going because we

11   only had one computer that had the program to look at all of

12   these e-mails that we had obtained, and as he was printing

13   them out, he was putting them in a basket and Koukios was

14   going through them and the other agents who knew more about

15   the case than I did.

16   Q.   Okay.  Do you understand that as you sit here now that

17   those e-mails were acquired pursuant to a search warrant?

18   A.   I don't think those e-mails were pursuant to a search

19   warrant.  They were consensual.

20   Q.   They were consensual what?

21   A.   A consensual -- we got the permission from the person

22   who owned the e-mails to get a copy of the e-mails.

23   Q.   I see.  So they were not pursuant to a search warrant on

24   Mr. Merrill's e-mail account.  Is that what you are telling

25   me?

1    A.    Correct.  That came later.

2    Q.    Okay.  And do you know in the course of this

3    investigation that you really started in March when those

4    e-mails were acquired by any investigator?

5    A.    No.  I don't know when that happened.  No, sir.

6    Q.    But you do know Koukios new knew about them a day or two

7    before.  You saw them 5 minutes before.  How about Detrick,

8    when did he first become aware of them?

9    A.    I think the same thing as I did.  The same time I did,

10   sir.

11   Q.    About 5 minutes before?

12   A.    Yes, sir.

13   Q.    All right.  So, in any event, you at some point asked

14   questions or Koukios asked questions about whether or not he

15   communicated concerning scraping with Mr. Diveroli, correct?

16   A.    Yes, sir.

17   Q.    And then there is another question about I think you

18   referred to it as leveraging a less price for the Chinese

19   ammo.  There is some communication about that.  Those were

20   just questions, right?

21   A.    Yes, sir.

22   Q.    You haven't shown the e-mails to Mr. Merrill, right?

23   A.    No, sir.

24   Q.    Okay.  And then the e-mails are shown to Mr. Merrill.

25   You have already testified as to what you recall he said, and

1   then at some point Koukios said this interview had gotten to

2   a new level, correct?

3   A.   Yes, sir.

4   Q.   Now it is true, is it not, that at that point, even

5   though I think you testified what Mr. Koukios said, "Mr.

6   Merrill, you are free to leave.  You are free to get a

7   lawyer."  Mr. Merrill did not, right?

8   A.   Correct.

9   Q.   And it is true, is it not, that at no time during the

10  that interview, at least when you were there, did Mr. Koukios

11  come back and give Mr. Merrill any kind of letter advising

12  him of his rights, did he?

13  A.   Correct.

14  Q.   And, in fact, he never told him in that interview on the

15  7th that Mr. Merrill was a target, did he?

16  A.   No, sir.

17  Q.   In fact, he never told him that Mr. Merrill was a

18  subject, did he?

19  A.   He wasn't at the time.  So there was no reason to tell.

20  Q.   Well, you as a trained criminal investigator, you did

21  not believe after the responses that you have testified to

22  concerning the e-mails, you did not believe that Mr. Merrill

23  had some potential criminal problems?  Is that what you are

24  telling us?

25  A.   No.  I said at the time.  That's when we stopped him and

1  said, "This interview," like you said, and it is in my report,

2  it was reaching a new level at that point.

3  Q.   At that point.  My question was he was never advised at

4  any point after that he was a target, right?

5  A.   No.

6  Q.   Nor a subject, correct?

7  A.   Correct.

8  Q.   But There is no question in your mind you considered

9  after he answered those e-mails he was a target, right?

10  A.   Not a target, per se.  He had some -- what is the word I

11  am looking for here -- some exposure to some criminal

12  activity.

13  Q.   Is it fair to say he was a subject, right?

14  A.   Yes, sir.

15  Q.   In other words, at that point his conduct would have

16  been the subject at least on the investigation in Aey; is that

17  right?

18  A.   Just one of the other subjects.

19  Q.   Sure.  So he is at least a subject in your mind as of

20  the time he answered those e-mails and gave those responses,

21  right?

22  A.   After the response he gave us, yes.

23  Q.   And at no time during the time you were there did

24  Koukios give any letter or any written document or anything

25  that said, "Mr. Merrill, you are a subject," right?

Page 64

1  A.   No, sir.

2  Q.   "And, Mr. Merrill, maybe you a target," right?

3  A.   Correct.

4  Q.   But you do testify that there were discussions about

5  possible charges against Mr. Merrill, right?

6  A.   Correct.

7  Q.   What charges were discussed?

8  A.   It was in general.  If it was anything, it was the lying

9  to the agents.  I think we were looking at that time a 1031,

10  a major fraud against the government, but there are some

11  other ones that I cannot remember.

12  Q.   Okay.  So charges were discussed that Mr. Merrill might

13  plead to, correct?

14  A.   Might or might not.

15  Q.   Okay.  But this was all in the context of talking about

16  cooperation and testifying before the grand jury the next

17  day, right?

18  A.   Yes, sir.

19  Q.   And the charges that were talked about were I believe

20  major fraud.  Did you just say that?

21  A.   Yes, sir.

22  Q.   And I think you also talked about a 1001 violation,

23  lying or giving false facts to federal agent?

24  A.   Yes, sir.

25  Q.   Any other charges do you remember that were discussed

1   with Mr. Merrill during that meeting?

2   A.   No, sir.

3   Q.   Was the meeting primarily conducted by Mr. Koukios?

4   A.   Yes, sir.

5   Q.   And Mr. Koukios identified himself as an Assistant

6   United States Attorney, right?

7   A.   Yes, sir.

8   Q.   And he asked most of the questions, right?

9   A.   Yes, sir.

10  Q.   I would figure he would because he is the lawyer, and

11  that is what lawyers do, right?

12  A.   Yes, sir.

13  Q.   Okay.  It is true, is it not, that as part of your work

14  as a special agent reports are to be prepared of interviews,

15  right?

16  A.   Yes, sir.

17  Q.   Whether they are fact witnesses or other witnesses,

18  written reports are to be prepared, correct?

19  A.   Yes, sir.

20  Q.   And it is true, is it not, that there is no report that

21  was prepared for the interview that was conducted on the 8th;

22  is that right?

23  A.   This was no report.  I believe there are some case notes

24  somewhere.

25  Q.   But there was no report written?

Page 66

1   A.   Correct.

2   Q.   And as I understand your testimony, you were there,

3   correct?

4   A.   In and out of the place.

5   Q.   And you were there and Vazquez was there?

6   A.   Yes, sir.

7   Q.   And at times Ms. Fernandez was there?

8   A.   Correct.

9   Q.   And at times Mr. Koukios was there?

10  A.   Correct.

11  Q.   Okay.  And it is also true, is it not, that you prepared

12  your report of the events of the 7th based upon Vazquez'

13  notes; is that right?

14  A.   Correct.

15  Q.   And those notes are not the notes of the 8th, are they?

16  A.   They are for the 7th.

17  Q.   Okay.  Where are they?  Do you have them with you?

18  A.   No, sir.

19  Q.   Did you bring them with you?

20  A.   No, sir.  You are talking about the 7th or the 8th?

21  Q.   The 7th.  And you are also aware -- let me ask this.

22  Maybe this is a better question.

23          You are also aware that at least with respect to

24  the submissions by the United, they have not been attached

25  like the 8th notes have to any submissions by the government?

1    A.    No.  I was not aware.

2              MR. STIRBA:  Judge, that's all.

3              THE COURT:  Any redirect?

4              MR. SCHWARTZ:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION

6    Q.    Now, on cross-examination you were asked whether there

7    was a discussion about a general, what would happen if he

8    cooperated in general, correct?

9    A.    Yes.  All general terms.

10   Q.    Let's go through specifically what you meant by

11   generally what Koukios said about cooperation.  Let's get

12   that clear.

13   A.    It was in the context if he cooperated, he told us what

14   is going on with Aey and tell us the rest of the story, we

15   could then, and he pleaded guilty to whatever X, Y, Z

16   charges, that his cooperation will be represented to the

17   judge at a certain time, and we would have a recommendation

18   of, you know, to reduce sentence or reduce charges or take

19   charges away in front of the judge.

20   Q.    And did AUSA Koukios specifically say which charges he

21   would be charged with at that moment and what he would plead

22   guilty to?

23   A.    No, sir.

24   Q.    When you say general terms in X, Y and Z, was Koukios

25   using general terms?

1    A.   Correct.

2    Q.   And why was he explaining that process?

3    A.   We wanted to explain to Mr. Merrill what could happen if

4    he had a lawyer, if he didn't have a lawyer, and the whole

5    judicial process he was explaining it to him.

6    Q.   And did he explain what would happen to his rights if he

7    didn't want to cooperate?

8    A.   Yes.

9    Q.   Okay.  And did Mr. Merrill, now the whole issue of

10   cooperation, was that brought up by Mr. Merrill's questions?

11        Yes.  He was asking questions about, "What if I

12   cooperate?  What if I don't cooperate?  What if I leave?

13   What if I need a lawyer?  Do I need a lawyer?"

14   Q.   Did AUSA Koukios guarantee filing like a 5K motion or

15   informing the judge of his cooperation at that point?

16   A.   No, he didn't guarantee it.  That was part of the

17   judicial process he was explaining to Mr. Merrill.

18   Q.   So he was explaining the process?

19   A.   Correct.

20   Q.   Did he make any promises?

21   A.   No, sir.

22   Q.   Did he make any specific representations about what

23   charges Mr. Merrill would be charged with at that time?

24   A.   No, sir.  They were generally like I said.  We were

25   looking at Aey for the major procurement fraud and, you know,

Page 69

1   we made an example of, you know, lying to the federal agents.

2   Q.   You were providing information for Mr. Merrill?

3   A.   Correct.

4   Q.   So he could make an informed decision?

5   A.   Yes, sir.

6   Q.   Okay.  Now, the second that the e-mails were shown as

7   D-1 and D-2 and Mr. Merrill, you know, first denied and then

8   admitted that they were real --

9          MR. STIRBA:  Now I am going to object.  It is all

10  characterization.

11         MR. SCHWARTZ:  After the e-mail issue.  I will just

12  generalize that.

13         MR. STIRBA:  Okay.

14         THE COURT:  I will allow it.

15  BY MR. SCHWARTZ:

16  Q.   Now, at that point did you know which charges you were

17  going to bring against Mr. Merrill?

18  A.   No, sir.

19  Q.   Did you know what he did wrong at that point?

20  A.   No, sir.  Just that he had lied to us previously.

21  That's it.

22  Q.   Did he confess at that point in your estimation?

23  A.   No.  Not at that point.

24  Q.   And at that point, though, what did AUSA Koukios advise

25  him of?

Page 70

1   A.   Of his Fifth and Sixth Amendment rights.

2   Q.   And in that whole hour, what was discussed?

3           MR. STIRBA:  Your Honor, I am going to object.

4   That was asked and answered.  He already went over that on

5   direct, and I didn't even ask him about it on cross.

6           MR. SCHWARTZ:  He touched on it pretty

7   significantly, Your Honor.

8           THE COURT:  I will allow it.

9           THE WITNESS:  Can you repeat the question, please.

10  BY MR. SCHWARTZ:

11  Q.   That whole hour, what rights did AUSA Koukios review

12  with Mr. Merrill?

13  A.   His right to an attorney; his right not to

14  self-incriminate, the Fifth and Sixth Amendments; the right

15  for him to leave if he wanted to, and it was just over and

16  over and over again.

17  Q.   Now, let me ask you, now the May 7th your ROY, your

18  report for May 7th, which is government exhibit D, now did

19  you write all of it or did Special Agent Vazquez write part

20  of it?

21  A.   I wrote part of it and the other part was done with

22  Vazquez' notes and Vazquez' report that he did, and we

23  combined it into one.

24  Q.   So he wrote something and you just pasted it on there?

25  A.   Correct.

1   Q.   Okay.  And was there any interview on May 8th the

2   following day?

3   A.   Not regarding Aey.  My understanding is Mr. Merrill told

4   Vazquez, "Hey, there are some issues that I have back in

5   Utah, and here they are," 1, 2, 3, 4.

6   Q.   To your recollection, was there any discussion regarding

7   the Chinese ammo issue at all on May 8th?

8   A.   No, sir.

9            MR. SCHWARTZ:  No further questions, Your Honor.

10           THE COURT:  Now, let me ask you this, and I don't

11   mean to put words in your mouth or to mischaracterize

12   anything.  Okay?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  I understand there was a lot of

15   conversation after the two e-mails were disclosed, and then

16   with Koukios there was a discussion.

17           THE WITNESS:  Yes, sir.

18           THE COURT:  Koukios gave him his rights, and then

19   he responded to Mr. Merrill's questions, and so forth and so

20   on.  Okay.  And there was talk of cooperation, correct?  I am

21   simplifying it.

22           THE WITNESS:  Yes, sir.

23           THE COURT:  Okay.  Did anybody say to him or can

24   you characterize as to there was an indication to Mr. Merrill

25   that any cooperation would be brought, on his part would be

1    brought to the attention of the judge?

2              THE WITNESS:  Yes, sir.  In general terms.

3              THE COURT:  In general terms?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Now, you may or may not have discussed

6    specific things that occurred after he pled and after he was

7    sentenced or before he was sentenced or after he was

8    sentenced in terms of reduction tell me, but the record is

9    the record, but what I am trying to get at is was there an

10   indication, either specifically or in the situation as a

11   whole, that if he cooperated you would tend to convey, you or

12   Koukios or whoever intended to convey to Mr. Merrill that if

13   he cooperated, that cooperation would be brought to the

14   attention of the Judge?

15             THE WITNESS:  Yes.  As part of the explanation,

16   yes.

17             THE COURT:  Okay.  Do you want to follow-up on that

18   first?  I will let you go first.

19             MR. STIRBA:  Thank you, Judge.

20                    RECROSS EXAMINATION

21   BY MR. STIRBA:

22   Q.   Special agent, one final point.  During the process and

23   after the e-mails were disclosed to Mr. Merrill, did

24   Mr. Koukios or anyone say to Mr. Merrill that in light of

25   what has happened that the interview would be postponed,

Page 73

1  delayed, continued until a further time?

2  A.   No.  We just told him that the interview had reached a

3  different level, and that he had the right not to

4  self-incriminate.  We were explaining he did not have to

5  continue again.

6  Q.   Maybe my question is not very good.

7  A.   Yes.  Sorry about that.

8  Q.   And I am sorry.  Maybe my question was not very good.

9  What I am really getting at I know you testified about what

10  was told to Mr. Merrill that he could terminate the interview

11  and get a lawyer.

12            I know you testified to that.  My question really

13  is did anybody from the government say, "Look, it is in your

14  interest, or given what you have testified or told us now, we

15  are going to stop the interview and basically wait a while

16  and let you think things over.  We think that is advisable.

17  Did anybody say that?

18  A.   No.

19            MR. STIRBA:  Okay.  Thank you.  That's all I have.

20            THE COURT:  Government, anything else?

21                    REDIRECT EXAMINATION

22  BY MR. SCHWARTZ:

23  Q.   Before the lunch break, what was Mr. Merrill advised?

24  A.   That he did not have to come back; that he could go find

25  a lawyer.

1        THE COURT:  That he did not have to come back?

2        THE WITNESS:  Did not have to come back, and that

3   he could get a lawyer and then come back and talk to us, or

4   he can come back without a lawyer.

5   BY MR. SCHWARTZ:

6   Q.   Was he given a moment before answering further questions

7   after that hour, like rights advice, period?

8   A.   He took a minute or two to think about it.

9        MR. SCHWARTZ:  No further questions, Your Honor.

10       THE COURT:  Thank you, sir.  You may step down, but

11  stand by.

12              [The witness was excused].

13       THE COURT:  Government, this is a purely neutral

14  question.  Is it necessary to call a second witness?

15       MR. SCHWARTZ:  I think so, but this will be

16  faster.  We will speed this one up.

17       The government calls Special Agent Ferdinand

18  Vazquez.

19       THE CLERK:  Right up here, sir.  Raise your right

20  hand, please.

21     FERDINAND VAZQUEZ, GOVERNMENT'S WITNESS, SWORN.

22                 DIRECT EXAMINATION

23  BY MR. SCHWARTZ:

24  Q.   Good morning.  Could you state your full name and spell

25  your last name for the court reporter?

Page 75

1    A.    Good morning, sir.  My name is Ferdinand Vazquez.

2    Vazquez is spelled V-a-z-q-u-e-z.

3    Q.    I am going to need you to sit up close to that

4    microphone and do your best to enunciate.  How is that?

5    A.    Yes.

6    Q.    That sounds better.  Okay.  Good.  Where do you work,

7    sir?

8    A.    I work with the U.S. Army Criminal Investigation

9    Division, Major Procurement Fraud Unit.

10   Q.    And how long have you worked there?

11   A.    I have worked there for approximately 10 years.

12   Q.    And what is your current rank or position there?

13   A.    I am resident agent in charge.

14   Q.    Okay.  And what are your practical duties with Army CID?

15   Is that what it is referred to as?

16   A.    Yes, sir.  General duties are we investigate fraud;

17   contract fraud matters that are related to the army.

18   Q.    Prior to working with CID, were you enlisted in the

19   military?

20   A.    Yes, sir.

21   Q.    How long?

22   A.    I was enlisted for 14 years.  The last three years were

23   as a CID agent.

24   Q.    Okay.  And when did you first become involved in the Aey

25   investigation?

Page 76

1   A.   I first became involved in the investigation around

2   October of 2007.

3   Q.   Now, let me ask you were --

4        THE COURT:   You are the resident agent in charge.

5   What residency?

6        THE WITNESS:   It is the Florida FRAUD resident

7   agency.

8        THE COURT:   Okay.

9   BY MR. SCHWARTZ:

10  Q.   Where are you locked?

11  A.   I am in Melbourne, Florida.

12  Q.   Now, let's turn your attention to April of 2008.

13  A.   Yes, sir.

14  Q.   In what context did you know of or hear the name Ralph

15  Merrill back then?

16  A.   At that time my knowledge of Mr. Merrill was that he had

17  provided some money to finance the Aey contract for

18  Afghanistan.

19  Q.   At that time did you know of Mr. Merrill's involvement

20  to conceal any involvement in concealing the origin of that

21  ammunition provided under the contract?

22  A.   No, sir.

23  Q.   Back in April of '08, would you consider Mr. Merrill a

24  target of the investigation?

25  A.   No, sir.

Page 77

1  Q.   A subject of the investigation?

2  A.   No.  No, sir.

3  Q.   Were you involved in the decision to subpoena Mr.

4  Merrill and Vector Arms back in April of 2008?

5  A.   I was not, sir.

6  Q.   Now, let me ask you, there are two e-mails in front of

7  you, government's exhibits D-1 and D-2.  Take a quick look at

8  those.

9  A.   Yes, sir.

10  Q.   Do you remember those?

11  A.   I do.

12  Q.   Do you remember when you first saw them?

13  A.   Well, the D-1 I saw sometime in May.

14          THE COURT:  Of 2008?

15          THE WITNESS:  Of 2008.

16          MR. SCHWARTZ:  Okay.

17          THE WITNESS:  And D-2, I don't remember seeing

18  until after the interview.

19  BY MR. SCHWARTZ:

20  Q.   Okay.  And when you first saw that D-1, that e-mail

21  sometime in 2008, was it before the May 7th interview?

22  A.   D-1 I cannot recall if I saw it before during the

23  interview or after the interview.

24  Q.   Did you see it during the interview?

25  A.   I am sorry?

1    Q.   Did you see it during the interview?

2    A.   I saw it during the interview, yeah, but I don't

3    remember if I saw it before.  The top page of this I saw, but

4    I don't remember, as far as the pictures that are attached to

5    it, I don't recall when I saw them.  I saw it during the

6    interview, but I don't remember if I had seen them before.

7    Q.   Let me see if I have got this right.  So you might have

8    seen the first page, the e-mail text itself prior to the

9    interview?

10   A.   Correct.

11   Q.   But not the attachments?

12   A.   Correct.

13   Q.   Okay.  Did that e-mail alert you to anything or change

14   your view of what Mr. Merrill's involvement was on its own?

15   A.   No, it did not.

16   Q.   Okay.  Now, let's talk about May 7, 2008.  Were you

17   supposed to participate in the interview of Mr. Merrill?

18   A.   No, I was not.

19   Q.   Why not?

20   A.   Actually that day I was driving from my office in

21   Melbourne.  I stopped.  I had a meeting or I was supposed to

22   stop at the Defense Contract Management Agency offices in

23   Hollywood, Florida to try and obtain some documentation that

24   was related to the case.

25   Q.   You didn't think it was important to go to the Ralph

Page 79

1   Merrill interview?

2   A.   Not at the time.

3   Q.   Okay.  What were you focused on in your part of the

4   investigation?  You were on it from April of '07, right?

5   A.   From October of --

6   Q.   of 07?

7   A.   'O7.

8   Q.   Got you.  I am sorry.

9   A.   My focus was the contract fraud aspect of the

10  investigation.  The documents that were being actually

11  provided to the government that may have indicated

12  concealment of the Chinese ammunition that was being

13  provided.

14  Q.   So you didn't feel a need to go to the interview?

15  A.   No, I did not.

16  Q.   Okay.  So let's talk about later that day, did you

17  eventually make it to the United States Attorney's Office?

18  A.   Yes, I did.

19  Q.   And what happened when you arrived?

20  A.   I arrived around 1430 or so, 2:30 in the afternoon.  I

21  walked into the room where normally we are using to work on

22  the investigation where other agents were sitting.

23       I remember somebody in the room telling me that I

24  may want to go into or sit it in on the interview of

25  Mr. Merrill because he had made some admissions as to the

Page 80

1   concealment of the ammo.  So that's pretty much what

2   happened.

3   Q.   When you heard that, what was your reaction?

4   A.   Well, initially I was surprised that --

5           MR. STIRBA:  Well, I am going to object.  First of

6   all, it is irrelevant.  Second of all, we have no idea who he

7   heard it from.  We have no idea.  He just sort of said it.

8           THE COURT:  When was the last time?

9           MR. STIRBA:  Pardon me?

10          THE COURT:  What did he just say.

11          MR. STIRBA:  What he said he heard that Mr. Merrill

12  made some admissions.  He just sort of volunteered that.

13  Then the next question is, "What was your reaction?"

14          THE COURT:  I will allow it.

15          MR. STIRBA:  I am saying it was irrelevant.  I do

16  not even know what the conversation is when he found out in

17  the first instance.

18          THE COURT:  I will allow it.

19          MR. SCHWARTZ:  Keep going.

20  BY MR. SCHWARTZ:

21  Q.   What was your reaction?

22  A.   The initial reaction was surprise because we didn't

23  suspect any involvement at that time, and interest, of

24  course, to know a little bit more about what he was talking

25  about.

1   BY MR. SCHWARTZ:

2   Q.   And did you participate in the afternoon portion of the

3   interview?

4   A.   Yes.  After they told me that, I went in and joined the

5   interview.

6   Q.   Was it already in progress?

7   A.   It was already in progress.

8   Q.   Was this before or after the lunch break?

9   A.   It was at 3:00 o'clock in the afternoon.  So I assume it

10  was after the lunch break they took.

11  Q.   Okay.  And who was in the interview room then?

12  A.   It was Mr. Merrill, of course; AUSA Koukios, Agent

13  Detrick from ICE and Agent Perez from DCIS.

14  Q.   Okay.  And was AUSA Koukios in the room the whole time?

15  A.   No, sir.

16  Q.   And what was Mr. Merrill's demeanor at that time?

17  A.   He seemed calm in discussing things with agents.

18  Q.   Let me ask you, the whole portion of when you were in

19  that interview, did anyone in the room make any promises with

20  respect to a Class A misdemeanor in exchange for Mr.

21  Merrill's continued cooperation or for his cooperation at all?

22  A.   No, sir.

23  Q.   Was there any promises made whatsoever for Mr. Merrill's

24  cooperation or for him to continue to speak that day?

25  A.   No, sir.

 1   Q.   At any time did Mr. Merrill say in the middle of the

 2   interview, "Wait.  I want my lawyer?"

 3   A.   No, sir.

 4   Q.   At any time in the interview was Mr. Merrill handed a

 5   plea agreement?

 6   A.   No, sir.

 7   Q.   Were specific charges which were to be levied against

 8   Mr. Merrill discussed during that interview when you were

 9   there?

10   A.   No, sir.

11   Q.   Unless the court wants, I don't think we have to get into

12   the substance of what was said during the interview.

13           Just generally speaking, what was discussed when

14   you were in that interview?

15   A.   Well, of course, I asked him what he knew about the

16   concealment of the Chinese ammunition that was coming from

17   Albania, and I asked him a few other things because at the

18   time there were several issues that we were investigating.

19           I wanted to know about the origin of weapons that

20   Mr. Diveroli had provided to the government under different

21   contracts in Iraq.

22   Q.   Let me ask you, you were taking notes during that

23   interview, correct?

24   A.   Yes, sir.

25   Q.   Did you draft the portion of the May 7 2007 ROI?

1    A.    I did, sir.

2    Q.    So you are familiar with that document?

3    A.    Yes, sir.

4    Q.    Now did any portion of what is in the May 7th report of

5    interview, which is government exhibit D, was any portion  of

6    that was stated in that that took place the following day on

7    May 8th?

8    A.    No, sir.

9    Q.    Okay.  Now, let's turn to the following day.  What time

10   did Mr. Merrill come in in the morning?

11   A.    We were having everybody come in around 9:00 o'clock in

12   the morning.  I don't remember the exact time that he came

13   in, but that was the general time that we were having

14   everybody come in.

15   Q.    Okay.  And what was your sort of role?  What were you

16   doing that morning with respect to this investigation?  What

17   were you assigned to do?

18   A.    We were pretty much to keep company with the witnesses

19   or the people that were coming in for the grand jury until

20   the AUSA's were prepared to walk up to the grand jury with

21   them.

22   Q.    And that day what was your specific task?

23   A.    I was sitting with Mr. Merrill.  We were just waiting

24   for the AUSA's to be ready.

25   Q.    Now, in the room were people walking in and out?  What

Page 84

1   was sort of going on in that conference room?

2   A.   There were people in and out.  Agent Perez was there.

3   AUSA Koukios.  AUSA Fernandez.

4   Q.   Were they in that whole time or were they walking in and

5   out.

6   A.   I remember people walking in and out.

7   Q.   Okay.  Now was there discussions with respect to the

8   Chinese ammunition or Aey that morning?

9   A.   Not that I recall.

10  Q.   Okay.  What happened that morning?

11  A.   My recollection of that morning was that Mr. Merrill

12  came in and he informed me that he was involved in other

13  legal issues in Utah, and he wanted to know if, you know, he

14  could testify based in front of the grand jury that day based

15  on those other issues, and he wanted to discuss it with the

16  AUSA.

17       So what I did, I formed AUSA Fernandez of what he

18  had just explained to me, and Ms. Fernandez asked me to sit

19  with him and get a list of the legal or the cases that he was

20  involved in that he mentioned.

21       So basically that was around 9:30 according to my

22  notes.  That's when I sat with him and obtained a list of

23  those cases that he said he was involved with.

24  Q.   Okay.  And you wrote those down, correct?

25  A.   I did.

1  Q.   Okay.  And then what happened next?

2  A.   After that I believe AUSA Koukios and AUSA Fernandez

3  came in.  There were discussions as to what he would testify

4  to before the grand jury.

5       It was agreed that he would go in and present the

6  documents and present the documents that he had brought with

7  him the previous day, and that he would go back to Utah to

8  discuss the other issues with the attorneys that were

9  involved in those issues and then inform the AUSA's of the

10  outcome of that.

11  Q.   Okay.  And did he express any hesitation or any concern

12  in saying he didn't want to testify that day?

13  A.   No.  I think, as a matter of fact, it was sort of

14  encouraged by him that since he was here he would introduce

15  those documents at least.

16  Q.   Now, did you take notes of what transpired that morning?

17  A.   The notes of the cases that he told me that he was

18  involved with in Utah, that was the only thing that I

19  remember happening that morning.

20  Q.   So would you say your notes are fair and accurate?

21  A.   Yes, sir.

22  Q.   They were complete?

23  A.   Yes, sir.

24  Q.   I am going to hand you exhibit E.

25  A.   Okay.

1   Q.   Are those your notes?

2   A.   Yes, sir.

3   Q.   And is everything that happened that morning reflected

4   in those notes?

5   A.   To the best of my recollection, yes.

6   Q.   Okay.  So there is no discussion of Aey?

7   A.   None that I recall.

8   Q.   Do you remember any discussion of Henry Tomay?

9   A.   None.

10   Q.   Do you remember any discussion or offer of a Class A

11   misdemeanor?

12   A.   No.

13   Q.   Any discussion of a promise to exchange for cooperation?

14   A.   No.

15   Q.   Any plea negotiations or plea agreements handed to

16   Mr. Merrill at that time?

17   A.   No, sir.

18   Q.   Any specific talk or conversation about having Merrill

19   lure Henry Tomay to New Jersey?

20   A.   No, sir.

21          MR. SCHWARTZ:  No further questions, Your Honor.

22          MR. STIRBA:  Thank you, Judge.

23                    CROSS EXAMINATION

24   BY MR. STIRBA:

25   Q.   Special Agent, just so we are clear, you got to the

1    interview on the 7th at about 3:00 o'clock; is that right?

2    A.    That's when I joined the interview, yes, sir.

3    Q.    Sure.  And you recall that at the time that Mr. Merrill

4    was asked at that time if he wished to cooperate.  Do you

5    remember that?

6    A.    I believe that had already taken place when I came.

7    Q.    You were not present when he was asked that question

8    about 3:00 o'clock?

9    A.    No, sir.

10   Q.    Okay.  And it is true, is it not, that the report by

11   Special Agent Perez was based upon notes that you took of

12   that or your participation on the interview on the 7th; is

13   that right?

14   A.    Part of the report, yes, sir.

15   Q.    Sure the.  Latter say 5 pages of the report, correct?

16   A.    I don't know if it is 5 pages, but the latter part of

17   the report.

18   Q.    In fact, you are familiar with the report.  He says, in

19   fact, that is what he did.  He prepared the report based upon

20   your notes on the 7th, right?

21   A.    Right.  I actually transcribed my notes and gave them to

22   him to incorporate into the report.

23   Q.    Okay.  And are those notes still in existence?

24   A.    The notes that I took, yes, sir.

25   Q.    Yes.  And do you have them with you?

1    A.   No, I don't, sir.

2    Q.   Did you bring them bring them with you?

3    A.   No.

4    Q.   It is true you were asked about D-1 and D-2.  Do you

5    have those in front of you again?

6    A.   Yes, sir.

7    Q.   Let's put our focus on those.  It is true, is it not,

8    that D-1 refers to scraping, correct?

9    A.   Yes, sir.

10   Q.   In fact, it refers to scraping off of containers, wood

11   containers certain markings.  True?

12   A.   Yes, sir.

13   Q.   And your testimony would be that then looking at that

14   back as a trained investigator, doesn't that lead you to

15   believe that Mr. Merrill, by sending that e-mail, was

16   attempting to conceal the origin of the ammo, the fact that

17   it was from China?

18   A.   Well, the e-mail itself does not mention anything about

19   China.

20   Q.   The question is you don't consider that a concealment

21   e-mail?

22   A.   No, I don't.  I didn't at the time because it does not

23   mention anything about China.

24   Q.   Okay.  I agree with you.  It doesn't mention anything

25   about China, but you did you the investigation was about the

1   source of the origin of the ammo that you just testified to;

2   is that right?

3            MR. STIRBA:  Asked and answered, Your Honor.

4   BY MR. STIRBA:

5   Q.   Is that right?

6   A.   Yes.

7   Q.   And the origin of the ammo you understood to be from

8   China.  Is that true?

9   A.   Yes, sir.

10  Q.   And it is true, is it not, you understood that part of

11  the problem here was that people were trying to conceal the

12  origin of the ammo, correct?

13  A.   Yes, sir.

14  Q.   So looking at that exhibit D-1, you are telling the

15  court that you don't have a reason to believe that that

16  scraping e-mail evidences concealment on behalf of

17  Mr. Merrill?

18  A.   It didn't constitute any evidence of concealment to me

19  at the time.

20  Q.   Looking at D-2, do you have that in front of you?

21  A.   Yes.

22  Q.   Are you familiar with that e-mail?

23  A.   I am now, yes.

24  Q.   Okay.  And that has I believe at the top circumvention,

25  does it not?

Page 90

1   A.   Yes.

2   Q.   And reading that e-mail, do you have reason to believe

3   that as you see that now, doesn't that evidence in your mind

4   concealment of the origin of the ammo by Mr. Merrill?

5   A.   Well, now I know what the e-mail is about.  I had not

6   seen this e-mail at the time of the interview.

7   Q.   Okay.  But seeing it now, it evidences in your mind

8   concealment by Mr. Merrill, does it not?

9   A.   Well, now I know exactly what happened in the case.  So

10  of course.

11  Q.   The answer is then, yes?

12          MR. SCHWARTZ:  Objection.  Relevancy.

13          THE COURT:  He can answer it.

14          THE WITNESS:  By this e-mail in itself, no, it does

15  not, but knowing what I know about the case now, I have to

16  say the answer is, yes.

17  BY MR. STIRBA:

18  Q.   In that e-mail, that D-2, when did you first see that,

19  sir?

20  A.   I don't recall.

21  Q.   Was it before or after the interview?

22  A.   It wasn't before.  So it was during the interview.

23  Q.   During the interview on the 7th is the first time you

24  saw it?

25  A.   Yes, sir.

Page 91

1   Q.   The scraping e-mail you saw before the 7th, right?

2   A.   I am not sure.  Yes, without the enclosures I had seen

3   the body of this, but I don't remember the photos that were

4   attached to it.

5   Q.   Okay.  Just so we are clear D-1 that we are talking

6   about, the question is did you see that prior to the

7   interview of the 7th?

8   A.   Yes.

9   Q.   And you also testified it didn't have the photo

10  enclosures; is that right?

11  A.   Well, I don't know if it had it or not.  I don't

12  remember seeing them.

13          MR. STIRBA:  Okay.  Thank you.  That's all I have,

14  Judge.

15          THE COURT:  The photo enclosures relate to D-1?

16          MR. STIRBA:  Yes, sir.

17          THE COURT:  Anything else?

18          MR. SCHWARTZ:  Briefly.

19                  REDIRECT EXAMINATION

20  BY MR. SCHWARTZ:

21  Q.   Now, on that May 8th meeting, were there discussions,

22  just to clarify it, what were the discussions about

23  testifying versus not testifying?  What was sort of discussed

24  then?

25  A.   The issue was whether he would testify as to what was

Page 92

1   discussed the previous day were based on his involvement in

2   other legal issues that he told us he was a witness to

3   whether he should testify about the entire thing or just

4   presenting the documents that he had brought with him.

5            I believe the decision was the encouragement by the

6   Assistant United States Attorneys was to go back to Utah,

7   discuss it with all of the attorneys that were involved in

8   these actions, and then get back to them as far as the other

9   issues that were talked about the previous day.

10  Q.   So just to be clear, so the decision for Merrill to

11  testify only regarding the documents and returning the

12  documents was based on a concern about these other criminal or

13  civil or whatever legal matters in Utah?

14  A.   Correct.

15  Q.   All right.  And what was the concern about the grand

16  jury testimony?

17  A.   Well, because now he had disclosed that he had some

18  exposure in knowing or being involved in the concealment of

19  the Chinese ammunition with respect to the Aey contract, and

20  he was acting as a witness in the other -- a witness for the

21  prosecution in the other legal matters that he was involved

22  in in Utah.

23           So they just wanted to clarify that by being

24  exposed to this issue concerning the Chinese ammo, that it

25  would not damage I would guess his testimony in the other

Page 93

1    actions.

2    Q.   And was the decision not to ask questions regarding his

3    interactions with Aey a result of Mr. Merrill's refusal or

4    unwillingness to do so or intent or desire or expressing a

5    desire not to testify?

6    A.   No.  It was more of a mutual agreement between both

7    parties that these things should be discussed with the

8    lawyers before.

9         MR. SCHWARTZ:  No further questions.

10                   RECROSS EXAMINATION

11   BY MR. STIRBA:

12   Q.   Just so I understand, Mr. Merrill was fully ready to

13   testify on the 8th before the grand jury.  Is that your

14   understanding?

15   A.   Yes, sir.

16   Q.   And he was going to testify about what he told you folks

17   on the 7th.  True?

18   A.   What was discussed on the 7th, yes.

19   Q.   That is what the expectation was, correct?

20   A.   Correct.

21   Q.   And you are telling us now that the reason why he didn't

22   testify is because these other legal matters came up in  Utah,

23   and there was a concern that if he testified adverse to

24   himself before the grand jury it would affect those other

25   legal matters.  Is that what you are telling me?

1  A.    Correct.

2  Q.    And that's why he didn't testify?

3  A.    Correct.

4  Q.    In other words, if he didn't have those legal matters in

5  Utah, he would have testified, right?

6  A.    As far as I know, yes.

7  Q.    And he would have testified about all matters and

8  circumstances involving Aey.   True?

9  A.    About what was discussed with him the day before, yes.

10          MR. STIRBA:  Very well.  Thank you.

11          THE COURT:  Anything else?

12          MR. SCHWARTZ:  Nothing further from the government,

13  Your Honor.

14          THE COURT:  Sir, you may step down.  Please stand

15  by for the time being.

16          THE WITNESS:  Yes.

17              [The witness was excused].

18          THE COURT:  Does the government rest?

19          MR. SCHWARTZ:  Unless you want to hear anything

20  else, Your Honor, we are resting.

21          THE COURT:  Now, don't say that.  Do you follow

22  me?

23          MR. SCHWARTZ:  No.  We are resting, Your Honor.

24          THE COURT:  So I am not so sure that it was

25  necessary to call the second witness.  I may be wrong, but

1    that's my first impression.  So you present the case that you

2    think is appropriate.

3              MR. SCHWARTZ:  We will rest, Your Honor.

4              THE COURT:  Okay.  Now, counsel, for the defense,

5    do you plan to call Mr. Merrill as your only witness?

6              MR. STIRBA:  Yes, Your Honor.

7              THE COURT:  All right.  We will do the following:

8    It is now noon.  We will take a break until 1 o'clock prompt.

9              Okay.  In the interim, I have this motion to compel

10   here.  I would like you to see you all have nourishment, and

11   so forth and so on.

12             I realize the motion was filed a while ago and the

13   government responded and there have been developments since

14   then.

15             I want you to see if you can use some of this time

16   to see if there is anything else you can reach agreement upon

17   in connection with the motion or motions to compel.  Do you

18   understand me?

19             MR. STIRBA:  I do, and you will be happy to know

20   that there was an extensive conference about it yesterday.

21             THE COURT:  Counsel, I will be happy to get to my

22   own nourishment.  Okay?

23             MR. STIRBA:  Okay.

24             THE COURT:  You look like, by the way, let me note

25   a young Charles Laughton, which is a compliment.  It also

Page 96

1  shows my age.

2           MR. STIRBA:  Thank you, Your Honor.

3           THE COURT:  Okay.  That's a high compliment.

4           MR. STIRBA:  Well.  Thank you.  I appreciate it.

5           THE COURT:  It is a very high compliment.  You are

6  better looking than he was, but you remind me of him.

7           MR. STIRBA:  Judge, we are calling no witnesses.

8           THE COURT:  Look it up.  Google it.

9           MR. STIRBA:  I will.

10           THE COURT:  You will be very impressed.

11           MR. STIRBA:  Thank you.

12           THE COURT:  He was a great actor.  All right.  We

13  will see you at 1:00 o'clock.  Court is in recess.

14           [There was a recess for the noon hour].

15           THE COURT:  Okay.  Mr. Stirba.

16           MR. STIRBA:  Yes, Your Honor.  We call Mr. Merrill

17  to the stand.

18           THE CLERK:  Mr. Merrill, please raise your right

19  hand.

20           RALPH G. MERRILL, DEFENDANT'S WITNESS, SWORN.

21                    DIRECT EXAMINATION

22           THE CLERK:  Thank you.

23  BY MR. STIRBA:

24  Q.   Mr. Merrill, would you, please, state your full name and

25  spell your last name?

Page 97

1   A.   Yes, sir.  Ralph G. Merrill, M-e-r-r-i-l-l.

2   Q.   And where do you reside, Mr. Merrill?

3   A.   I reside in Bountiful, Utah.

4   Q.   And you are one of the defendants in this case that has

5   resulted in this suppression hearing; is that right?

6   A.   Yes.

7   Q.   Now, Mr. Merrill, I want to call your attention and

8   direct your attention to April 24, 2008.  Do you recall if on

9   that occasion you were visited by two agents?

10  A.   Yes.

11  Q.   And where did they visit you?

12  A.   At my place of business in North Salt Lake, Utah.

13  Q.   What is the name of that business?

14  A.   Vector Arms.

15  Q.   And about what time of the day did they show up?

16  A.   It was mid-morning.

17  Q.   And did they engage you then in some conversation about

18  certain facts that they were interested in?

19  A.   Yes, sir.

20  Q.   And who was present during that conversation?

21  A.   Agent Perez and Agent Barrett.

22  Q.   And Agent Perez is one of the gentlemen who testified

23  here earlier; is that correct?

24  A.   Yes, sir.

25  Q.   How long did you talk?

Page 98

1   A.   I would guess 45 minutes to an hour.

2   Q.   And where did you talk or where did you converse with

3   them in the office at Vector Arms?

4   A.   I ushered them from the waiting room into our conference

5   room.

6   Q.   And did anybody take any notes during that conversation?

7   A.   Yes.  I noticed that Agent Barrett was taking some

8   notes.

9   Q.   Did you take any notes?

10  A.   No.

11  Q.   Do you know in the conversation was recorded?

12  A.   No.

13  Q.   Now, during that conversation, just generally tell the

14  court what you were asked?

15  A.   I was asked about my relationship, my previous

16  relationship with Aey and whether or not I had funded certain

17  contracts.

18  Q.   Did they indicate to you what the purpose was such that

19  they were talking to you?

20  A.   Yes, they did.  They said they were investigating Aey

21  and had some questions about what I knew about Aey.

22  Q.   Did you answer their questions?

23  A.   I did.

24  Q.   And did you answer them fully to the best of your

25  knowledge?

Page 99

1    A.    Yes, sir.

2    Q.    Did they give you any documents?

3    A.    At the end of the meeting they handed me two subpoenas.

4    Q.    And do you recall which agent did that?

5    A.    It was Agent Perez.

6    Q.    Okay.

7              MR. STIRBA:  May I approach, Your Honor?

8    BY MR. STIRBA:

9    Q.    Let me show you what has been marked as D-1 and D-2 and

10   see if you can review those and identify those for us,

11   starting with D-1.

12   A.    Yes.  This is the subpoena to testify before the grand

13   jury requesting that I appear personally and that I submit

14   documents.

15   Q.    Okay.  You have seen that before and that was served on

16   you on April 24th of 2008?

17   A.    Yes.

18   Q.    Refer to D-2, please.

19   A.    This is a subpoena to testify before the grand jury

20   requesting again that I appear personally and that I bring

21   documents.

22   Q.    D-2 is directed to you or to Vector?

23   A.    It is directed to Vector.

24   Q.    Okay.  And that was served on you as well by one of the

25   agents on April 24, 2008?

1    A.    Yes, sir.

2    Q.    What is the time indicated on the subpoenas when you

3    were to appear and testify and provide documents?

4    A.    I was to appear on the 8th of May 2008 at 9:30 a.m.

5    Q.    Here in Miami; is that right?

6    A.    Yes.

7    Q.    Now, the documents that you have in front of you, are

8    they complete in terms of the documents and the subpoenas

9    that were served on you that day?

10   A.    Yes, sir.

11   Q.    Is anything else attached to either one of the

12   subpoenas?

13   A.    Yes, sir.  There was an attachment that listed all of

14   the types of documents that I should bring.

15   Q.    Okay.  And that is on what subpoena, sir?

16   A.    That's on the Vector Arms subpoena.

17   Q.    Other than that were there any other attachments then to

18   either one of the subpoenas?

19   A.    No, sir.

20   Q.    Now, during the time that you were conversing with the

21   agents for the approximate two hours, did any of the agents

22   indicate to you that you were the subject of a criminal

23   investigation?

24   A.    No, sir.

25   Q.    Did either of the agents indicate to you that you were

Page 101

1    the target of a criminal investigation?

2    A.    No, sir.

3    Q.    Did either one of them characterize your relationship to

4    the investigation?

5    A.    No, sir.

6    Q.    What did you understand your situation to be when they

7    left in terms of this investigation?

8    A.    I understood that I was coming to Miami to be a fact

9    witness to answer certain questions about Aey.

10   Q.    Now, between the 8th of May, which is the return date on

11   the subpoenas, and the 24th of April, when Agent Perez and

12   Agent Barrett visited you at Vector, did you have any other

13   conversations with either Agent Perez or Agent Barrett?

14   A.    I had several conversations with Agent Perez.

15   Q.    Were those conversations in person or by phone?

16   A.    They were by phone.

17   Q.    About how many did you have?

18   A.    I would say 6.

19   Q.    And were they initiated by you or by him?

20   A.    They were initiated partly by him and some of them by me.

21   A mix.

22   Q.    Okay.  Now, you say 6.  How do you know that?

23   A.    I have gone back and looked at my phone records.

24   Q.    And what have you done such that your phone records

25   assist you with your recollection of the number of calls you

Page 102

1   had with Agent Perez?

2   A.   Yes.   I counted 6 calls to his number.

3   Q.   Okay.   You were able to identify his number on your

4   phone records?

5   A.   Correct.

6   Q.   Just generally tell the court what was the nature of

7   conversations that you had on the phone with Agent Perez

8   during this time period?

9   A.   Some of them were regarding my flight information and

10  hotel information, and a couple of them were again if he

11  could tell me anything further about what I would be or what

12  the reason for my coming was.

13  Q.   Okay.   And what do you recall you asked him in terms of

14  your reason for coming?

15  A.   I recall some concerns about, oh, again whether I should

16  bring an attorney, and I wanted him to repeat again to me or

17  describe what my role was as a fact witness; what that meant.

18  Q.   And what did he tell you.

19  A.   He said, yes, that's exactly what it was, and I would be

20  one among other fact witnesses.   I believe he mentioned a

21  lady was coming in from the Rock Island Arsenal in Illinois

22  to testify before me, and it was pretty routine.

23  Q.   Now, the grand jury appearance was scheduled for the 8th

24  of May.   In relationship to that date, when did you arrive in

25  Miami?

1    A.   I arrived two days before in the evening.  They wanted

2    me to be positioned there on the 6th so that I would be ready

3    for a meeting on the morning of the 7th.

4    Q.   So who is "they" that you are referring to wanted you

5    positioned in Miami on the 6th?

6    A.   Oh.  This was Agent Perez.

7    Q.   Okay.  What did he tell you in that regard?

8    A.   He said that it was routine for me to come to an

9    orientation meeting where they would give me instructions

10   about the grand jury; how it proceeded and what to expect,

11   and just a general orientation session.

12   Q.   Okay.  So you got to Miami on the 6th then?

13   A.   Yes.  In the evening.

14   Q.   And who picked you up at the airport, if anyone?

15   A.   Agent Perez.

16   Q.   Okay.  And he took you to the hotel where you were

17   staying that night?

18   A.   Correct.

19   Q.   And who arranged for that facility?  Was that you or was

20   that the government?

21   A.   That was the government.

22   Q.   Okay.  And did you have any discussion then on the way

23   from the airport about this meeting on the 7th that was to

24   take place?

25   A.   We discussed the time that he should pick me up, and it

1   was again just it was an orientation meeting what to expect

2   in front of the grand jury.

3   Q.   Okay.  Mr. Merrill, was there a particular reason why

4   you did not bring an attorney with you to Miami for purposes

5   of compliance with the subpoenas?

6   A.   Yes.  I didn't feel there was a need based on the fact

7   that I was just a fact witness.

8   Q.   On the 7th, do you recall if you were picked up at where

9   you were staying to go to the meeting?

10  A.   Yes.

11  Q.   And who picked you up?

12  A.   Agent Perez.

13  Q.   And where did the meeting take place?

14  A.   It took place in the courthouse up on one of the upper

15  floors in a conference room.

16  Q.   At what time did Agent Perez pick you up?

17  A.   My recollection is it was about 8:30.

18  Q.   Did you on the way from where he picked you up to where

19  the meeting took place, did you have any discussion with him

20  about the meeting go or the purpose of the meeting?

21  A.   Nothing really further; just again reiterating that it

22  was a briefing on the grand jury.

23  Q.   Okay.  So you arrive at the place where the meeting

24  takes place.  Describe just generally what happened next in

25  terms of orienting the court to where you went, who escorted

Page 105

1   you and the beginning of the meeting.

2   A.   I arrived at the courthouse much like this one and went

3   through security and checked in my belongings and proceeded

4   up the elevator to the, I think it was the United States

5   Attorney's Office that was nearby and was escorted into a

6   conference room.  And when we arrived there, my first

7   impression was lots of people in the room; a couple of agents

8   and AUSA Koukios.

9   Q.   Okay.  A couple of agents and AUSA Koukios?

10  A.   Correct.

11  Q.   When you say a "couple," do you mean two?

12  A.   Yes.

13  Q.   Do you recall who they were?

14  A.   They were Agent Perez, and I don't remember the name of

15  the other one.

16  Q.   Okay.  And did the interview of the or the meeting start

17  at approximately 8:30, or was it a little later than that?

18  A.   It was probably around 9:00.

19  Q.   Okay.  And do you recall that day when you left the

20  United States Attorney's Office?

21  A.   Yes.

22  Q.   And what time was that?

23  A.   We had a lunch break around 2:30 or 3:00 and then came

24  back and resumed.

25  Q.   And so what time did you leave?

1   A.   At 5:00.

2   Q.   Now, when the meeting began, who conducted the meeting?

3   A.   AUSA Koukios did.

4   Q.   Okay.  And when it started, did he provide any

5   preliminary information to you now about the purpose of the

6   meeting or your reasons for being there?

7   A.   He just reiterated that he wanted to review the

8   documents that I had brought and answer any questions I might

9   have about the grand jury proceeding.

10  Q.   Okay.  Did he inform you initially at the beginning of

11  the meeting of any rights, you know, in the broadest sense?

12  A.   No.  No.

13  Q.   Did he say anything to you in the beginning of the

14  meeting about you having any criminal responsibility?

15  A.   No, sir.

16  Q.   Did he say anything about charges?

17  A.   No, sir.

18  Q.   Did he say anything about anything that you may say in

19  that meeting could be used against you?

20  A.   No, sir.

21  Q.   Please take us then forward as to what was discussed in

22  the beginning stages of the meeting until we get to the

23  e-mails which were testified to earlier, which are

24  government's exhibits 1 and 2.

25          Just generally what was discussed?  How did the

1   meeting develop?

2   A.   It started out with my history with Aey and something

3   about myself; what I did for a living, and then it moved onto

4   the documents that I brought.

5            We looked them over to see if they had any

6   questions about them.  I answered a few questions about the

7   documents.

8   Q.   Just generally what documents did you bring?

9   A.   These were financial records of the loans I had made to

10  Aey and bank records showing how the funds moved.

11  Q.   Okay.  So you complied with respect to the grand jury

12  subpoenas requiring the production of documents?

13  A.   Yes, sir.

14  Q.   All right.  There came a point then where the e-mails,

15  government's exhibits 1 and 2 were displayed now; is that

16  right?

17  A.   No.  Actually, it started out with some questions that

18  later became apparent referred to those e-mails.

19  Q.   Okay.  Why don't you tell the COURT then the context in

20  which you saw those e-mails?

21  A.   Well, more or less out of the blue, Koukios brought or

22  AUSA brought or set some papers on the table upside down that

23  I couldn't see them and just asked me if I had had any

24  communications with Diveroli about scraping, and I

25  immediately didn't really recognize what communication he was

1   referring to, so I denied that.

2          Then he asked me if I had had any communications

3   with Diveroli about negotiating a discount based on the fact

4   that the ammunition was Chinese.

5          Again, I didn't know which communication he was

6   referring to.  It didn't ring any bells in my mind at that

7   moment, and so I denied that as well.

8   Q.   Okay.  And then what happened?

9   A.   And then they presented to me copies of these e-mails,

10  and I was allowed to read them and study them over.  And

11  after seeing them, I could see that they had come from me.

12  My name was on the top as the originator, and I had signed

13  them.  So I just simply asked, "Where do we go from here?"

14  Q.   Okay.  And seeing those e-mails, did that refresh your

15  recollection that, in fact, they were yours?

16  A.   Right.  That is correct, sir.

17  Q.   So you said then, "Where do we go from here?"  And who

18  said what to that?

19  A.   AUSA Koukios said, "Well, this will ratchet the

20  conversation up to a whole new level."

21          He said, "You know, this looks as though there are

22  some charges apparent here, and you can at this point leave

23  the meeting and return home or go get an attorney, or you can

24  stay and decide to cooperate with us in exchange for a deal."

25  Q.   And you did not take his offer up to leave the meeting,

1   is that right, at that time?

2   A.   Correct.

3   Q.   And tell the court why not?

4   A.   Well, I asked him what he wanted to offer, and he said

5   that there would be some charges involved, and if I wanted to

6   cooperate with the government they would or he was in a

7   position to reduce those charges, and I asked him further

8   about what they would be, and the subject of a Class A

9   misdemeanor with probation was brought up, with the proviso

10  that that had to be signed by the U.S. Attorney, but he was

11  in a position to recommend that.

12  Q.   Do you recall if Mr. Koukios referred specifically to

13  any charges that he was interested in having you plead to?

14  A.   He mentioned that in denying those e-mails that I had

15  made false statements about them, and that it appeared from

16  the e-mails that I would be involved in a fraud situation

17  similar to Aey; a major fraud.

18  Q.   And when you are having this conversation with

19  Mr. Koukios, what did you understand the government was

20  asking you to do?

21  A.   That I would be available to answer any questions on an

22  on-going basis, and that they were particularly interested in

23  Mr. Tomay, the broker who had brokered the Chinese

24  ammunition, and they wanted to interview him.

25          They wanted all of his contact information that I

1    might have, and we also discussed the prospect that I would

2    be in a position to lure him to the United States where

3    agents of the government could detain him and interrogate

4    him, and I agreed to attempt that.  I would give that my best

5    shot.

6    Q.   During this time in the interview when you talked to

7    Mr. Koukios about the matters you have testified to, did he

8    use the word "cooperation"?

9    A.   Very much so, yes.  Several times.

10   Q.   And what did he say regarding cooperation?

11   A.   He said that the cooperation would be what they would

12   expect in return for the reduced charges, and that

13   cooperation would mean a variety of things that I would

14   answer any questions that they might come up with then or

15   later, and that I would be cooperative in helping them to

16   contact Mr. Tomay.

17   Q.   What did you understand your role to have been at this

18   point concerning your testimony before the grand jury which

19   was scheduled for the next day?

20   A.   Well, that was part of the bargain as well, is that I

21   would agree to testify before the grand jury about what we

22   had discussed.

23   Q.   And were you fully prepared to do that?

24   A.   At that point, considering the offer, I was.

25   Q.   Now, what did you understand was going on between you

1    and Mr. Koukios when he is telling you these things?

2    A.   I understood that we had made an arrangement that if I

3    cooperated in the various ways that they expected me to, that

4    he was in a position to reduce my sentence -- excuse me -- my

5    charges.  Not the sentence.

6    Q.   Did the word "leniency" come up in your conversation?

7    A.   Yes.

8    Q.   How did that come up?

9    A.   He said he was in a position to recommend leniency to

10   the judge as a result of my cooperation.

11   Q.   Do you recall the term 5K-1 or the words 5K-1 come up?

12   A.   I think that was more described rather than referred to,

13   but I am not sure that I heard exactly 5K-1, but we discussed

14   several provisions.

15   Q.   As you sit here today, do you know what 5K-1 means?

16   A.   I don't.

17   Q.   Okay.  Now, you testified about Mr. Tomay there was some

18   desire on the part of the government for you to assist them

19   with respect to him.  Do you remember that?

20   A.   Yes, sir.

21   Q.   And you are aware, are you not, that there was a plea

22   agreement that was sent to you or your counsel several weeks

23   after this interview?

24   A.   Yes, sir.

25   Q.   That was sent by the United States Government?

1   A.   Yes, sir.

2   Q.   Do you recall in that proposed plea agreement if there

3   this was a provision in there --

4            THE COURT:  I am awfully sorry.

5            MR. STIRBA:  I am sorry.

6            THE COURT:  You are referring to a proposed plea

7   agreement to who?

8            MR. STIRBA:  Yes.  It is the government's proposed

9   plea agreement sent to Mr. Merrill and his counsel a few

10  weeks later.  It is attached.

11           THE COURT:  It was sent later after what he is

12  talking about here?

13           MR. STIRBA:  Yes, sir, and it is attached to the

14  government's response to our motion to suppress.

15           THE COURT:  Okay.

16           MR. STIRBA:  There is actually two of them.  There

17  is actually one I think is the 15th of May, Judge, that is

18  attached, and then there is a draft that is a couple of weeks

19  later that was sent by the government.

20           THE COURT:  Okay.  Will you start the question all

21  over again when you are asking, "Are you aware of."

22           MR. STIRBA:  Yes.  Thank you, Judge.

23  BY MR. STIRBA:

24  Q.   Mr. Merrill, my question is are you aware of a plea

25  agreement or a proposed plea agreement that was sent to you

1    or your counsel shortly after this interview on the 7th?

2    A.    Yes, sir.

3    Q.    And you have reviewed that?

4    A.    Yes, sir.

5    Q.    And it defines cooperation in part, does it not?

6    A.    Yes, it does.

7    Q.    And do you recall what one of the themes that is in that

8    plea agreement or proposed plea agreement that defines

9    cooperation that might relate to Mr. Tomay?

10   A.    Yes.  It states that I would be willing to be an agent

11   and assist the government in finding and locating people for

12   interrogation, and that I would be an undercover agent.

13   Q.    And you understood that to be relating back to this

14   conversation about work for the government finding Mr. Tomay?

15   A.    Correct.

16   Q.    Now, after you had the discussion that you have just

17   testified to, did anyone, Mr. Koukios or anyone else in that

18   meeting, give you any kind of document or letter indicating

19   certain rights that you had?

20   A.    No, sir.

21   Q.    Did anyone after that conversation or at any time in

22   this interview tell you that you were now a target?

23   A.    No, sir.

24   Q.    Did anybody tell you that you were a subject?

25   A.    They didn't use that word, no, sir.

1   Q.   Okay.  After you had this conversation, and let me ask

2   this:  Was this before or after lunch?

3   A.   This started before lunch.  We continued and with some

4   of the details after lunch.

5   Q.   Okay.  What details were after lunch?

6   A.   I proceeded to answer several questions about Mr. Tomay;

7   his connections, associations with certain people named in

8   some e-mails that the AUSA wanted to know more about in

9   Europe.

10  Q.   After lunch, was there any further discussion that you

11  recall between you on anyone else about your negotiations or

12  your arrangement?

13  A.   I believe I had some additional questions as to how that

14  would work; how it would take; how it would proceed.

15  Q.   And those were directed to whom?

16  A.   To agent or -- excuse me -- AUSA Koukios.

17  Q.   Did he answer them.

18  A.   Yes.

19  Q.   By the way, for purposes of just clarification,

20  generally what is your understanding of who Mr. Tomay is?

21  A.   Mr. Tomay is a Swiss citizen and an arms broker.  He was

22  the broker for the ammunition in question coming from

23  Albania.

24  Q.   Now, you have testified that you left at 5:00 o'clock.

25  After lunch, were you also asked other questions generally

1    about the facts relating to Aey and the Afghanistan contract?

2    A.   Yes, sir.

3    Q.   And just generally what do you recall you talked about

4    after lunch?

5    A.   Whether I knew any particulars about Diveroli's dealings

6    in Albania; whether I knew about any connections with

7    organized crime over there; whether I knew about his drug

8    habit.  Just more questions about Diveroli and his dealings

9    in Albania.

10   Q.   And once again you answered those questions fully to the

11   best of your knowledge?

12   A.   I did.

13   Q.   Did you consider responding to those questions as part

14   of your cooperation?

15   A.   Definitely.

16   Q.   Did you feel some obligation to do that, given the fact

17   of your previous conversation with Mr. Koukios?

18   A.   Yes, I did.

19   Q.   And tell the court why?

20   A.   They just expected me to answer any questions they came

21   up with on any subject.  So I pledged to tell them everything

22   I knew about Tomay, about Diveroli; any of their connections

23   or associations; the activities that they had engaged in.

24   Q.   And how did the meeting wrap up?

25   A.   It wrapped up that I was going to follow through.  I was

```
1    going to testify the next day, and that was pretty much it.

2              They said they would like me back again in the

3    morning in the event that they had any further questions that

4    they maybe thought of in the interim, and to make sure I was

5    on hand and ready to go for the testimony before the grand

6    jury.

7    Q.   Okay.  And where did you go after the meeting adjourned?

8    A.   I was taken back to my hotel by Agent Perez.

9    Q.   Okay.  Did you have any conversation with him in transit

10   from the meeting to where you were staying subsequently about

11   Aey or any of the events that day?

12   A.   No, sir.

13   Q.   Okay.  The next morning did you have a chance to talk

14   with Agent Perez?

15   A.   Yes.  Before I went back to my hotel room, I thought

16   about the events of the day.  I became concerned that I might

17   be going into something still a bit blind, and determined

18   that --

19              THE COURT:  You what?

20              THE WITNESS:  That I might be going into the grand

21   jury somewhat blind or uninformed.

22              THE COURT:  Blind?

23              THE WITNESS:  Blind.

24              THE COURT:  Okay.  Go ahead.

25              THE WITNESS:  Uninformed.  I started thinking
```

1  about this was getting to be pretty serious stuff, and I

2  should really talk to my attorney before I carried on with

3  this deal that I had been offered, and I would just get some

4  outside additional input.

5       MR. STIRBA:  Okay.

6  BY MR. STIRBA:

7  Q.  So in light of this conversation with Agent Perez on the

8  morning of the 8th, tell us was by phone or in person?

9  A.  I called Agent Perez just after 8:00 and informed him

10 that I had decided to return to Salt Lake City.

11      I did not want to testify and did not want to

12 discuss the matter any further and would he, please, take me

13 to the airport.

14 Q.  And what did he say?

15 A.  He said, "Well, what time is your flight?"  And I said,

16 "Well, the earliest flight that I can get back is at 4:00,"

17 and he said, "If you do leave, you are going to have to come

18 right back because taking the Fifth does not excuse you from

19 testifying about documents and papers related to the case.

20      So you are going to be right back testifying before

21 the grand jury again, and I am not sure that the deal will

22 still be on the table if you leave now."

23 Q.  By what deal did you understand that he was referring?

24 A.  This was essentially the bargain that we had struck for

25 leniency and for a reduced charge in exchange for full

1  cooperation at that time and ongoing into the indefinite

2  future.

3  Q.   What happened next?

4  A.   He convinced me that I probably should stay because I

5  really didn't want to come back to Miami and just turn around

6  and come right back.

7        So he also suggested that we go back to the

8  courthouse and discuss this with AUSA Koukios.  So I decided

9  that might be a good idea to see how that would affect the

10 arrangement that we had, and so we went back to the

11 courthouse, and I was ushered into the same room, and there

12 were agents there again.

13 Q.   Who was presents?

14 A.   Perez and Vazquez.

15 Q.   Anyone else?

16 A.   And Koukios and Hernandez, if I am getting her name

17 correct.

18 Q.   Okay.  The lady sitting over at counsel table?

19 A.   Yes.

20 Q.   Okay.  That's Ms. Fernandez.  Yes.

21 A.   Fernandez.  Yes.

22 Q.   Okay.  And what time did you get there?

23 A.   It seemed to me we got there about 9:00.

24 Q.   Okay.  And you then had a conversation in the conference

25 room with the parties there?

Page 119

1    A.    Yes.  I told Koukios, AUSA Koukios that I had decided to

2    go back to Salt Lake, and that is what I really wanted to do

3    and would that affect our arrangement.

4              I felt that I really should talk with my attorney

5    before I went forward with all of this, and he reiterated

6    that, he suggested that I stay and testify, but said that it

7    would only be testifying about the documents he would not

8    introduce any substantive questions about the case or my

9    involvement with Aey or my possible exposure.

10             It would just be restricted to documents and their

11   completeness and their truth.

12   Q.    And you did testify that day before the grand jury?

13   A.    Yes.  He also reiterated that, you know, that the deal

14   may or may not be on the table if I left.

15   Q.    I am sorry.  What did you understand him to mean by

16   that?

17   A.    That our cooperation bargain, you know, he couldn't

18   guarantee it going forward.

19   Q.    Going forward if what would happen?

20   A.    If I left.

21   Q.    Okay.

22   A.    If I did what I said I wanted to do.

23   Q.    I see.  Now, did you have any other discussions with

24   anyone else before you testified at the grand jury that

25   morning about anything else?

1    A.    Other than Perez and AUSA Koukios, well, I called Delta

2    Airlines to find out when, you know, the first flight out was

3    available.

4    Q.    Okay.  You heard the testimony of Special Agent Vazquez

5    this morning?

6    A.    Yes, sir.

7    Q.    Did you have a conversation with him or anyone else

8    relating to some matters in Salt Lake?

9    A.    Well, at the end of that meeting, I asked AUSA Koukios

10   how long this process, to process this misdemeanor would take

11   and how time consuming it would be because I had 5 cases

12   going on in Salt Lake that might offer an interference

13   time-wise and, you, know with the judge taking into

14   consideration or with the U.S. attorney taking that into

15   consideration, that I needed some time to testify and pursue

16   these 5 cases that I had already begun in Salt Lake.

17   Q.    And the meeting you are referring to is the meeting on

18   the 8th; is that right?

19   A.    Correct.

20   Q.    So at the end of the meeting, after you advised them

21   about your position of returning to Salt Lake, then there is

22   this additional conversation about these matters that you had

23   pending in Salt Lake?

24   A.    Right.

25   Q.    And your concern was what again?

Page 121

1   A.   How the timing would be.  The timing.  Would I have

2   enough time to finish up or pursue these cases that I had

3   begun.

4   Q.   And how would your situation in Florida, from your

5   understanding, possibly affect your cases in Utah?  Could you

6   explain that more fully, please?

7   A.   Well, I was concerned that I would have to make possibly

8   more trips out here and go to hearings.  I didn't really know

9   the process, but whatever was involved, I realized that I

10  these cases going on, and they were going to require quite a

11  bit of my time.

12          So I think it was more trying to understand how the

13  proceedings that we were discussing in this meeting would

14  affect those cases.  I didn't want to jeopardize those cases.

15  Q.   Now, Mr. Merrill, at any time on the 8th did anyone

16  present you with a letter or a document advising you of your

17  rights?

18  A.   No, sir.

19  Q.   Did anyone tell you on the 8th that you were, indeed, a

20  target?

21  A.   No, sir.

22  Q.   Or a subject?

23  A.   No, sir.

24  Q.   You understood, did you not, that when you left Miami on

25  the 8th that you had been, as you put it, the arrangement you

Page 122

1    had been discussing a deal with the government; is that

2    right?

3    A.   Yes, sir.

4    Q.   And primarily this was in your conversation or

5    conversations with Mr. Koukios; is that right?

6    A.   Yes, sir.

7    Q.   And you understood at the time that he was a government

8    prosecutor?

9    A.   Yes, sir.

10   Q.   Now, after you left Miami, you left on the 8th?

11   A.   Yes, sir.

12   Q.   And you returned to Salt Lake?

13   A.   Yes, sir.

14   Q.   Did you then take any other action consistent with your

15   understanding of what the government expected you to do in

16   terms of your cooperation?

17   A.   Yes, I did.

18   Q.   And tell the court what you did?

19   A.   I reviewed e-mails that I had had with Mr. Tomay to see

20   if there was any prospect of pursuing one of those deals and

21   thereby luring him to Newark, New Jersey which is a port that

22   we had discussed, that I had discussed with AUSA Koukios

23   would be a likely and good place for them to detain Mr.

24   Tomay.

25            So I proposed to Mr. Tomay that we follow through

1    with an offer that he had made me for some weapons parts, and

2    under the circumstances it would be better if he came to the

3    states so that he could turn over the bill of lading to me at

4    the Port of Newark, and we could hand him a cashier's check

5    thereafter we verified that the goods had arrived, and he

6    could be sure that he got his check when he consigned the

7    bill of lading over to us; that that would a sensible

8    arrangement and everyone's requirements would be satisfied.

9    Q.   Okay.  And did that happen?

10   A.   It did.  That is to say I did send that e-mail, yes.

11   Q.   Okay.  And what happened?

12   A.   Mr. Tomay did not respond to that e-mail.

13   Q.   Okay.  And approximately when did you send it?

14   A.   I sent that in June probably around the 20th of June.

15   Q.   Now, Mr. Merrill, going back through the dates that you

16   have testified to in the interviews and in the discussions,

17   did you feel any promises were made to you?

18   A.   Absolutely I did.

19   Q.   Tell the court what promises you believed were made to

20   you?

21   A.   I believe that AUSA Koukios promised me that he would

22   reduce the charges the charges, whatever they were to a Class

23   A misdemeanor with probation and a possible modest fine as I

24   understood, maybe $1,000 or something in exchange for my full

25   cooperation going forward.

Page 124

1    Q.   Okay.

2    A.   And that he would also plead for leniency with the

3    judge.

4    Q.   Okay.  And any other promises that you believed you were

5    made in this time frame by representatives of the government?

6    A.   That was pretty much it.

7              MR. STIRBA:  If I may just have a chance to review

8    my notes, briefly, Your Honor.  That's all.  Thank you,

9    Mr. Merrill.  Thank you, Judge.

10                       CROSS EXAMINATION

11   BY MR. SCHWARTZ:

12   Q.   Good afternoon, Mr. Merrill.

13   A.   Good afternoon, sir.

14   Q.   Now, sir, you are the owner of Vector Arms, correct?

15   A.   Yes, sir.

16   Q.   And in Vector Arms you manufacture semi-automatic and

17   automatic weapons, right?

18   A.   Yes, sir.

19   Q.   You operate a full manufacturing plant.  Is that about

20   right?

21   A.   Yes, sir.

22   Q.   How many employees do you employ?

23   A.   Right now we have 21.

24   Q.   And you have to deal with employment and payroll issues,

25   isn't that right, as the owner and operator of Aey; is that

Page 125

1    correct?

2    A.    Of Vector Arms did you mean?

3    Q.    Yes.  I am sorry.  Vector Arms.  Vector Arms.

4    A.    Yes, sir, although my accountant -- I must admit my

5    accountant takes care of that.

6    Q.    All right.  And in the course of your 12 years, you are

7    also involved in numerous arms brokering deals across the

8    world; isn't that right?

9    A.    To a limited extent.  I have never been actually a

10   broker.  That is, I have not sold to any foreign entities,

11   and I have never dealt with any foreign governments or our

12   own government, for that matter.

13           I just simply by parts for the weapons we make from

14   suppliers occasionally in countries.

15   Q.    So you never deal with the United States Government on

16   an international scale?

17   A.    No.

18   Q.    Is that what you are saying?

19   A.    No.

20   Q.    You never had direct communication with the government

21   on previous international contracts?

22   A.    Prior to?

23   Q.    Prior to this Afghanistan situation.

24   A.    Prior to my association with Diveroli no, sir.

25   Q.    But you have had communications; in fact, very detailed

1    ones, isn't that right, with officers in Iraq?

2    A.   Yes, sir.

3    Q.   Okay.  And so you are pretty involved with respect to

4    dealing with issues with respect to contracts being cancelled

5    for lack of performance, for example.  Is that about right?

6    A.   I have seen e-mails to that effect that were directed to

7    Mr. Diveroli, yes.

8    Q.   And you have been involved in actually sending those

9    e-mails, too; is that correct?

10           MR. STIRBA:  Your Honor, I am going to object.  I

11   mean, I know he would like to conduct discovery here, but

12   this is a fairly narrow hearing.

13           THE COURT:  Overruled.  It shows his -- well, I am

14   overruling it.

15   BY MR. SCHWARTZ:

16   Q.   So, for instance, you were aware of what was going on

17   with your involvement and Aey's involvement in the Iraq

18   contract and the U.S. Government's cancellation; isn't that

19   correct?

20   A.   Yes.  Diveroli would send me courtesy copies of the

21   e-mails that he received, yes.

22   Q.   Okay.  But you have also sent e-mails to Iraq as well,

23   haven't you?

24   A.   On occasion, yes.

25   Q.   Okay.  And also you were aware you have your attorney.

1    I believe his name is Greg Erickson, right?  That's one of

2    your attorneys that you have used in the past; is that

3    right?

4    A.   Correct, sir.

5    Q.   And that attorney has also helped you out in other

6    issues.  For instance, you own real estate or have been

7    involved in real estate; is that right?

8    A.   Yes, sir.

9          MR. STIRBA:  I object as to relevancy, Judge.

10         THE COURT:  Overruled.

11   BY MR. SCHWARTZ:

12   Q.   In fact, there is one parcel of property known as

13   Quinn's Junction; is that right?

14   A.   Yes, sir.

15   Q.   Okay.  And at one the point you were involved in trying

16   to develop that land; isn't that correct?

17   A.   Yes, sir.

18   Q.   And that is also the land you put up as a collateral for

19   Aey Afghan contract; is that right?

20   A.   Yes, sir.

21   Q.   And that land was involved in litigation.  Legal

22   disputes, right?

23   A.   Yes.  I had initiated some litigation regarding that

24   property, yes.

25   Q.   Okay.  And so you retained counsel in that case, right?

Page 128

1    A.    Yes, sir.

2    Q.    Okay.  And, sir, I think prior to your involvement in

3    dealing with arms and ammunition, you served in the military;

4    isn't that correct, sir?

5    A.    Yes, sir.

6    Q.    In fact, you were serving as a military police officer,

7    right?

8    A.    No, sir.

9    Q.    Have you ever held yourself out to be someone who served

10   in the military police?

11   A.    I served in a military police unit.  I was not an

12   officer.  I was an interpreter.

13   Q.    And that was in Germany?

14   A.    Yes, sir.

15   Q.    Okay.  So as an interpreter, you would sit in on

16   interviews, is that correct, with agents from maybe the U.S.

17   Army CID?

18   A.    No, sir.  I just translated paperwork.

19   Q.    Okay.  But paperwork relating to military police, isn't

20   that right, or legal issues with respect to the military?

21   A.    I did some translation on some cases, yes.

22   Q.    Okay.  And if we can jump ahead.  If we can jump to 2008.

23   Now, two months prior to that April 24th visit, you, in fact,

24   had a little bit of criminal legal problems in Utah; isn't

25   that right?

Page 129

1    A.    No, sir.

2    Q.    You had no criminal issues back in Utah?

3    A.    No, sir.

4    Q.    You never retained a criminal attorney back in February?

5           MR. STIRBA:  Your Honor, this is vague and an

6    ambiguous question.

7           THE COURT:  Overruled.

8    BY MR. SCHWARTZ:

9    Q.    Sir, you never retained a criminal attorney in February?

10   A.    Yes, sir, I did.

11   Q.    You did.  So you were in a little bit of a criminal

12   legal trouble back in February of '08 back in Utah, right?

13   A.    I don't know that we would characterize it as "trouble."

14   We anticipated that there might be a problem.

15   Q.    Okay.  And that related to discharging a firearm and

16   blowing up a car on some federal protected land; is that

17   right?

18   A.    Yes.  My employees had gone out on to the desert to test

19   fire some of our weapons, and a ranger showed up and

20   complained about that.

21   Q.    And, in fact, you sent your attorney to the United

22   States Attorney's Office in Utah to see what could happen to

23   work out some sort of deal; isn't that right?

24   A.    That was later on, yes, when one of the employees was

25   summoned to court.

Page 130

1    Q.    Well, that would have been February 22nd, 2008, right?

2    A.    Yes, sir.

3    Q.    Okay.  And even prior to February 22nd, 2008, you came

4    up with the idea to call the ranger, record the phone

5    conversation and ask him if it was okay to fire weapons on

6    that land; isn't that correct?

7    A.    No, sir.

8    Q.    You never recorded a phone conversation with a sheriff?

9    A.    Yes.  You said ranger.

10   Q.    I am sorry.  Sorry.  A sheriff.

11   A.    Yes.  One of my employees called the sheriff to ask if

12   it was okay to shoot on that particular piece of land.

13   Q.    And you thought it was a good idea to record that

14   conversation; isn't that right?

15   A.    Typically we would, yes, whenever we are getting

16   permission like that.

17   Q.    Okay.  Did you let the sheriff know you were recording

18   the conversation?

19   A.    No, sir.  In Utah it is not required.

20   Q.    So you are pretty aware of the laws of Utah and the laws

21   of sort of one matter consent, correct?  Would that be a fair

22   assessment?

23   A.    I am not sure I could really say that, no.

24   Q.    But you know that law in Utah; isn't that right?

25   A.    The law of recording?

1   Q.   Yes.

2   A.   I had heard that.  In Utah if one parties knows that the

3   conversation is being recorded, then it is legal.  Yes, I had

4   heard that.

5   Q.   Okay.  And let me ask you, so that was around February

6   22nd, 2008 you had a criminal defense attorney that hired or

7   was on retainer.

8           So you had access to a criminal defense attorney;

9   isn't that right?

10  A.   Yes, sir.

11  Q.   And that was just two months before April 24th, 2008;

12  isn't that right?

13  A.   Yes, sir.

14  Q.   And since Vector Arms involves the manufacture and

15  licensing of firearms, you have to deal with a lot of

16  licensing; isn't that right?

17  A.   I have to deal with a manufacturer's license for

18  firearms, yes.

19  Q.   And so the fact that ATF agents, you are used to having

20  ATF agents come and inspect your premises; isn't that right?

21  A.   They come once a year typically, or less.

22  Q.   And you are pretty familiar.  You have a pretty good

23  working knowledge of the ATF regulations; isn't that right?

24  A.   Yes, sir.

25  Q.   Now, the first time you ever saw, let's turn to April

Page 132

1   24th of 2008.

2              THE COURT:  Let me ask this question because I am

3   getting old and I may forgot to ask it later.

4              In the course of your testimony, you said you had 5

5   other matters pending in Utah, right?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  They were civil and/or criminal

8   matters?

9              THE WITNESS:  They were all civil.

10             THE COURT:  Civil matters?

11             THE WITNESS:  Yes.

12             THE COURT:  So you have attorneys involved with

13   those cases?

14             THE WITNESS:  Yes, Your Honor.

15             THE COURT:  Go ahead, counsel.

16             MR. SCHWARTZ:  Okay.  Let's talk about that.

17   BY MR. SCHWARTZ:

18   Q.   Wasn't one of those cases where you were a witness and a

19   source?  You claim to be a source and a source for a grand

20   jury investigation with respect to racketeering and evasion

21   against county officials?

22   A.   Yes, sir.

23   Q.   So that is actually a criminal matter, right?

24   A.   Nothing had been filed yet.  I was supplying

25   information.  I didn't really know whether that was civil or

Page 133

1   criminal.

2   Q.   Okay.  So they were not all civil litigation matters.

3   One involved you being a witness for the prosecution?

4   A.   I was an information source at that time.

5   Q.   Okay.  As an information source, you were familiar with

6   the --

7          THE COURT:  Mr. Stirba?

8          MR. STIRBA:  Yes, Your Honor.

9          THE COURT:  A witness for the prosecution was with

10  Charles Laughton and Marlena Detrick.  I just want to make

11  sure that you are still awake.

12         MR. STIRBA:  I appreciate that, Judge.

13         THE COURT:  In 1957 Billy Wilder was the director.

14  You can go back to sleep now.

15         MR. STIRBA:  No.  I do have an inclination to nap,

16  but it is amazing how I still absorb.

17         THE COURT:  All right.  Go ahead.  Thank you,

18  counsel.  Go ahead.

19  BY MR. SCHWARTZ:

20  Q.   So let's just go now to April 24, 2008.

21  A.   Yes, sir.

22  Q.   Now, that date, that was the first time you ever saw

23  Special Agent Luis Perez; isn't that correct?

24  A.   Yes, sir.

25  Q.   Okay.  And you chose a room, and they showed you their

Page 134

1    credentials; isn't that right?

2    A.   Yes, sir.  They were already in the building when I

3    arrived.  So I directed them to the conference room.  That is

4    correct.

5    Q.   First you to took them on a little tour, right?

6    A.   My employees did, actually, before I got there.

7    Q.   You didn't show them your prized possession, your

8    four-wheel drive vehicle?

9    A.   My employees did, I believe.

10   Q.   So you didn't?

11   A.   I don't recall that, no.

12            THE COURT:  That's not the one you blew up, right?

13            THE WITNESS:  No.

14            THE COURT:  Okay.  All right.  Go ahead.

15            THE WITNESS:  That was a junk car provided by one

16   of our employees.

17   BY MR. SCHWARTZ:

18   Q.   And you chose the room to meet in the conference room or

19   break room.  That's a room of that nature; isn't that right?

20   A.   Yes, sir.

21   Q.   Okay.  And they didn't brandish their weapons or

22   handcuff you, or anything like that?

23   A.   No, sir.

24   Q.   No.  Okay.  And today you testified -- let me get this

25   wording right -- that Special Agent Perez told you that they

Page 135

1    were investigating Aey; isn't that right?

2    A.   Yes, sir.

3    Q.   And that at that time you answered their questions fully

4    to the best of your knowledge; is that correct?

5    A.   Yes, sir.

6    Q.   Is that really correct, sir?

7    A.   Yes, sir.

8    Q.   All right.  Well, let's go through some of what you said

9    that day.

10            Now, you told Special Agent Perez in your prior

11   dealings with Aey that Aey did all of the contract work, and

12   that you never helped out or got involved with billing out

13   the contract; is that right?

14   A.   That is correct.

15   Q.   But, in fact, you are a little bit more involved in

16   day-to-day issues with those contracts; isn't that true?

17   A.   Well, the government would write all of the contracts.

18   My understanding is Aey had no control over the contracts.

19   The government wrote them all, and they were government

20   contracts.  So there was no writing of contracts.

21   Q.   And you also told the agents that, you were asked by the

22   agent that if you ever helped Diveroli with any of the

23   language in the documentation to obtain any DOD contracts

24   with Diveroli; isn't that right?

25   A.   Well, I recall that question as using the word "writing"

1   and the word "contracts."  I don't recall the question as it

2   appeared in the memorandum.

3   Q.   Okay.  But, in fact, you were pretty deeply involved

4   with putting together the bid for the Aey Afghanistan

5   contract, right?

6   A.   Not at all.

7   Q.   No?

8   A.   No.

9   Q.   So you didn't write any of the past performance part of

10  the bid to the United States Government?

11  A.   That was not the bid.  That was a request for a

12  qualification.  Proposal it had nothing to do with -- I mean,

13  it wasn't a bid.

14  Q.   So the past performance tender had nothing to do with

15  getting the contracts?

16  A.   It wasn't the bid.  You asked if I had helped write the

17  bid.  I never did.

18          THE COURT:  Did you have answer to do with getting

19  the contract?

20          THE WITNESS:  I did review some paper for syntax,

21  spelling, grammar that Diveroli had asked me to do.  Yes, I

22  did.

23  BY MR. SCHWARTZ:

24  Q.   Isn't it true that you outlined what the narrative would

25  be and then drafted it and kept making changes over the

1    course of the period before the contract was signed?

2    A.   Oh.  I recall that all of the substantive information

3    about Aey had to come from Aey.

4    Q.   Well, you have held yourself out in the past as the

5    vice-president of Aey; isn't that correct?

6    A.   On occasion I have used that term, yes.

7    Q.   Okay.  And, in fact, your attorney, that Craig Erickson

8    also at times signed his name as counsel for Aey; isn't that

9    right?

10   A.   No, sir.

11   Q.   Never?

12   A.   No, sir.

13   Q.   All right.

14   A.   Not that I recall.

15   Q.   Not that you recall.  Okay.  Well, I want to show you

16   something.  CX-78.  Take a quick look at this.

17   A.   Yes.

18   Q.   Do you now remember those e-mails?

19   A.   Yes, sir.

20          MR. STIRBA:  Your Honor, I am just going to object

21   again.  These are dated September 9, 2006, September 11,

22   2006.  I just don't see the relevance.

23          THE COURT:  Overruled.

24          MR. SCHWARTZ:  Okay.  So let's take a look at CX-8.

25   BY MR. SCHWARTZ:

1   Q.   Isn't it true in this e-mail you are sending an e-mail

2   to Henry Tomay summarizing the narrative for the Afghan tender

3   past performance document and a list of issues that we must

4   address?

5          MR. STIRBA:  The document speaks for itself, Judge.

6   If he wants to read it, fine.

7          THE COURT:  Government, I am going to have to ask

8   you to be a little more declarative and Hemmingway-esk in

9   your questioning.

10          MR. SCHWARTZ:  Yes, Your Honor.

11  BY MR. SCHWARTZ:

12  Q.   So, in fact, sir, as shown in cross-examination exhibit

13  8, you sent Henry Tomay an e-mail with a list of issues that

14  needed to be addressed for the Afghan past performance bid;

15  isn't that correct?

16  A.   It appears that is correct.

17  Q.   So you summarized and came up with a to do list of how

18  to fill out that portion of the past performance, the Afghan

19  tender past performance requirement?

20  A.   Yes.

21  Q.   Okay.  And, in fact, as shown in cross-examination

22  exhibit 7, you drafted the Afghan tender past performance

23  narrative; isn't that correct?

24  A.   I assisted.  I don't recall that I -- it could be said

25  that I drafted the entire document, no.

1  Q.   So you were not being very forthcoming back on April

2  24th when that question was asked?

3  A.   Well, I have stated that I dispute that that is how that

4  question was asked.  I remember distinctly that the word

5  contract was used, and I didn't remember assisting with

6  writing any contracts.

7  Q.   Okay.  But now you remember that, right?

8  A.   I remember that I had assisted in writing proposals.

9  Q.   Okay.

10        THE COURT:  All right.  Now, government, I don't

11 mean to chill you, but now I am giving you a chance to

12 question him, but I was allowing this to show to some extent

13 his sophistication, and so forth and so on, but this is not

14 the trial of the case.

15        MR. SCHWARTZ:  Absolutely, Your Honor.

16        THE COURT:  Okay.

17        MR. SCHWARTZ:  Now, there is one other issue that I

18 wanted to address before and then we can move on.

19        THE COURT:  Go ahead.

20        MR. SCHWARTZ:  That is not with respect to that.

21 It will be very clear.

22        THE COURT:  Go ahead.

23 BY MR. SCHWARTZ:

24 Q.   Now, you also advised the agents on April 24th that you

25 didn't know that the ammunition was Chinese until after it

Page 140

1  was sent; isn't that correct?

2  A.   I think that question has been improperly transcribed.

3  My recollection of that question, I actually answered a

4  question just before that as to when I knew that the

5  ammunition was Chinese, and I answered that that was about a

6  year ago which would have placed that in April of '07.

7       So I basically answered that question, but the

8  following question, to my recollection, was a question about

9  when did I know that the Chinese ammo was a problem, and that

10  was after it had shipped, yes.

11       THE COURT:  After what?

12       THE WITNESS:  If the Chinese ammunition was a

13  problem.

14       THE COURT:  After what?  You said after what?

15       THE WITNESS:  After it had shipped.

16  BY MR. SCHWARTZ:

17  Q.   Now, I want to show you government's exhibits D-1 and

18  D-2.  I think you have heard a lot about it already.

19  A.   Yes.

20  Q.   Now, the e-mail you sent regarding scraping off the

21  markings was in May of 2007, isn't that correct, or is it?

22       MR. STIRBA:  April 25th.

23       MR. SCHWARTZ:  I am sorry.  April 25.

24       THE WITNESS:  Yes, sir.

25  BY MR. SCHWARTZ:

1   Q.   Okay.  And that was before the ammunition shipped; isn't

2   that right?

3   A.   Yes.  Quite a while.

4   Q.   Okay.  And so you sent that e-mail with an idea of how

5   to conceal the Chinese origin back before any of the

6   ammunition shipped; isn't that correct?

7   A.   Yes, sir.

8   Q.   So you knew it was a problem beforehand?

9   A.   Yes.  I had been informed.  Diveroli informed me that

10   the Albanian Government had wanted to do something about

11   meeting a first shipment with some unmarked crates, and he

12   wanted to know how they were going to do it.

13   Q.   So you were not honest with the officers on April 24th?

14   A.   Yes, I was.

15          THE COURT:  Counsel, what is the relevance on this

16   motion to suppress that is along this questioning now?

17          MR. SCHWARTZ:  Your Honor, it shows that he was

18   lying.  He is a sophisticated individual who was not harassed

19   or coerced.

20          In looking at the totality of the circumstances,

21   the case law says he is best less than honest in deceiving

22   investigators, it goes to the argument that they raise, Your

23   Honor.

24          THE COURT:  About what?

25          MR. SCHWARTZ:  That he was duped into coming down,

1    or that his confession was not voluntary.

2              THE COURT:  Well, you know, it cuts both ways,

3    counsel, and I have heard enough, and I think the record is

4    clear enough for somebody to judge his sophistication.

5              MR. SCHWARTZ:  Okay.

6              THE COURT:  All right.  But to cut the other way is

7    why he was asked to come down to Miami.  So if your purpose

8    is sophistication, you know, there is a record there.

9              Okay.  But what you are doing is, I am just saying

10   without making any findings is that you are arguing against

11   your own argument that this is just almost a ministerial

12   matter to comply with the grand jury subpoena.  Now, with

13   that, go ahead.

14             MR. SCHWARTZ:  I will explain that.

15   BY MR. SCHWARTZ:

16   Q.   So then, sir, you stated on direct that at the time the

17   agents didn't characterize your relationship with the

18   investigation; isn't that right?

19   A.   Well, they characterized it as a fact witness, yes.

20   Q.   On direct you said that they didn't characterize the

21   relationship, your relationship with the investigation in any

22   specific way; isn't that right?

23   A.   I understood that to mean tying me with their

24   investigation of Aey in criminal matters.  You know, they

25   didn't intimate that I was involved like Aey was.

Page 143

1   Q.   Well, let me ask you, now when you said that the

2   government arranged travel for you, isn't it true really that

3   you called the travel agent?

4   A.   They directed me to the government travel agent who was

5   going to pay for the ticket, and we more or less coordinated

6   when I would be coming down.  They pretty much told me when

7   to come, yes.

8   Q.   Okay.  But you were booking your own flights through the

9   government travel agent.  No one just handed you a ticket and

10  said, "Be here this date, this time, this flight.  You have

11  no choice."

12  A.   Agent Perez told me when he wanted me there.  He wanted

13  me there on the evening of the 6th.  That was very clear.

14  Q.   But there is --

15          THE COURT:  But it was up to you.  Let's get to the

16  heart of the matter.  He told you when you had to be here,

17  right?  You made your specific travel plans, right?

18          You booked your flight.  The government is going to

19  pay for it.  They may have suggested a travel agency?

20          THE WITNESS:  No, I didn't, really.  I was not the

21  one that booked my flight.  I just told the government travel

22  agent when I needed to be there, and they booked the flight.

23          THE COURT:  Got you.

24  BY MR. SCHWARTZ:

25  Q.   So when you came down to Miami, you were you were booked

Page 144

1    in a hotel, right?

2    A.   Yes, sir.

3    Q.   And the following morning you brought with you the

4    documents that were requested for you; isn't that right?

5    A.   Yes, sir.

6    Q.   Okay.  And prior to that, you actually, you know,

7    created your own excel sort of summary chart listing how much

8    money you were owed by Aey; isn't that right?

9    A.   Yes, sir.

10   Q.   And the bank records you also put in your own

11   annotations showing which contracts they were related to like

12   the Colombia contract, the Bagdad contract; isn't that

13   correct?

14   A.   Yes, sir.

15   Q.   Okay.  And that morning you went into the United States

16   Attorney's Office, right?

17   A.   Yes.

18   Q.   And you went into the room.  Was the door locked?

19   A.   No, sir.

20   Q.   Were you ever told you could not leave?

21   A.   No, but I assumed that I could not because I was given

22   to understand that the meeting was part of the subpoena

23   process, and I was commanded to appear.

24   Q.   Now, did anyone tell you that you could not leave?

25   That's my question.

1    A.    No, but they didn't say I could.

2    Q.    Okay.

3    A.    I assumed that I was commanded to be there.

4          THE COURT:  Sir, you must answer the question with

5    a yes or no if you can.  And if you feel the need to explain

6    it, then you can, but it is not required.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  Did anybody tell you that you could not

9    leave?

10          THE WITNESS:  No one said I could not leave.

11   BY MR. SCHWARTZ:

12   Q.    And so that morning, now there was no advice of rights

13   provided, right, when you first started?

14   A.    Yes, sir.

15   Q.    And you were first asked questions with respect to when

16   you how you met Efraim Diveroli and got involved with Aey;

17   isn't that correct?

18   A.    Yes, sir.

19   Q.    And you were also asked a lot of background questions

20   that were asked of you already back on April 24th, right?

21   A.    Yes, sir.

22   Q.    This is two weeks after that April 24th meeting, right?

23   A.    Yes, sir.

24   Q.    So you had a two week period where theoretically you

25   could have called an attorney?

Page 146

1   A.   Yes, sir.

2   Q.   There is nothing precluding you from doing so, correct?

3   A.   Correct, sir.

4   Q.   You know criminal defense attorneys.  You know multiple

5   attorneys?

6   A.   Yes, sir.

7   Q.   Okay.  And they then turned to the documents themselves,

8   right?  So Assistant AUSA Koukios started looking at the

9   financial documents that you brought, right?

10  A.   Yes, sir.

11  Q.   And you guys went through that in pretty excruciating

12  detail; isn't that right?

13  A.   I suppose you could characterize it that way, yes.

14  Q.   It is not the most exciting thing, going through

15  financial records in a conference room?

16  A.   Yes, sir.

17  Q.   But there was some time taken.  It was not you just

18  handed the documents and there was a thank you.  There was

19  real questioning with respect to understanding your

20  annotations; isn't that right?

21  A.   Yes, sir.

22  Q.   Okay.  And then you were asked about when you knew about

23  the issue with respect to the Chinese ammunition, right?

24       Then there were questions with respect to about

25  whether you were aware of the nature or the origin of the

Page 147

1  ammunition, correct?

2  A.   No, sir.

3  Q.   There were no questions regarding that?

4         THE COURT:  Are you talking about before he was

5  shown the e-mails?

6         MR. SCHWARTZ:  Before, Your Honor.

7         THE WITNESS:  No, sir.

8  BY MR. SCHWARTZ:

9  Q.   So you were never asked about whether, or you were never

10  asked and never told the agents that you first learned that

11  the ammunition was Chinese and was a problem until the

12  previous fall when the search warrant was done at Aey.  You

13  never said that?

14  A.   No, sir.

15  Q.   So that part of the report of the investigations, I am

16  sure you looked at, is incorrect?

17  A.   I don't recall reading any commentary on what I knew and

18  when prior to the question about scraping.

19  Q.   Okay.  But you knew about that the ammunition was Chinese

20  back in April, right?

21  A.   Yes, sir.

22  Q.   Okay.  And at that time AUSA Koukios asked you if you

23  had any e-mails related to scraping, right?

24  A.   He used the word "communication."

25  Q.   Communication.  I am sorry.  Communication with respect

Page 148

1   to scraping?

2   A.   Yes, sir.

3   Q.   And you said, no?

4   A.   That is correct, sir.

5   Q.   He asked you if you were involved in any communications

6   with respect to using the origin of ammunition as a leverage?

7   A.   Yes, sir.

8   Q.   And you said, no?

9   A.   That is correct.

10   Q.   And then he showed you those two e-mails; isn't that

11   right?

12   A.   Yes, sir.

13   Q.   When he showed you those two e-mails, at first you said

14   they were false.  They were fake; isn't that correct?

15   A.   No, sir.

16   Q.   You never said that at all?

17   A.   I never said that.

18   Q.   So when that agent got on the stand, that agent, Luis

19   Perez, made that up; is that correct?

20          MR. STIRBA:  Objection, Judge.  That's an improper

21   question, Judge.

22          THE COURT:  His answer is what it is.  Ask the next

23   question.

24          MR. SCHWARTZ:  Okay.

25   BY MR. SCHWARTZ:

1    Q.    So then after that, Assistant AUSA Koukios stopped the

2    interview, correct?

3    A.    Yes, sir.

4    Q.    Okay.  And that was before you went into detail about

5    how you are trying to save your investment to conceal the

6    ammunition and any of that, correct?

7            That was just after those two e-mails you were

8    shown, you said, "What do we do now."  Isn't that correct?

9    A.    That is correct.

10   Q.    That's your testimony?

11   A.    That is correct.

12   Q.    So before you made any sort of serious admissions or

13   anything to that effect; isn't that correct?

14   A.    Yes.  Well, what was the question again?

15   Q.    Before you went into detail about your concealment and

16   before you actually admitted that, yeah, you sent those

17   e-mails to think a way to conceal the Chinese ammunition.

18           THE COURT:  Your question is absolutely unclear.

19   BY MR. SCHWARTZ:

20   Q.    Now, you just said you didn't really discuss those

21   e-mails at all.  You just said, "What do we do now," correct?

22   That's your testimony?

23   A.    That is correct.

24   Q.    There was no further line of questioning with respect to

25   those e-mails, correct?

Page 150

1    A.   That is correct.

2    Q.   Or the context of those e-mails, correct, or anything

3    else relating to Aey or Chinese ammunition issues at that

4    point, correct?

5    A.   Not until we had discussed the arrangement or the

6    bargain deal.

7    Q.   So the answer to that question is, no?  There was no

8    discussion about any of that?

9              MR. STIRBA:  Well, no, he didn't testify to that.

10             THE COURT:  All right.  Please be seated.  Now,

11   ask your questioner again.  And if you can, answer it with a

12   yes or no, do it.  Then if you can explain do so, but ask

13   your question again.

14   BY MR. SCHWARTZ:

15   Q.   Now, when you were shown the e-mails and you claim to

16   have said, "What do we now," prior to that period --

17             THE COURT:  Is that right so far?

18             THE WITNESS:  Yes.

19             THE COURT:  Go ahead.

20   BY MR. SCHWARTZ:

21   Q.   That is correct, right?  According to you that is

22   correct, right?

23   A.   Yes, sir.

24   Q.   Okay.  Prior to that, you didn't go into the context of

25   those e-mails?

1  A.   No, sir.

2  Q.   You didn't discuss any further or give any further

3  explanation of those e-mails, correct?

4  A.   Correct, sir.

5  Q.   You didn't discuss your involvement with respect to any

6  of the concealment issues at that point, correct?

7  A.   Correct.

8  Q.   Okay.  And at that point Assistant AUSA Koukios stops

9  the interview and advises you of your rights; isn't that

10 true?

11      THE COURT:  You said what is next?  Is that what

12 you are talking about?

13      MR. SCHWARTZ:  Right.

14      THE COURT:  He said what is next.  Go ahead,

15 according to him.

16      MR. SCHWARTZ:  Okay.  He said what is next.

17 BY MR. SCHWARTZ:

18 Q.   And Assistant AUSA Koukios then says, "This interview

19 has taken on a new level;" isn't that correct?

20 A.   Yes, sir.

21 Q.   Okay.  And then AUSA Koukios says, "We can stop now.

22 You can leave or you can get a lawyer," correct?  He says

23 that, right?

24 A.   Yes, sir.

25 Q.   He also advises you that you could possibly cooperate as

1   well; isn't that correct?

2   A.   Yes, sir.

3   Q.   Okay.  So he advised you of your right to have counsel

4   present, right?

5   A.   Yes, sir.

6   Q.   He tells you that you are free to leave, correct?

7   A.   Yes, sir.

8   Q.   Okay.  And he tells you that you can keep talking; isn't

9   that right?

10  A.   In effect.  I mean, that was part of a deal offer.  I

11  mean, there had to be a reason why I kept talking, so he

12  offered me to deal at that point.

13  Q.   Well, let's talk about this deal.  You said that you

14  were offered a Class A misdemeanor with probation; isn't that

15  correct?

16  A.   Yes, sir.

17  Q.   Okay.  And what Class A misdemeanor were you offered?

18  A.   He said that he didn't have the charges exactly clear at

19  that point, but there would be some, but whatever they were,

20  it would be reduced to a Class A misdemeanor.

21  Q.   So he never mind anything about possibly if you

22  cooperate about reducing your sentence and letting the judge

23  know of your cooperation if you chose to do so?

24  A.   He said they would plead with the judge for a reduced

25  sentence also.

1    Q.    In addition to the Class A misdemeanor?

2    A.    Yes, sir.

3            THE COURT:  In addition to a Class A misdemeanor

4    with probation, they would recommend a reduced sentence?

5            THE WITNESS:  They would plead with the judge for a

6    reduced sentence, yes.

7            THE COURT:  What could be more reduced than

8    probation?

9            THE WITNESS:  I was not clear on that point.

10           THE COURT:  Okay.  Next question.

11   BY MR. SCHWARTZ:

12   Q.    And then you continued on.  And after this point you

13   were asked questions relating to the Chinese ammunition and

14   you explained those e-mails in greater detail; isn't that

15   correct?

16   A.    Yes, sir.

17   Q.    Okay.  And then there was a lunch break; isn't that

18   right?

19   A.    Yes, sir.

20   Q.    Okay.  During that lunch break, were you told that you

21   didn't have to come back if you didn't want to?

22   A.    Not at the lunch break.  They had mentioned that

23   earlier.

24   Q.    Okay.  But you decided to come back after lunch, right?

25   A.    Yes, sir.

1   Q.   You decided not to consult with an attorney during the

2   lunch hour; isn't that right?

3   A.   That is right.

4   Q.   You decided not to ask for any breaks so you could call a

5   lawyer that you knew.  And you know other lawyers, right?

6   A.   Yes, sir.

7   Q.   Okay.  Now, Mr. Stirba talked about a plea agreement.

8   You are aware of a plea agreement; isn't that correct?

9   A.   In writing.  It came a few weeks later, yes.

10  Q.   Okay.  Well, let me ask you first.  Let me go back.  On

11  May 15th, about a week after you were present at the United

12  States Attorney's Office in Miami, you retained an attorney

13  in this case; isn't that right?

14  A.   I had retained one earlier, actually.

15  Q.   Earlier than that?

16  A.   Yes, sir.

17  Q.   But you first made it known to the United States

18  Attorney's Office around May 15th.  Is that a fair

19  assessment?

20  A.   Yes, sir.

21            THE COURT:  Had you retained that lawyer after the

22  grand jury appearance?

23            THE WITNESS:  Before.

24            THE COURT:  Before your grand jury appearance here?

25            THE WITNESS:  Yes, Your Honor.

 1              THE COURT:  You had a lawyer?

 2              THE WITNESS:  Yes, I did, sir.

 3              THE COURT:  Was that after?  Did you hire the

 4      lawyer after April 24th and before your grand jury appearance

 5      here?

 6              THE WITNESS:  Yes, Your Honor.

 7              THE COURT:  So at the time that you appeared here

 8      for your grand jury appearance, you had a lawyer, right?

 9              THE WITNESS:  I had discussed the subpoena with an

10      attorney, yes, Your Honor.

11              THE COURT:  What was the attorney's name?

12              THE WITNESS:  Brad Rich.  Bradley Rich.

13              THE COURT:  Go ahead.

14      BY MR. SCHWARTZ:

15      Q.  And let me ask you, sir, now the plea agreements that

16      were sent, and I believe they are government's exhibit 8 --

17              THE COURT:  Government, don't you want to ask about

18      his lawyer that he had before the grand jury appearance?

19      BY MR. SCHWARTZ:

20      Q.  Did you have any conversations with your lawyer.

21              MR. STIRBA:  Well, you know, this is a privileged

22      area, but --

23              THE COURT:  Hiring a lawyer?  That's not

24      privileged.

25              MR. STIRBA:  No, no.  I understand that, but I

Page 156

1   didn't think that was the question.  May I just consult

2   briefly with my client?

3              THE COURT:  No.

4              MR. STIRBA:  Okay.

5   BY MR. SCHWARTZ:

6   Q.   So when did you decide to hire an attorney, Mr. Rich?

7   A.   I had him already on retainer on behalf of my employees

8   because of that incident out in the desert.

9   Q.   Okay.  And did you consult with him about this subpoena?

10  A.   I did, sir.

11  Q.   Okay.

12             THE COURT:  All right.  Do what you are going to

13  do.  Okay.

14  BY MR. SCHWARTZ:

15  Q.   Now, later you talked a little bit about a plea

16  agreement, isn't that correct, that was provided by the

17  United States Attorney's Office?

18  A.   Yes, sir.

19  Q.   Now that was provided to the same attorney, Mr. Bradley

20  Rich; isn't that right?

21  A.   That is right, sir.

22  Q.   And that plea agreement, and I think the two drafts on

23  June 6th and again on June 10th, those, in fact, had you

24  pleading to a felony offense; isn't that correct?

25  A.   Yes, sir.

Page 157

1    Q.    Okay.  Do you want to take a look at those?

2          THE COURT:  Well, he doesn't need to take a look.

3    Next question, unless you want to for some reason or unless

4    Mr. Stirba wants him to look at it.

5          MR. STIRBA:  No.  I think we are fine.  Thank you,

6    Judge.

7    BY MR. SCHWARTZ:

8    Q.    And, in fact, that plea agreement didn't have an offer

9    for a Class A misdemeanor with an offer of cooperation; isn't

10   that correct?

11   A.    That's correct .

12   Q.    But you signed it anyway; isn't that correct?

13   A.    Do we have a signed copy?

14   Q.    You signed it on June 12th; isn't that correct?

15   A.    And then rescinded it about a day later.

16         THE COURT:  All right.  Show it to him and mark it

17   and we will admit it.  You signed a plea agreement for a

18   felony you are saying a week or two after his grand jury

19   appearance.  Is that what you are saying?

20         MR. SCHWARTZ:  Yes, Your Honor.

21         THE COURT:  Go ahead and show it and mark it.

22         MR. STIRBA:  No.  It is actually a month more,

23   Judge.

24         THE COURT:  Okay.

25         MR. STIRBA:  June 12th, 2008 is when it was faxed

1    to the United States Attorney's Office.

2              THE COURT:  Is that the first one or the second

3    one that you are referring to?

4              MR. STIRBA:  This is the second one.

5              THE COURT:  All right.  Now, I am sorry.  The first

6    one was sent to his lawyer on what date?

7              MR. SCHWARTZ:  On June 6th.

8              THE COURT:  And then what happened that causes the

9    second one?

10             MR. SCHWARTZ:  The second one was sent on June

11   10th.

12             THE COURT:  What is the difference between the two,

13   and why?

14             MR. STIRBA:  Judge, if memory serves me, the first

15   one was sent on May 15th.

16             THE COURT:  The first plea agreement was sent to

17   his other lawyer on May 15th?

18             MR. STIRBA:  That is what I am looking at.

19             THE COURT:  Is that right, counsel?

20             MR. SCHWARTZ:  That's incorrect, Your Honor.

21   Government Exhibit H which is provided, the cover letter for

22   the first one was June 6th.  The second one was June 10th.

23             THE COURT:  Okay.  And what was the difference

24   between the two and why was the second one sent?

25             MR. SCHWARTZ:  That's draft 2.

1          MR. STIRBA:  Your Honor, we are taking a look.

2          THE COURT:  That's why you get the big bucks,

3   counsel.

4   BY MR. SCHWARTZ:

5   Q.   Sir, that is that your signature on the government

6   exhibit --

7          THE COURT:  I want you to answer my question.

8          MR. SCHWARTZ:  We are looking, Your Honor.  They

9   are both the same felony.

10         THE COURT:  Okay.  While you are looking, let me

11  tell the parties that are waiting for the continued Garcia

12  matter that as soon as we are done with this witness I will

13  take care of that matter.  Okay.

14         MR. SCHWARTZ:  There is a loss amount differential.

15         THE COURT:  A what?

16         MR. SCHWARTZ:  A loss amount differential of

17  agreed loss.

18         THE COURT:  Okay.  Agreed loss.  Okay.

19         MR. SCHWARTZ:  As to the fraud, Your Honor.

20         THE COURT:  Okay.  But what he was offered, the

21  offer was the same?

22         MR. SCHWARTZ:  The same felony.

23         THE COURT:  And what was the offer?

24         MR. SCHWARTZ:  It was to plead to a violation of

25  major fraud against the United States, 18, U.S.C. 1031, which

Page 160

1   has a 10 year maximum.

2            THE COURT:  Okay.  And somebody brought out,

3   correct, either counsel for the defendant or the government

4   noticed there was a factual mistake as to the loss amount or

5   a change?

6            MR. SCHWARTZ:  Or a change as to the loss amount.

7            THE COURT:  Okay.  Now, was the first letter

8   accepted?  In other words, the deal, other than the loss

9   amount?

10            MR. SCHWARTZ:  Well, the second letter was

11   accepted.

12            THE COURT:  The second letter was accepted.  Okay.

13            MR. SCHWARTZ:  Right.  Correct.

14            THE COURT:  What was the date the second letter was

15   accepted?

16            MR. SCHWARTZ:  It was signed and faxed back to the

17   United States Attorney's Office on June 12th.

18            THE COURT:  Okay.  On June 12th?

19            MR. SCHWARTZ:  Correct, Your Honor.

20            THE COURT:  Okay.  And what was the deal?

21            MR. SCHWARTZ:  The deal was to plead to the major

22   loss against the United States.

23            THE COURT:  A felony?

24            MR. SCHWARTZ:  A felony.  A 1031 felony with a 10

25   year maximum.

1          THE COURT:  Any promise made as to sentence?

2          MR. SCHWARTZ:  No, Your Honor.

3          THE COURT:  Okay.  And what promises were made?  It

4   speaks for itself.

5          MR. SCHWARTZ:  Yes, Your Honor.

6          THE COURT:  So show him this letter number 2 and

7   mark it as an exhibit.  Maybe he has it in his hands

8   already.

9          MR. SCHWARTZ:  He has the signed plea agreement.  I

10  will show him the second letter.  It is Government Exhibit

11  H.

12   [Government Exhibits H and H-1 marked for identification].

13         MR. SCHWARTZ:  I am showing you we will call this

14  H-1, the cover letter and plea agreement.

15         THE COURT:  Okay.  So now we are referring to H-1,

16  which is the cover letter and the plea agreement, right?

17         MR. SCHWARTZ:  That was provided.

18         THE COURT:  That was the second one.  This is the

19  second one, right?

20         MR. SCHWARTZ:  Correct, Your Honor.

21         THE COURT:  It was a letter that was provided, and

22  he signed the plea agreement, right?

23         MR. SCHWARTZ:  Right.  The signed copy that was

24  faxed to the United States is CX-18.  Government exhibit

25  CX-18.

Page 162

1        [Government Exhibit CX-18 marked for identification].

2             THE COURT:  Okay.  What does he have in his hand

3    that we are offering into evidence here?

4             MR. SCHWARTZ:  We would offer both CX-18 and

5    Government Exhibit H-1.

6             THE COURT:  Which constitutes between them the

7    cover letter to him and the signed plea agreement, right?

8             MR. SCHWARTZ:  Correct, Your Honor.

9             THE COURT:  Okay.

10            MR. SCHWARTZ:  And we now move to offer those into

11   evidence.

12            THE COURT:  That's admitted.

13    [Government Exhibits H-1 and CX-18 received in evidence].

14            MR. RYAN:  And everything that has been offered and

15   to which there was no objection thus far in this hearing is

16   admitted.

17            Now, with respect to the document, what does it

18   provide?  It is a felony?

19            MR. SCHWARTZ:  Yes, Your Honor.

20            THE COURT:  One felony count, correct?

21            MR. SCHWARTZ:  Correct, Your Honor.

22            THE COURT:  And it has a 10 year maximum, right?

23            MR. SCHWARTZ:  Yes, Your Honor.

24            THE COURT:  And what was agreed to in the letter

25   that he signed, the plea agreement that he signed with

Page 163

1   respect to sentencing?

2          MR. SCHWARTZ:  I will get it.

3          THE COURT:  You have it.  Take a look at the

4   exhibit.

5          MR. SCHWARTZ:  Your Honor, with respect to if

6   there was any specific recommendation for sentencing, I

7   think it was just the loss.  The special offense was that the

8   loss involved was more than $7,000,000 and less than

9   20,000,000.

10         MR. STIRBA:  Page 3.

11         MR. SCHWARTZ:  Page 5 on my faxed signed copy, but

12   CX-18, and that there should be no increase or decrease in

13   role adjustments, and I think it had an appellate waiver as

14   well, and I think it included the government's standard

15   cooperation language.

16         THE COURT:  Okay.  So with respect to the deal,

17   then, he was going to plead to that one felony count, right?

18         MR. SCHWARTZ:  Yes, Your Honor.

19         THE COURT:  And what was going to happen with

20   respect to sentencing?

21         MR. SCHWARTZ:  There was no specific promise as to

22   sentence.

23         MR. STIRBA:  Judge, it is right on page 3.

24         THE COURT:  Which says what, counsel?

25         MR. STIRBA:  It says this:  "The United States and

1   the defendant agree, although not binding on the Probation

2   Office or the Court, they will jointly recommend the Court

3   impose a sentence within the advisory sentencing guidelines

4   range produced by the applicable sentencing guidelines."

5        They go on to say, "The United States agrees that

6   it will recommend a sentence that the Court reduce by 2 or 3

7   levels the sentencing guidelines applicable to the

8   defendant's offense pursuant to Section 3E1.1 of the

9   sentencing guidelines, and based upon his recognition of the

10  timely acceptance of personal responsibility."

11       It also has, and I am paraphrasing a little bit.

12  "The defendant agrees that he shall cooperate fully with this

13  office by, A, producing truthful and complete information and

14  testimony; B, appearing at such grand jury proceedings here

15  and/or trials and, C, if requested by this office, working in

16  an undercover role to contact and negotiate with others

17  suspected and believed to be involved in criminal misconduct

18  under the supervision of, and in compliance with law

19  enforcement officers and agents."  And then attached with

20  this was also another grand jury subpoena.

21       MR. SCHWARTZ:  Correct.

22       THE COURT:  Now, that is Res ipsa loquitur, right?

23  The exhibit speaks for itself, correct?

24       MR. STIRBA:  Yes.

25       THE COURT:  Now, what I am asking you is with

Page 165

1   respect to, and that's fine, it is in the record, but what I

2   am asking is -- well, let me see what my understanding is

3   then.

4          He is pleading to the felony.  It is whatever the

5   guidelines are, less what the government agrees to recommend

6   a couple of levels lower, correct?

7          MR. SCHWARTZ:  Correct.

8          THE COURT:  That, in the best case scenario from

9   the defendant's point of view, would he still be possibly

10  looking at jail time as determined by the court?

11         MR. SCHWARTZ:  Yes, Your Honor I.  Think around --

12         THE COURT:  Is that correct?

13         MR. SCHWARTZ:  -- around 5 years at least.

14         THE COURT:  Mr. Stirba, the way the plea agreement

15  that he signed allows for the court to impose whatever

16  sentence it sees fit, consistent with the guidelines, less

17  whatever the levels the government agrees to recommend; is

18  that correct?

19         MR. STIRBA:  Generally you are right, except there

20  is additional language.

21         THE COURT:  Yes.

22         MR. STIRBA:  "If in the judgment (inaudible) of the

23  defendant's cooperation is of such quality and significance,

24  warrants the court's downward departure under 5.K1 or Rule 35

25  under the Federal Rules Of Criminal Procedure subsequent to

1  sentencing reflecting his assistance," and what have you.

2          So that is another area where there could be

3  significant reduction.

4          THE COURT:  Right, but it is clear that he is

5  looking at jail time by signing that agreement that he had?

6          MR. STIRBA:  I think that is a fair reading, just

7  generally in the document.

8          THE COURT:  Okay.  It speaks for itself.  I am

9  trying to make a record here.

10          So in June, after his grand jury appearance, he

11  signed a plea agreement that was to a felony that could have

12  resulted in jail time.

13          That's all.  The record speaks for itself.  I am

14  trying to clarify the record here, okay, without making a

15  finding on the motion to suppress.

16          MR. STIRBA:  And then with his caveat that he said

17  he rescinded it, and I think that's true, too.

18          THE COURT:  He rescinded what?

19          MR. STIRBA:  The plea agreement that he signed he

20  rescinded the following day.

21          THE COURT:  Okay.  Next question, if any.

22          MR. SCHWARTZ:  I don't think I have any further

23  questions, Your Honor.

24          THE COURT:  I would hope not.  Any redirect?

25          MR. STIRBA:  Yes.

1          THE COURT:  I don't mean to give you a hard time,

2     counsel.  It is already hard doing what you do.  Okay.

3          I am just trying to help everybody make a record

4     here so that a higher and wiser authority will have an

5     understandable record here.

6          MR. STIRBA:  Understood.

7          THE COURT:  Yes.  Counsel.

8                    REDIRECT EXAMINATION

9     BY MR. STIRBA:

10    Q.   Yes. And without telling exactly what you were told, did

11    you consulted with Brad Rich who testified; is that right?

12    A.   Yes, sir.

13    Q.   And that was before your appearance in Miami on May 6th,

14    May 7th and May 8th, right?

15    A.   Yes, sir.

16    Q.   And just based upon what that consultation was, did you

17    feel comfortable coming to Miami unrepresented?

18    A.   Yes, I did.

19    Q.   And did you have any reason, based upon that

20    consultation, to believe that you needed to have Mr. Rich

21    here?

22    A.   No.  Mr. Rich, I told him that I had been told that I

23    was a fact witness to answer questions about Aey, and he said

24    then, "You don't need me."

25    Q.   Finally, with respect to that recording of the sheriff,

1    and you recorded that because you were seeking some

2    authorization or permission to do something; is that right?

3    A.    Yes, sir.

4    Q.    And what was the permission that you were seeking?

5    A.    We wanted to make sure that the area where we had

6    planned to go or where the employees had planned to go was

7    clear, and that we could shoot there without expecting a

8    problem.

9    Q.    And the sheriff said what?

10   A.    He said that, "I know the area.  There is no problem.

11   People shoot there all the time."

12   Q.    And the criminal matter that you have been asked about,

13   no charges have been filed, right?

14   A.    That is correct, sir.

15            MR. STIRBA:  Thank you.  That's all, Judge.

16            THE COURT:  Now, this Mr. Rich, I have seen his

17   name in the pleadings.  That's the same Mr. Rich that you

18   consulted before you came down here and the same Mr. Rich

19   that was your lawyer at the time that you looked and signed

20   the plea agreement, correct?

21            THE WITNESS:  Yes, Your Honor.

22            THE COURT:  And then thereafter, I don't know

23   Mr. Rich, he may be Clarence Darrow, but then you went to

24   the best lawyer in the land that and hired Mr. Stirba, right?

25            MR. STIRBA:  He wanted somebody who looked like

Page 169

 1   Charles Lawton.

 2              THE COURT:  Okay.  Thank you.

 3              MR. STIRBA:  Thank you.

 4              THE COURT:  Is there any redirect?

 5              MR. SCHWARTZ:  No, Your Honor.  Nothing.

 6              THE COURT:  Okay.  All right.  Do you rest on your

 7   evidence?

 8              MR. STIRBA:  I do, Judge.

 9              THE COURT:  Okay.  Sir, you may step down, but

10   stand by.  I am just going to interrupt to do this.

11              I will make ask you to make way for another matter

12   that I have to got to take care of, and then we will get back

13   to your matter.  Okay?

14              THE WITNESS:  Thank you, Your Honor.

15                   [The witness was excused].

16                   [There was a short recess].

17              THE COURT:  Recalling United States versus

18   Merrill.

19              Folks, I apologize for that interruption.  That

20   was a matter that I had to handle.  So we have taken of that

21   for the time being.

22              Now, everybody has rested.  Government, I think

23   you rested on your evidence?

24              MR. SCHWARTZ:  Yes, Your Honor.

25              THE COURT:  And the defense has rested on their

1   evidence.

2          Your arguments, I have them in the pleadings.  I

3   am not prepared to rule from the bench, but I expect to get

4   out an R and R expeditiously.

5          Is there anything else that you would like to

6   argue?  Well, here is what I will do to save time with

7   respect to the motion:

8          I will give you each 72 hours, if you want,

9   voluntarily to file a supplementary argument based upon the

10  testimony here.  How is that?

11         MR. STIRBA:  That's fine, Judge.

12         THE COURT:  But I think I have everything I need

13  because the pleadings are superb here.

14         Okay.  The pleadings are superb, but I will give

15  you 27 hours from today to file simultaneously supplemental

16  memoranda of law based upon the evidence that was heard.  It

17  is not required.  Okay?  All right.

18         MR. STIRBA:  That's fine.

19         THE COURT:  Now, we have docket entry 418,

20  defendant Merrill's motion to compel all preserved hand

21  written memoranda and rough notes, and we have defendant

22  Ralph Merrill's motion to compel, docket entry 406.

23         Let's turn to page 418.  It is docket entry 418; a

24  motion to compel all preserved handwritten memoranda and

25  notes.  What is the government's position with respect to

1   that?

2          MR. SCHWARTZ:  Your Honor, with respect to that

3   motion, we would rely on the case law which says there is no

4   general right to agent's notes when the statements of a

5   defendant have been put in a typewritten memorandum which

6   has been handed over.

7          THE COURT:  It is called a motion to preserve.

8          MR. SCHWARTZ:  Oh.

9          MR. STIRBA:  That has been granted, Judge.

10         MR. SCHWARTZ:  That has been granted.  We have

11  preserved notes, Your Honor.

12         THE COURT:  Was it granted before as we speak by

13  Judge Lenard?

14         MR. STIRBA:  Yes.  I am pretty sure.

15         THE COURT:  Or I did it already?

16         MR. STIRBA:  Yes.  I am  sorry.  There is

17  ambiguity the way we captioned it.  It is actually a motion

18  to produce the preserved notes, as opposed to preserving the

19  notes.

20         THE COURT:  Okay.  What is the status of that?

21         MR. SCHWARTZ:  Well, Your Honor, our position is

22  there is no --

23         THE COURT:  So 418 is still pending, right?

24         MR. SCHWARTZ:  Yes, Your Honor.  Yes.  And, Your

25  Honor, the government's position is the motion asks for

Page 172

1    every single agent's notes throughout the course of the case.

2              THE COURT:  You have preserved them already.

3              MR. SCHWARTZ:  Yes.

4              THE COURT:  But you don't want to produce it,

5    right?

6              MR. SCHWARTZ:  Correct, Your Honor.

7              THE COURT:  Okay.  Your position is sound so far.

8    Counsel, why should they produce them now?

9              MR. STIRBA:  Well, we had some need with respect

10   to this hearing, but it is probably moot and academic at

11   this point, but we do think because of the way this was

12   stored, there were notes of the 8th interview, no written

13   summary of the 8th interview.

14             I am talking about the testimony here.  Then we

15   had obviously disputes about what occurred on the 7th.  We

16   are interested in having the notes of the 7th.

17             THE COURT:  I don't recall, counsel, you asking at

18   the time that the witnesses were on the stand or your

19   questioning, "Where are the notes?  Can you get them?  Do you

20   have access to them?"  They didn't bring them with them.

21             MR. STIRBA:  I actually did ask those questions of

22   both of the agents.

23             THE COURT:  You said, "Do you have it with you?"

24             MR. STIRBA:  Yes.

25             THE COURT:  And they didn't.

1              MR. STIRBA:  That's true.  I didn't go into some

2       further delving.  That's true.

3              THE COURT:  Okay.  All right.

4              MR. STIRBA:  I thought it was sort of self-evident

5       to ask questions about it.

6              THE COURT:  I understand what you are saying.

7       Your motion is denied.  Now, it is denied without prejudice.

8              I am not encouraging you to do it, but it is

9       without prejudice to you refiling with more specificity

10      based upon something that occurred today or something that

11      you need for trial.  Do you follow me?

12             MR. STIRBA:  Yes, I do.

13             THE COURT:  Okay.

14             MR. STIRBA:  Absolutely.  Thank you.

15             THE COURT:  Now, I am not encouraging you to

16      refile, but I want justice to be done here, but you are

17      going to have to be more specific, and you may not need it

18      now.  Okay.  Fair enough?

19             MR. STIRBA:  That's fair, Judge.

20             THE COURT:  Okay.  So it is denied without

21      prejudice.

22             That leaves us with 406 which is this colossal

23      motion to compel.  Quite frankly, I will tell you that I was

24      not going to get to that right away, but since you were

25      coming in today, I put it on the calendar.  Do you follow

1   me?

2            MR. STIRBA:  Yes.

3            THE COURT:  Now, that motion was filed a long time

4   ago.  It was responded to, so there has been time for it to

5   gestate it and for you to work without telling you that I

6   agree with anything that you are saying there, in some or in

7   part, I have read the government's response, and I have

8   looked at the state of the record.

9            I take it that there has been some communication

10  since the filing of this motion, correct?

11           MR. STIRBA:  Yes, and some resolution of a number

12  of the issues.  There are still a relatively small amount

13  that I think we have to still work through, and we probably

14  will need the court's assistance, but generally we have

15  worked out quite a bit.

16           THE COURT:  Now, here is what I will do, okay, with

17  respect to that, and it is okay because I probably was not

18  going to set this immediately quickly because of the then

19  trial date, but here is what I suggest with respect to that,

20  since you are all here:

21           Okay.  By the way, let me ask the government who

22  wrote the responses to the motion to suppress and the motion

23  to compel?

24           MS. FERNANDEZ:  It was a group effort, Your Honor.

25           THE COURT:  Okay, because I want to say it was a

1   very fine, both of them were very fine, and I note that

2   because, you know, as much as I love the office, and

3   everything, as a former alumnus, some written work is better

4   than others.

5          MS. FERNANDEZ:  Thank you, Your Honor.

6          THE COURT:  Okay.  I am not addressing the merits,

7   counsel, but these were very fine well-written crafted

8   responses both to the motion to suppress and this motion to

9   compel.  I want it noted.

10         MS. FERNANDEZ:  Thank you, Your Honor.

11         THE COURT:  Of course, the motions were very well

12  represented, Mr. Merrill.

13         THE DEFENDANT:  Thank you, Your Honor.

14         THE COURT:  Here is what I am going to suggest:

15  Since you are all here now, I am going to let you confer.  I

16  am not telling the government to agree to something that, you

17  know, for whatever reason or requiring you to do anything.

18         I commend you for what you have been doing so far;

19  a million and a half documents are pretty good, you know,

20  and I have carefully read your response.

21         Counsel, without indicating that I think there is

22  merit to any or part of your motion, do you follow me?

23         MR. STIRBA:  Yes.

24         THE COURT:  I will give you the opportunity to

25  confer and, government, to I would err on the side of

Page 176

1   disclosing, frankly, not because you are necessarily

2   required to do so, but because like who cares?  And to save

3   time at trial.  But you don't have to give up one additional

4   thing.  Don't get that impression.  Do you follow me?

5          MS. FERNANDEZ:  Yes.

6          THE COURT:  And, counsel, the same thing here.  I

7   am neutral.  Anything I have to decide I am neutral and

8   detached on, but I am giving you a chance to take control of

9   this.

10         You know what you have really got to have, counsel.

11  You know what you really are not allowed to produce, for

12  whatever reason, but I will simply say nothing will be

13  precedential in any other case that I have pending.  Do you

14  follow what I am saying?  But I will give you a chance to

15  discuss it because you know better than I what you really

16  need and think you are entitled to as a matter of law,

17  counsel, and the same thing with the government, what you

18  can disclose consistent with policy that is in black and

19  white or case law.  Do you follow me?

20         I am going to let you confer on that, and then you

21  will announce what you don't agree upon, but I would like to

22  give you each a chance so you are not rushed to do that and

23  give you the rest of the day to do that.

24         Then, counsel, I know you are in from Utah, but

25  this is a Miami case.  Do you follow me?  So I would ask you

1   to come back.

2            I have other things tomorrow, but I would suggest

3   that you come back tomorrow at 2:00 o'clock and announce

4   either it is resolved or at that time we are going to have

5   argument, and I will try to rule, you see, but let me put it

6   in this light:

7            I may get it wrong, as hard as I try.  And,

8   counsel, you know what you really need and what you think

9   you are really are entitled to.  And, government, you are in

10  a position to know the law and your requirements, but I

11  commend you for what has been done here.

12           This must be a nightmare of production in this

13  case.  I hope they have given you some time other than the

14  100 other cases to do this.

15           Is that right?  Was it a million and a half

16  documents so far?

17           MS. FERNANDEZ:  Yes.

18           THE COURT:  But you get paid, counsel.

19           MR. STIRBA:  Think about it from our standpoint.

20  Deal with it.

21           THE COURT:  You are getting paid, though.

22           MR. STIRBA:  Well, they get paid, too.

23           THE COURT:  They get paid less than I do.  We

24  didn't get a pay raise, counsel.

25           MR. STIRBA:  May I make just a suggestion, Your

1  Honor?  I have discussed this with government counsel.

2         THE COURT:  Sure.

3         MR. STIRBA:  If we could come to a point where we

4  could submit essentially a joint stipulation to Your Honor

5  that may say these particular things we have a dispute on,

6  and for the reasons whatever.  Very simple.

7         THE COURT:  I think you ought to address that.  Go

8  as far as you can until tomorrow at 2:00 o'clock.  That's

9  less than 24 hours.

10        If you cannot reach agreement, I will hear argument

11 and rule or I will hear argument and I will reserve or I

12 will hear what you have to say about a stipulation.

13        MR. STIRBA:  Okay.  All right.

14        THE COURT:  I suggest that you take the bull by

15 the horns.  Do you follow me?  And you know what you really

16 need and what the law will allow, counsel.  And the

17 government, the same thing, and, also, as a practical

18 matter, what you can do.

19        In other words, it is better that you resolve it

20 than have me resolve it, but it will be resolved one way or

21 the other  Do you follow me?

22        MR. STIRBA:  I do very much, and I appreciate it.

23 By the way, just one thing as a practical logistical thing.

24        May Mr. Merrill be excused from being here

25 tomorrow at that hearing?

1          THE COURT:  No.  It is his case.  It is his

2     liberty.  Do you follow me?

3          Do you know what else?  He should stand by because

4     these are the prosecutors in this case, correct?

5          You are free to go beyond discussing this motion

6     to compel, so you want Mr. Merrill to stand by to consult

7     with you and you consult with the government.  Do you follow

8     me?

9          MR. STIRBA:  Not quite.

10          THE COURT:  Okay.  Well, then, I will just ask

11     Mr. Merrill to stand by for an extra 24 hours.

12          These are matters that I could rule upon without a

13     hearing, and I have granted you a hearing on this, so take

14     advantage of it.

15          I appreciate the distance and the travel, and

16     whatever, but I think another 24 hours, given it is a

17     criminal charge against Mr. Merrill, I think you ought to

18     stand by for consultation with you, counsel.

19          MR. STIRBA:  That's fine.

20          THE COURT:  And I am saying you are free to go

21     beyond what I am keeping you here for.  Does everybody

22     understand that?

23          Mr. Merrill, I say you are very well represented.

24     He is an excellent lawyer.  I have been around a long time.

25     And, government, you get the big bucks.  That's why I am

Page 180

1    allowed to give you a hard time?  Do you understand that?

2           But I am proud.  Your office is well-served and

3    the community is well-served.  You are doing a fine job here.

4           I am just trying to help make a record here to make

5    it understandable and to make sure your positions are fairly

6    set forth.  Do you follow me?  That is all I am trying to do.

7           I am not as smart as you guys, so I have to slow

8    you down to make sure I have got the right dates, I have got

9    the right events, and so forth and so on, but I can only do

10   it with you because I respect you so much.

11          MS. FERNANDEZ:  We appreciate that, Your Honor.

12          MR. SCHWARTZ:  Thank you, Your Honor.

13          THE COURT:  And tell your supervisors and the

14   people who give out the bonuses, particularly about the

15   written stuff, which is really very, very good.

16          We had to read a lot, and it really was a pleasure

17   to read.  I am not getting to the merits, but professionally

18   it was like very good in a very busy office.

19          Okay.  I am a stickler for that.  When I see good

20   writing, I like it.  Substantively it was good.  That was

21   the important thing, but it was also very well written, and I

22   compliment you for that.

23          Now, the ideal situation here is if you can reach

24   some kind of agreement here.  However, I understand it is

25   not a civil case, you know, but on the motion to compel, that

Page 181

1    I think you should be able to reach agreement on, but, you

2    know, I am paid to make decisions and I will take care of it

3    if you can't.  Fair enough?

4         MR. STIRBA:  Very well.  Perfectly understood,

5    Judge.  I appreciate your efforts today and the short notice

6    of the hearings.  I appreciate it very much.

7         THE COURT:  Well, that is what I am saying.  I am

8    letting you know.  The only reason I put it on is because

9    you are going to be here already.  Do you follow me?

10        MR. STIRBA:  Yes.

11        THE COURT:  So there is no prejudice here, and

12   actually you can take advantage of the situation.

13        Because you are here on a motion to suppress, you

14   are face-to-face on this matter as well as anything else that

15   you want to resolve.

16        And since Mr. Merrill is here, and it is all about

17   Mr. Merrill, you are the one facing the consequences here.

18   These prosecutors have 100 other cases and you have a lawyer

19   who is excellent and superb, and obviously he has mastered

20   this case, but when it is over, he goes on to other cases,

21   but it is your life that is involved here.  Do you follow me?

22   So I think you ought to stand by.

23        THE DEFENDANT:  Thank you, Your Honor.

24        THE COURT:  Do you follow me?  I am trying to be

25   helpful and be fair.

Page 182

1          THE DEFENDANT:  Yes, Your Honor.  Thank you.

2          THE COURT:  Fair enough?

3          MR. STIRBA:  Yes, sir.

4          THE COURT:  Okay.  So I will see you all tomorrow

5   at 2:00 o'clock.  Let me let me ask permission of Lizbeth,

6   Lakisha, is there anything else that I need to cover?

7   Nothing.  Okay.  Have a pleasant afternoon.

8          MS. FERNANDEZ:  Thank you, Your Honor.

9          MR. STIRBA:  Thank you, Judge.

10          MR. SCHWARTZ:  Thank you.

11          (Whereupon the proceedings were concluded)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2          I hereby certify that the foregoing is an accurate

3     transcription of proceedings in the above-entitled matter.

4
      December 15, 2009    S/Jerald M. Meyers
5     _____    _____
         DATE                JERALD M. MEYERS, RPR-CM
6                            Miami, FL  33128-7797

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25