```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                   CASE NO. 08-20574-CRIMINAL-LENARD
3

4    UNITED STATES OF AMERICA,        Miami, Florida

5                    Plaintiff,       December 2, 2010

6            vs.                      10:25 a.m. to 11:57 a.m.
                                      2:42 p.m. to 3:21 p.m.
7                                     3:48 p.m. to 4:39 p.m.

8    RALPH MERRILL,

9                    Defendant.       Pages 1 to 108
                                                                
10   _____

11      EXCERPTED TESTIMONY OF ALBERT WIESNER, DAVID BLACK AND
              KIM JONES FROM THE JURY TRIAL HELD BEFORE
12    THE HONORABLE JOAN A. LENARD, UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   FOR THE GOVERNMENT:      ELOISA FERNANDEZ, ESQ.,
                              ADAM SCHWARTZ, ESQ., and
15                            FRANK TAMEN, ESQ.
                              ASSISTANT UNITED STATES ATTORNEYS
16                            99 Northeast Fourth Street
                              Miami, Florida 33132
17
     FOR THE DEFENDANT:       BRIAN H. BIEBER, ESQ.,
18                            HIRSCHHORN & BIEBER, PA
                              550 Biltmore Way
19                            Penthouse Three A
                              Coral Gables, Florida 33134
20                                    -and-
                              NATHAN A. CRANE, ESQ.
21                            STIRBA & ASSOCIATES
                              215 South State Street, Suite 750
22                            Salt Lake City, Utah 84111

23   REPORTED BY:             LISA EDWARDS, CRR, RMR
                              Official Court Reporter
24                            400 North Miami Avenue
                              Twelfth Floor
25                            Miami, Florida 33128
                              (305) 523-5499
```

1                        I N D E X

2

3                                   Direct    Cross    Red.

4

5   WITNESSES FOR THE GOVERNMENT:

6   Albert Michael Wiesner            3        39       42

7   David Brian Black                50        67

8   Kim Machelle Jones               79

9

10  EXHIBITS RECEIVED IN EVIDENCE:                       PAGE

11  Government's Exhibit Nos. 43.1 through 43.8            18
    Government's Exhibit No. 43.5A                         21
12  Government's Exhibit No. 43.8A                         23
    Government's Exhibit Nos. 45.1 through 45.12,
13    excluding 45.10; 46.1 through 46.13,
      excluding 46.10; 47.1 through 47.6; 48.1
14    through 48.13, excluding 48.10; 49.1 through
      49.27, excluding 49.10 and 49.20; 50.1 through
15    50.8; 51.1 through 51.15, excluding 51.10; 52.1
      Through 52.16, excluding 52.10; 53.1 through
16    53.28, excluding 53.10 and 53.20; 54.1 through
      54.26 excluding 54.10 and 54.20; 56.1 through
17    56.18, excluding 56.10; and 57.1 through 57.6        26
    Government's Exhibit Nos. 44.5A, 44.6A, 45.5A,
18    45.7A, 46.6A, 46.11A, 46.13A, 47.6A, 48.6A,
      48.9A, 48.13A, 49.6A, 49.11A, 49.15A, 49.19A,
19    49.24A, 49.27A, 50.4A, 50.8A, 51.6A, 51.9A,
      51.13A, 51.15A, 52.6A, 52.9A, 52.13A, 52.16A,
20    53.6A, 53.11A, 53.15A, 53.19A, 53.24A, 53.28A,
      54.7A, 54.12A, 54.16A, 54.22A, 54.26A, 55.6A,
21    55.11A, 55.15A, 55.18A, 56.6A, 56.9A, 56.14A,
      56.18A and 57.6A                                     30
22  Government's Exhibit No. 59                            31
    Government's Exhibit Nos. 55.1 through 55.18,
23    excluding 55.10                                      47
    Government's Composite Exhibit Nos. 3, 3-A,
24    3-B and 3-C                                          91

25

1         ALBERT MICHAEL WIESNER, GOVERNMENT WITNESS, SWORN

2              THE COURT REPORTER:  Please take the stand.

3              Please state your full name for the record and spell

4    your last name.

5              THE WITNESS:  Albert Michael Wiesner, W-i-e-s-n-e-r.

6                       DIRECT EXAMINATION

7    BY MR. SCHWARTZ:

8    Q.  Special Agent Wiesner, where do you work?

9    A.  I work with the major procurement fraud unit of US Army

10   Criminal Investigations Command.

11   Q.  And what is the US Army Criminal Investigations Command?

12   A.  The Investigations Command is the entity responsible for

13   conducting investigations for the United States Army.

14   Q.  And you said you were in the major procurement fraud unit

15   or division.  Is that correct?

16   A.  Yes.

17   Q.  What do you investigate in that unit?

18   A.  The unit investigates allegations and -- related to fraud

19   and associated US Army contracts.

20   Q.  Where are you currently stationed?

21   A.  Colorado Springs.

22   Q.  Back in January of 2008, where were you stationed?

23   A.  I was stationed at Bagram Air Base, Afghanistan.

24   Q.  I want to talk about your time in Bagram Air Force base in

25   Afghanistan in a few minutes.

1      But let me just ask you:  How long have you been with the

2  US Army criminal investigative -- is it division?  I'm sorry.

3  A.   It's the US Army Criminal Investigations Command.

4  Q.   The Criminal Investigations Command.

5      How long have you been a special agent with that --

6  A.   Since 2003.

7  Q.   And prior to that, where did you work?

8  A.   I worked for the United States Air Force.  I did a total of

9  16 years.  The last eight years were with the Air Force Office

10  of Special Investigations.

11  Q.   So how many years total of at least criminal investigative

12  experience do you have?

13  A.   15.

14  Q.   Did you receive training while you were doing such criminal

15  investigative work?

16  A.   I did.  I attended a multitude of investigative academies,

17  including the Air Force Office of Special Investigations basic

18  academy, advanced academy, economic crimes and a multitude of

19  other investigative training courses, including courses at the

20  Federal Law Enforcement Training Center in Glynco, Georgia.

21  Q.   So, Special Agent Wiesner, you mentioned before that, back

22  in January of 2008, you were stationed at Bagram Air Force in

23  Afghanistan.  Is that correct?

24  A.   Yes.

25  Q.   When did you first arrive or when did your tour or stint at

Wiesner - DIRECT - By Mr. Schwartz                    5

1   Bagram Air Force Base begin?

2   A.   It began in early December, 2007.

3   Q.   What were your duties when you were at Bagram Air Force

4   Base?

5   A.   I was assigned as a special agent in charge of the major

6   procurement fraud unit for the entire country of Afghanistan.

7   Q.   And how many people were in the major procurement fraud

8   unit that you led?

9   A.   In Afghanistan?

10  Q.   Correct.

11  A.   There was just two of us.

12  Q.   For the entire country?

13  A.   Yes.

14  Q.   Okay.  And how long did you spend in Afghanistan?

15  A.   Approximately ten months.

16  Q.   At some point during your period of time in Afghanistan,

17  did you learn of or work on an investigation relating to a

18  company by the name of AEY?

19  A.   Yes, I did.

20  Q.   How did you become involved?

21  A.   During the transition period with my predecessor, we

22  discussed all of the ongoing investigations and all of the

23  ongoing matters that were occurring that needed to be

24  completed.  That's when he identified to me that there was a

25  request for assistance from the Defense Criminal Investigative

Wiesner - DIRECT - By Mr. Schwartz                6

1   Service.

2   Q.   And what was this request?

3   A.   The request was to collect ammunition in the 22 Bunkers

4   ammo depot just outside of Kabul, Afghanistan.

5   Q.   When was that request first sent?

6   A.   I believe our office received it at the end of October of

7   '07.

8   Q.   Did you know why it hadn't been completed at that time --

9   and this time we're talking about -- so it came at the end of

10  October of '07 and now we're at the end of '07 -- why it had

11  yet to be completed?

12  A.   Due to logistical and manpower issues, my predecessor was

13  not able to complete the request.

14  Q.   You mentioned a facility, 22 Bunkers.

15       What is that facility?

16  A.   22 Bunkers is an ammunitions storage depot located just

17  east of Kabul.

18  Q.   Who operates that depot?

19  A.   It's actually -- it belongs to the Afghanis, operated by

20  the Afghan National Police, Afghan National Army.  But

21  maintenance and support -- logistical support is provided by

22  the US Army.

23  Q.   So this is a facility outside Kabul, I think you mentioned.

24  Is that correct?

25  A.   Yes.

Wiesner - DIRECT - By Mr. Schwartz                7

1    Q.   Now, where were you stationed, in Bagram, how far away is

2    Kabul, to begin with?

3    A.   Kabul is approximately 50 miles.

4    Q.   And from there, how much further out is Kabul to

5    22 Bunkers?

6    A.   I don't know the exact distance.  I know that it took us

7    about an hour to get there.

8    Q.   Now, back in December, when you first learned about this

9    request, did you attempt to go to 22 Bunkers and obtain samples

10   of ammunition?

11   A.   Yes.  My predecessor and I, Special Agent Jurgensen,

12   attempted to coordinate travel to Kabul and then subsequent

13   travel to 22 Bunkers, but that did not occur.

14   Q.   Why did that not occur?

15   A.   Based on the threat environment and based on other

16   considerations, our travel was disapproved.

17   Q.   Was there a time that you were able to travel to

18   22 Bunkers?

19   A.   Yes.  We precoordinated travel for January, 2008.

20   Q.   Let me direct your attention to January 4th of 2008.

21        Is that when you began your trip to the 22 Bunkers

22   facility?

23   A.   Yes, it is.

24   Q.   Can you explain to us what took place on January 4th of

25   2008.

Wiesner - DIRECT - By Mr. Schwartz                    8

 1    A.   On January 4th -- actually, prior to January 4th, travel

 2    throughout the country was extremely difficult and the

 3    logistics required were time-intensive and a lot of

 4    coordination was required to actually make the trip happen.   On

 5    the 4th, following approval, we traveled from Bagram Air Base

 6    to Kabul International Airport via aircraft.

 7         In addition to that, prior to our travel, we had

 8    coordinated with the Federal Bureau of Investigation liaison in

 9    Kabul so that we could actually travel from the Kabul

10    International Airport to the US Army Corps of Engineers Koala

11    House, which is where we had -- we were able to secure lodging.

12         There are several compounds in Kabul.  And so we determined

13    that the easiest location would be to Koala House so that we

14    could actually have a place to stay.

15    Q.   So you flew in the morning from Bagram Air Force Base to

16    Kabul International Airport.  Is that correct?

17    A.   That is correct.

18    Q.   It wasn't a commercial flight, was it?

19    A.   No.

20    Q.   And when you -- what time did you arrive in Kabul?

21    A.   I believe it was 7:00, 7:30 in the morning.

22    Q.   And when did you leave the airport?

23    A.   About 12:30.

24    Q.   Describe the convoy.  What did you use to travel to the

25    Army Corps of Engineers facility, the Koala House?

Wiesner - DIRECT - By Mr. Schwartz                    9

1    A.   We had precoordinated travel with the Federal Bureau of

2    Investigation, the FBI, and they indicated to us that they

3    could not pick us up until 12:30 because, again, of the threat

4    environment.

5         First of all, it was Friday.  So it's the Muslim Sabbath,

6    and the threat is just much higher.  And the insurgents know,

7    you know, what -- which convoys use which routes.  So it was

8    extremely dangerous.  And again, they picked us up at 12:30.

9    Q.   And how were you dressed that day?

10   A.   Protocol required us to wear our body armor, helmets.  We

11   had to have our M4 rifles, which is, you know, the

12   standard-issue rifle for the Army.  We also had our side arms.

13   The vehicle was an up-armored, inconspicuous Land Rover, and we

14   had four individuals in the vehicle.

15   Q.   Describe the trip from the airport to the Koala House.

16   A.   It was intense.  There had been insurgent attacks on the

17   route on multiple occasions.  So the only way I can describe it

18   is intense.

19   Q.   Now, that day, when you arrived at the Koala House, did you

20   attempt to proceed on to 22 Bunkers?

21   A.   No.  We had previously coordinated with the Government

22   entity that was managing the logistics for the site and we had

23   coordinated a meeting with an individual -- the individuals

24   from that unit at Camp Eggers.

25   Q.   And Camp Eggers:  Is that near the Koala -- the engineering

Wiesner - DIRECT - By Mr. Schwartz                10

1   facility?

2   A.   It's located right across the street, but requires travel

3   outside the wire to travel from one location to the other.

4   Q.   And let me ask you:  Is travel restricted to the 22 Bunkers

5   facility for US Army personnel?

6   A.   Yes.  Once we coordinated with the entities supporting the

7   logistics there, we were told that we could only travel during

8   daylight hours.

9   Q.   Let's go to the following day, January 5th of 2008.

10       Did you then proceed to 22 Bunkers?

11  A.   We did.  We initially traveled to Camp Eggers, coordinated

12  with Chief Warrant Officer Sailer and then traveled via convoy

13  from Camp Eggers to 22 Bunkers.

14  Q.   And Chief -- is it Chief Sailer?

15  A.   Chief Warrant Officer Sailer or Warrant Officer Sailer.

16  Q.   Warrant Officer Sailer:  Was he involved or had any

17  relationship with the 22 Bunkers facility?

18  A.   Yes.  He was the supervisor for the ANP side of the storage

19  facility.

20  Q.   And ANP, what is that?

21  A.   The Afghan National Police.

22  Q.   What time did you arrive at 22 Bunkers?

23  A.   I believe it was 8:30 or so.

24  Q.   When you arrived there, what did you do first?

25  A.   We spoke to Chief Sailer and we wanted to get a layout of,

1   you know, what the facility actually entailed.  Nobody had been

2   able to provide us photos.  So we wanted to see what the

3   overall layout of the actual complex was.

4   Q.  Can you describe to the ladies and gentlemen of the jury

5   what you saw on the layout of the complex.

6   A.  The complex itself was rolling hills.  It's, you know, a

7   compound surrounded by concertina wire walls.  There are

8   several old Afghani bunkers which are no longer utilized

9   because they're extremely fragile, and the weapons stored in

10  those bunkers are actually so dilapidated that they're

11  extremely dangerous.

12      The actual portion of the complex that contained the

13  ammunition that we were supposed to collect were -- was made of

14  Sea-Land containers, the ones you typically see here at the

15  Port of Miami.

16  Q.  And were these Sea-Land containers numbered or identified

17  in any way?

18  A.  The Sea-Land containers did have numbers on them, but they

19  weren't placed -- or they weren't segregated by number.  I

20  mean, the numbers were sporadically placed throughout the

21  compounds.

22  Q.  So your mission was to obtain ammunition provided by a

23  company known as AEY.  Is that correct?

24  A.  Yes.

25  Q.  How did you go about identifying where the ammunition from

     1    AEY was located in 22 Bunkers?

     2    A.   When we coordinated with Chief Sailer, he identified that

     3    the majority of this ammunition came from AEY and then he

     4    identified the containers which had AEY ammunition.

     5    Q.   And let's talk about your system of obtaining samples.

     6         Did you have -- how did you go about collecting this

     7    ammunition?

     8    A.   Once we actually were able to look inside the containers,

     9    we decided that we would draw a sketch of each of the

    10    containers, identify the number of pallets that were on the

    11    right and left-hand side of the container because that's how

    12    they were stacked in the container.  We also decided to take

    13    photographs to document the collection of the evidence.

    14    Q.   Now, did you have -- already have in mind which pallets you

    15    wanted to take samples of or were they sampled randomly?

    16    A.   No.  We just took random samples.

    17    Q.   How many -- when you took a sample from a pallet -- you

    18    know, let's break it down a bit.

    19         Can you describe to the ladies and gentlemen the pallets

    20    that you saw in these Sea-Land containers.

    21    A.   The pallets themselves were your typical wooden pallets

    22    that you would see, you know, at a grocery store or at other

    23    shipping facilities.

    24         Each pallet had approximately 30 to 40 cardboard boxes,

    25    just a little bit larger than a soda can -- or a soda pop box.

1    And then each and every one of those pallets and boxes were

2    wrapped in cellophane.

3    Q.   And were there -- was all of the pallets that you saw

4    containing cardboard boxes or did you see any pallets that also

5    contained another form of storage, other storage methods?

6    A.   One of the containers had -- the actual pallets contained

7    metal boxes versus cardboard boxes.

8    Q.   Now, these pallets:  Did you -- when you were taking

9    samples from the pallets, did you select the pallets at random,

10   just to be clear?

11   A.   Yes.

12   Q.   And would you always take on the top of the box or on the

13   side of the box?  Did you have a set location where you'd

14   always take samples from?

15   A.   No.  We just decided to make it random.

16   Q.   When you -- did you also see open cardboard boxes that had

17   loose-packed ammunition?

18   A.   Yes.

19   Q.   Did you take samples from those -- certain of those boxes

20   as well?

21   A.   On some occasions.  Yes.

22   Q.   Did any of these pallets have any bond paper or labels

23   which mentioned the contractor AEY?

24   A.   Some of them did.  Yes.

25   Q.   When you opened the pallets, was there any way for you to

Wiesner - DIRECT - By Mr. Schwartz                    14

```
 1  determine where this ammunition was manufactured?
 2  A.  The pallet or the boxes?
 3  Q.  The boxes.
 4  A.  When we opened the boxes, there were -- there was no
 5  identifying data inside -- there were no data cards inside the
 6  boxes.
 7  Q.  You mentioned the term "data card."
 8      What do you mean by that?
 9  A.  I can only tell you what I'm used to.  When we receive
10  ammunition for our own purposes, normally, the boxes that we
11  receive are fully identified and, you know, the serial
12  number -- or the lot number is on each and every box of
13  ammunition that we receive.
14      In this case, the cardboard boxes actually had what I --
15  what appeared to be butcher-style paper and the ammunition was
16  wrapped in the butcher-style paper and then tied.
17  Q.  Did any of that butcher-style paper inside have any
18  discernible Chinese markings?
19  A.  No.
20  Q.  Could you tell if the ammunition was -- if the ammunition
21  was manufactured in China by your inspection?
22  A.  No.
23  Q.  Let me ask you, Special Agent Wiesner --
24          MR. SCHWARTZ:  May I approach, your Honor?
25          THE COURT:  Yes.
```

1   BY MR. SCHWARTZ:

2   Q.   I'm showing you what's been entered into evidence as

3   Government's Exhibit 42.22.

4        Did you see any source of cardboard sheets --

5            THE COURT:  I don't think that microphone is on.  You

6   have to press the button on the mic.

7            Oh.  Maybe it is.

8            MR. SCHWARTZ:  I'll hand it up and come back.

9   BY MR. SCHWARTZ:

10  Q.   Special Agent Wiesner, can you hold up that exhibit I just

11  presented to you.

12       Did you see any sorts of cardboard placards like that in

13  any of the pallets that you opened up inside any of the boxes

14  you took samples from?

15  A.   No, I did not.

16  Q.   Now, you said you were taking samples from these boxes.

17  Correct?

18  A.   Yes.

19  Q.   You took approximately 10 rounds each for each sample?

20  A.   Yes.

21  Q.   What did you do with those -- each of those 10 rounds once

22  you collected it from the box?

23  A.   Once the rounds were collected, I placed the rounds in a

24  small manila envelope.  The manila envelope was sealed.  The

25  container number, the pallet number, my initials and the date

Wiesner - DIRECT - By Mr. Schwartz                    16

1  and time collected were placed on each and every one of the

2  manila envelopes.

3  Q.   Now, that day, did you -- did you recover ammunition from

4  15 Sea-Land containers?  Is that correct?

5  A.   Yes.

6  Q.   Why only 15?

7  A.   We had very limited time on the ground.  Again, we could

8  only be there during the daylight hours.  We pushed the

9  envelope as much as we could.  We only had a limited amount of

10  time to do our collection.

11  Q.   So you had these samples of ammunition from the

12  15 containers.  Correct?

13  A.   Yes.

14  Q.   They were placed in manila envelopes.  Correct?

15  A.   Yes.

16  Q.   The manila envelopes had the location on -- on where it was

17  recovered from each individual container.  Correct?

18  A.   Yes.  Each individual one is labeled.

19  Q.   Where did you place those manila envelopes with the

20  ammunition?

21  A.   At the end of the day, we placed those in a metal

22  ammunition box and secured the metal ammunition box.

23  Q.   What did you do with that ammunition box later that

24  evening?

25  A.   We traveled back to the Koala House, and I secured the

Wiesner - DIRECT - By Mr. Schwartz          17

```
 1   ammunition box in a locker in my room and locked the locker
 2   with a lock that I only had the key to.
 3   Q.  And did that ammunition eventually make it down to -- back
 4   to the United States?
 5   A.  Yes.  On 8 January, we traveled back to Bagram Air Base,
 6   and I transferred the entire box to the evidence custodians for
 7   the military CID office at Bagram Air Base.
 8   Q.  And was it eventually shipped back to America?
 9   A.  It was.
10   Q.  How so?
11   A.  It was shipped via registered mail.
12   Q.  Now, let's start talking about the actual collection.
13       Do you remember taking samples from a container labeled as
14   B22?
15   A.  Yes.
16   Q.  Now, I'm about to hand up to you, Special Agent Wiesner,
17   Government's exhibits marked for identification purposes as
18   Government's Exhibit 43.1 through 43.8.
19       Now, Special Agent Wiesner, are you familiar with those
20   exhibits?
21   A.  I am.
22   Q.  What are they?
23   A.  It's a sketch of Container B22 that was compiled by myself
24   and SA Kevin Park.  It's photographs of the container and
25   photographs of the ammunition collected.
```

Wiesner - DIRECT - By Mr. Schwartz          18

1    Q.   Do they fairly and accurately depict Container B22 as it

2    appeared on the 5th of January, 2008?

3    A.   Yes.

4           MR. SCHWARTZ:   Your Honor, at this time the Government

5    would offer Exhibits 43.1 through 43.8 into evidence.

6           MR. BIEBER:   No objection, Judge.

7           THE COURT:   They will be admitted as Government's

8    Exhibits 43.1 through 43.8.

9           (Whereupon, Government's Exhibit Nos. 43.1 through

10   43.8 were entered into evidence.)

11          MR. SCHWARTZ:   May we publish, your Honor?

12          THE COURT:   Yes.   How are you publishing?

13          MR. SCHWARTZ:   Through the computer.

14   BY MR. SCHWARTZ:

15   Q.   Could we start and take a look at Government's

16   Exhibit 43.2, please.

17       Could you explain to the ladies and gentlemen of the jury

18   what we're all looking at in this exhibit.

19   A.   This is a picture of Container B22, the exterior of the

20   container, looking into the container.

21   Q.   How do you know it's Container B22?

22   A.   Because the number is on the actual container.

23   Q.   Now, we see a few white specks or sprinkles on the picture.

24       What was the weather like that day?

25   A.   It was extremely cold and snowing.

Wiesner - DIRECT - By Mr. Schwartz                    19

1    Q.   And could we go to Exhibit 43.3, please.

2         What are we looking at in this exhibit?

3    A.   This is a picture of the interior of the container with the

4    actual pallets.

5    Q.   These are the pallets you discussed previously?

6    A.   Yes.

7    Q.   And could we go to 43.4, please.

8         What are we looking at in this exhibit?

9    A.   This is the top of the pallet.  This is the ammunition that

10   was contained within the boxes and the butcher-style paper that

11   the rounds were wrapped in.

12   Q.   By "butcher-style paper," you're talking about this paper

13   underneath the rounds of ammunition?

14   A.   Yes.

15   Q.   Are you aware of the caliber of that ammunition?

16   A.   Yes.

17   Q.   What is it?

18   A.   7.62 x 39.

19   Q.   And if we could go to Government's Exhibit 43.1.

20        Can you explain to the ladies and gentlemen of the jury

21   what this document is.

22   A.   This is a rough sketch of Container B22.  As I discussed

23   earlier, we identified the number of pallets that were

24   contained on the left side and the right side.

25        We also further identified, if there were pallets stacked

1   on top of other pallets, by identifying them with the -- for

2   example, R7, top.

3   Q.   And how did you identify which pallets you took samples

4   from?

5   A.   Those were identified with the bold lettering in the actual

6   document.

7   Q.   And did you do a sketch like this for each of the

8   15 containers that you took samples from that day?

9   A.   Yes.

10   Q.   Now, if we could go to Government's Exhibit 43.5, please.

11        What are we looking at here?

12   A.   These are the rounds of ammunition that were collected.

13   And that's my hand.

14   Q.   Now I'm going to hand you what's been marked for

15   identification purposes as Government's Exhibit 43.5A.

16        Do you recognize that exhibit, sir?

17   A.   I do.

18   Q.   How do you recognize that exhibit?

19   A.   I recognize the exhibit because this is the manila envelope

20   I previously identified.  And it has my initials, the date and

21   time of collection.  It also has the container and pallet from

22   which the evidence was collected.

23   Q.   And is this the ammunition that you seized -- or took

24   samples from from Container B22 on the 5th of January, 2008?

25   A.   Yes.

Wiesner - DIRECT - By Mr. Schwartz                    21

1    Q.   Is it in the same or substantially same condition as you

2    found it that day?

3    A.   Yes.

4              MR. SCHWARTZ:   Your Honor, at this time the Government

5    would offer Government's Exhibit 43.5A into evidence.

6              MR. BIEBER:   No objection.

7              THE COURT:   It will be admitted as Government's

8    Exhibit 43.5A.

9              (Whereupon, Government's Exhibit No. 43.5A was entered

10   into evidence.)

11   BY MR. SCHWARTZ:

12   Q.   Special Agent Wiesner, we are looking at Government's

13   Exhibit 43.5.

14       Are we looking at a picture of the physical Exhibit 43.5A?

15   A.   Yes.

16   Q.   Did you take photographs of every single sample like you

17   did here?

18   A.   Yes.

19   Q.   Now, if we could go to 43.7, please.

20       What are we looking at in this exhibit?

21   A.   This is a piece of bond paper that was part of the pallet.

22   It was underneath the cellophane.  And it identifies the

23   contractor, the contractor number and the type of ammunition.

24   Q.   What is the contractor listed here?

25   A.   It's AEY, Inc.

Wiesner - DIRECT - By Mr. Schwartz                     22

1   Q.   Now, did you take samples from this container -- from this

2   pallet?

3   A.   Yes.

4   Q.   Okay.  And could we go -- before we do that, can I ask you

5   now -- you mentioned that some pallets had this marked -- this

6   sheet of paper on it.  Is that correct?

7   A.   Yes.

8   Q.   Is it a -- very tightly affixed or, from your experience,

9   could it have fallen off?

10  A.   That one was very tightly affixed.  Some of the pallets

11  were, you know, in different -- some were torn apart.

12  Q.   Were they glued to the boxes or how were they secured to

13  the pallets?

14  A.   They were underneath the cellophane.  So they were placed

15  there and then it appeared that the cellophane had been, you

16  know, strapped around the entire pallet.

17  Q.   Now, there were some pallets you saw that did not have this

18  document on it.  Is that correct?

19  A.   Yes.

20  Q.   Did they have the same appearance of the pallets, though?

21  A.   Yes.

22  Q.   Now, if we can go to Government's Exhibit 43.8, please.

23       What are we looking at in this picture?

24  A.   Another 10 rounds of ammunition that were collected.

25  Q.   Was that collected from the previous pallet that we just

Wiesner - DIRECT - By Mr. Schwartz                    23

1  were looking at, the picture with the AEY label?

2  A.   It was collected from, I believe, R7, top.

3  Q.   I'm going to hand you up what's been marked for

4  identification purposes as Government's Exhibit 43.8A.

5       Do you recognize that exhibit?

6  A.   I do.

7  Q.   Are your initials on the manila envelope in that exhibit?

8  A.   They are.  They're on the tape that's actually sealed --

9  that sealed the envelope.  And then there's the date and time

10 of collection, the container number and the actual pallet in

11 which it was contained.

12 Q.   Is this the ammunition you seized from Container B22 on the

13 5th of January?

14 A.   Yes.

15 Q.   Is it in the same or substantially same condition as when

16 you first found it?

17 A.   Yes.

18       MR. SCHWARTZ:  Your Honor, at this time the Government

19 offers Government's Exhibit 43.8A into evidence.

20       MR. BIEBER:  No objection.

21       THE COURT:  It will be admitted as Government's

22 Exhibit 43.8A.

23       (Whereupon, Government's Exhibit No. 43.8A was entered

24 into evidence.)

25

Wiesner - DIRECT - By Mr. Schwartz                    24

1    BY MR. SCHWARTZ:

2    Q.   Now, did you follow the same sorts of procedures and

3    protocol with the other containers you did -- you took samples

4    from?

5    A.   Yes, we did.

6    Q.   So I don't want to go through each one one by one or we may

7    be here for quite a long time.

8         So I'm going to hand you what has been -- a binder that

9    includes a number of exhibits.  I'll go slow.  It includes

10   Government's Exhibits -- what's been marked for identification

11   purposes as Government's Exhibit 45.1 through 45.12, excluding

12   45.10; 46.1 through 46.13, excluding 46.10; 47.1 through 47.6;

13   48.1 through 48.13, excluding 48.10; 49.1 through 49.27,

14   excluding 49.10 and 49.20; Government's Exhibit 50.1 through

15   50.8; Government's Exhibit 51.1 through 51.15, excluding 51.10;

16   Government's Exhibit 52.1 to 52.16, excluding 52.10;

17   Government's Exhibit 53.1 through 53.28, excluding 53.10 and

18   53.20; Government's Exhibit 54.1 through 54.26, excluding 54.10

19   and 54.20; Government's Exhibit 56.1 through 56.18, excluding

20   56.10; and Government's Exhibit 57.1 through 57.6.

21             MR. BIEBER:  No objections.

22             MR. SCHWARTZ:  Your Honor, seeing that there's no

23   objections, the Government would seek to move those exhibits at

24   this time.

25             THE COURT:  I'm not ready.

1          MR. SCHWARTZ:  Do you want me to go through it again?

2          THE COURT:  No.  No.  No.  I have it.  We're going to

3     take a break.

4          Do not discuss this case either amongst yourselves or

5     with anyone else.  Have no contact whatsoever with anyone

6     associated with the trial.  Do not read, listen or see anything

7     touching on this matter in any way, including the Internet.

8          If anyone should try to talk to you about this case,

9     you should immediately instruct them to stop and report it to

10    my staff.

11         You may leave your notebooks in your chairs.  Please

12    be back in the jury room in ten minutes.

13         (Whereupon, the jury exited the courtroom at

14    10:56 a.m. and the following proceedings were had:)

15         THE COURT:  We're in recess for ten.

16          (Thereupon a recess was taken, after which the

17    following proceedings were had:)

18         THE COURT:  We're back on United States of America

19    versus Ralph Merrill, Case No. 08-20574.

20         Counsel, state your appearances, please, for the

21    record.

22         MR. SCHWARTZ:  Good morning, your Honor.

23         Adam Schwartz, Eloisa Fernandez and Frank Tamen on

24    behalf of the United States.

25         MR. BIEBER:  Brian Bieber and Nathan Crane on behalf

1    of Ralph Merrill.

2            And Mr. Merrill is present.

3            THE COURT:  Let's bring in the jury.  We're going to

4    break at -- right before 12:15 for lunch.

5            (Whereupon, the jury entered the courtroom at

6    11:12 a.m. and the following proceedings were had:)

7            THE COURT:  You may be seated.

8            You are still under oath, sir.

9            They will be admitted as Government's Exhibits 45.1

10   through 45.12, excluding 45.10; 46.1 through 46.13, excluding

11   46.10; 47.1 through 47.6; 48.1 through 48.13, excluding 48.10;

12   49.1 through 49.27, excluding 49.10 and 49.20; 50.1 through

13   50.8; 51.1 through 51.15, excluding 51.10; 52.1 through 52.16,

14   excluding 52.10; 53.1 through 53.28, excluding 53.10 and 53.20;

15   54.1 through 54.26, excluding 54.10 and 54.20; 56.1 through

16   56.18, excluding 56.10; and 57.1 through 57.6.

17           (Whereupon, Government's Exhibit Nos. 45.1 through

18   45.12, excluding 45.10; 46.1 through 46.13, excluding 46.10;

19   47.1 through 47.6; 48.1 through 48.13, excluding 48.10; 49.1

20   through 49.27, excluding 49.10 and 49.20; 50.1 through 50.8;

21   51.1 through 51.15, excluding 51.10; 52.1 through 52.16,

22   excluding 52.10; 53.1 through 53.28, excluding 53.10 and 53.20;

23   54.1 through 54.26, excluding 54.10 and 54.20; 56.1 through

24   56.18, excluding 56.10; and 57.1 through 57.6 were entered into

25   evidence.)

Wiesner - DIRECT - By Mr. Schwartz          27

```
 1              THE COURT:  You may proceed.

 2   BY MR. SCHWARTZ:

 3   Q.   Now, Special Agent Wiesner, the containers you took samples

 4   from all had labels or numbers.  Correct?

 5   A.   Yes.

 6   Q.   We went through B22.

 7        That was on the screen and we went through that container?

 8   A.   Yes.

 9   Q.   And the samples you took from that one?

10   A.   Yes.

11   Q.   Did you also take samples from Container B21?

12   A.   Yes.

13   Q.   B27?

14   A.   Yes.

15   Q.   B31?

16   A.   Yes.

17   Q.   B33?

18   A.   Yes.

19   Q.   ANP1?

20   A.   Yes.

21   Q.   E6?

22   A.   Yes.

23   Q.   I16?

24   A.   Yes.

25   Q.   I15?
```

1    A.   Yes.

2    Q.   I10?

3    A.   Yes.

4    Q.   I23?

5    A.   Yes.

6    Q.   I38?

7    A.   Yes.

8    Q.   J9?

9    A.   Yes.

10   Q.   T6?

11   A.   Yes.

12   Q.   And F9?

13   A.   Yes.

14   Q.   And each one of those containers -- before you in those

15   exhibits that were just offered into evidence, is there a

16   sketch showing where you obtained samples of ammunition?

17   A.   Yes, there is.

18   Q.   And a number of photographs as well.  Correct?

19   A.   That is correct.

20   Q.   So now let's talk briefly about the actual samples.

21        I'm going to hand up to you a box containing a number of

22   exhibit -- Government's exhibits marked for identification.

23   They are 44.5A, 44.6A, 45.5A, 45.7A, 46.6A, 46.11A, 46.13A,

24   47.6A, 48.6A, 48.9A, 48.13A, 49.6A, 49.11A, 49.15A, 49.19A,

25   49.24A, 49.27A, 50.4A, 50.8A, 51.6A, 51.9A, 51.13A, 51.15A,

Wiesner - DIRECT - By Mr. Schwartz                    29

1   52.6A, 52.9A, 52.13A, 52.16A, 53.6A, 53.11A, 53.15A, 53.19A,

2   53.24A, 53.28A, 54.7A, 54.12A, 54.16A, 54.22A, 54.26A, 55.6A,

3   55.11A, 55.15A, 55.18A, 56.6A, 56.9A, 56.14A, 56.18A, 57.6A.

4   And that's it.

5       Special Agent Wiesner, please take your time and review

6   those exhibits.  And just look up whenever you're ready.

7       So you've had a chance to review all of those exhibits.

8   Correct?

9   A.   Yes.

10  Q.   Do you recognize those exhibits?

11  A.   I do.

12  Q.   Do all of them include manila envelopes with your initials

13  on them?

14  A.   Yes, they do.

15  Q.   Are those the -- is that the ammunition you -- which you

16  obtained and took samples from in the 22 Bunkers facility on

17  January 5th of 2008?

18  A.   Yes, it is.

19  Q.   And are they in the same or substantially same condition as

20  they appeared then?

21  A.   Yes.

22  Q.   Has some of the rounds subsequently been opened up or

23  disassembled?

24  A.   Yes.

25           MR. SCHWARTZ:  Your Honor, at this time the Government

Wiesner - DIRECT - By Mr. Schwartz                    30

1    would offer those exhibits into evidence, which are -- do you

2    want me to -- should I read them out again, your Honor?

3            THE COURT:  I've got them.

4            MR. SCHWARTZ:  Okay.

5            MR. BIEBER:  No objection.

6            THE COURT:  They will be admitted as Government's

7    Exhibits 44.5A, 44.6A, 45.5A, 45.7A, 46.6A, 46.11A, 46.13A,

8    47.6A, 48.6A, 48.9A, 48.13A -- is that right, 48.13A? --

9            MR. SCHWARTZ:  Yes, your Honor.

10           THE COURT:  -- 49.6A, 49.11A, 49.15A, 49.19A, 49.24A,

11   49.27A, 50.4A, 50.8A, 51.6A, 51.9A, 51.13A, 51.15A, 52.6A,

12   52.9A, 52.13A, 52.16A, 53.6A, 53.11A, 53.15A, 53.19A, 53.24A,

13   53.28A, 54 .7A, 54.12A, 54.16A, 54.22A, 54.26A, 55.6A, 55.11A,

14   55.15A, 55.18A, 56.6A, 56.9A, 56.14A, 56.18A and 57.6A.

15           (Whereupon, Government's Exhibit Nos. 44.5A, 44.6A,

16   45.5A, 45.7A, 46.6A, 46.11A, 46.13A, 47.6A, 48.6A, 48.9A,

17   48.13A, 49.6A, 49.11A, 49.15A, 49.19A, 49.24A, 49.27A, 50.4A,

18   50.8A, 51.6A, 51.9A, 51.13A, 51.15A, 52.6A, 52.9A, 52.13A,

19   52.16A, 53.6A, 53.11A, 53.15A, 53.19A, 53.24A, 53.28A, 54.7A,

20   54.12A, 54.16A, 54.22A, 54.26A, 55.6A, 55.11A, 55.15A, 55.18A,

21   56.6A, 56.9A, 56.14A, 56.18A and 57.6A were entered into

22   evidence.)

23           THE COURT:  You may proceed.

24   BY MR. SCHWARTZ:

25   Q.   Now, Special Agent Wiesner, I'm going to hand up to you the

Wiesner - DIRECT - By Mr. Schwartz                    31

 1    last exhibits we'll enter in today.  I'm going to hand up to

 2    you what's been marked for identification purposes as

 3    Government's Exhibit 59 and what's already been admitted as

 4    Government's Exhibit 58A.

 5         What is Government's Exhibit 59?

 6    A.  It's chain of custody.

 7    Q.  Is your signature on that document?

 8    A.  Yes, it is.

 9    Q.  And by "chain of custody," is that a document that reflects

10    who the ammunition is passed down to from its initial receipt?

11    A.  Yes.

12    Q.  And what is Government's Exhibit 58A?

13    A.  A certificate.

14    Q.  Is it a certificate of regularly conducted business

15    activities for Government's Exhibit 59?

16    A.  Yes.

17         MR. SCHWARTZ:  Your Honor, at this time the Government

18    would offer Government's Exhibit 59 into evidence.

19         MR. BIEBER:  No objection.

20         THE COURT:  It will be admitted as Government's

21    Exhibit 59.

22         (Whereupon, Government's Exhibit No. 59 was entered

23    into evidence.)

24    BY MR. SCHWARTZ:

25    Q.  Now, let's talk about some of the ammunition in your

 1   recovery process.  If we could, let's turn to Container B27 and

 2   Government's Exhibit 45.3.

 3        What are we looking at in Government's 45.3?

 4   A.   This is the picture of the interior of the container.

 5   Q.   What do we see in the back portion of the container?

 6   A.   The pallets are basically falling apart.

 7   Q.   Could we go to Government's Exhibit 45.4, please.

 8        What are we looking at here?

 9   A.   This is the top of the pallet, looking down, with the

10   boxes, the straps and a piece of bond paper.

11   Q.   Could we zoom in on that bond paper, please.

12        Does that bond paper identify the contractor?

13   A.   Yes.

14   Q.   What is that contractor?

15   A.   AEY, Inc.

16   Q.   Could we go to Government's Exhibit 45.12, please.

17        What are we looking at in this picture?

18   A.   This is a closeup of the side of the pallet, one of the

19   boxes.  And this is the interior of the box which we tore open.

20   Q.   And is the ammunition packaged in butcher paper, as you

21   explained previously?

22   A.   It is.  And wrapped in what appears to be some string.

23   Q.   Could we go now to Container B31 and Government's

24   Exhibit 46.3.

25        What are we looking at in this picture?

1   A.   Again, it's one of the pallets that was inside the

2   container.  It's the standard configuration that we saw with

3   the wooden pallet, cardboard boxes, straps and cellophane and

4   the bond paper.

5   Q.   Now, there appears to be two different kinds of bond paper

6   on this pallet.  Is that correct?

7   A.   Yes.

8   Q.   Could we zoom in on the bond paper to the right-hand side.

9        Can you identify the contractor, based upon that bond

10  paper?

11  A.   Yes.  The "Y" is missing, but it's AEY, Inc.

12  Q.   Could we zoom back out.

13       And look at that piece of bond paper on the top.

14       Now, does that piece of bond paper include the contractor?

15  A.   It does not.  I can't -- it's not legible.

16  Q.   Now, did you see similar pallets with that type of bond

17  paper that we're looking at here zoomed in?

18  A.   Yes.

19  Q.   Okay.  Now, if we could go to Government's Exhibit 46.8.

20       What are we looking at in this picture?

21  A.   This is one of the packets that was inside of the cardboard

22  boxes.  It's again the ammunition wrapped in this brown

23  butcher-like paper and then wrapped with this string-like

24  material.

25  Q.   And let's now go to Container B33 and Government's

Wiesner - DIRECT - By Mr. Schwartz                34

1    Exhibit 47.3.

2         What are we looking at here?

3    A.   This is that other type of packaging with the wooden

4    pallet.  This one had metal cans, which the individuals who

5    were maintaining the site commonly refer to as "sardine cans."

6    Q.   Could we zoom in on the sheet of paper that's on the

7    pallet.

8         From that sheet of paper, can you identify the contract

9    number?

10   A.   Yes.

11   Q.   Can you identify the contractor?

12   A.   Yes.  It has a contractor listed right there.

13   Q.   What is the contractor?

14   A.   AEY.

15   Q.   Zoom back out.

16        You took samples from this container?

17   A.   Yes.

18   Q.   If we could go to 47.4, please.

19        What are we looking at in this picture?

20   A.   We're looking at the top of one of the metal sardine cans.

21   Q.   Could you -- do you notice any Chinese markings on the

22   sardine can?

23   A.   No.

24   Q.   Could we go to 57.5 here.

25        What are we looking at here?

Wiesner - DIRECT - By Mr. Schwartz                35

1    A.   This is the interior of the actual can itself with the

2    boxes of ammunition.

3    Q.   And how were you able to open that sardine can?

4    A.   Basically, we took a plier and, you know, peeled back the

5    top.

6    Q.   Were these containers hermetically sealed?

7    A.   I don't know.

8    Q.   And could we go to Government's Exhibit 47.6.

9         Is that the ammunition that you obtained from the sardine

10   cans?

11   A.   Yes.

12   Q.   Let's talk about Container ANP1 and go to Government's

13   Exhibit 48.4.

14        What are we looking at here again?

15   A.   Again, this is a closeup of the bond paper that was affixed

16   to the cardboard boxes on one of the pallets.

17   Q.   And let's go to 58.5.

18        Is that a sample of ammunition you took from

19   Container ANP1?

20   A.   Yes.

21   Q.   Could we go to Container E6 and Government's Exhibit 49.4.

22        Again, what are we looking at here?

23   A.   The top of the pallet with the boxes and, again, a piece of

24   bond paper underneath the cellophane.

25   Q.   Now, from that piece of bond paper, can you identify the

1   contractor?

2   A.   If I could get a closeup.

3        Yes.   It's partially legible, but it looks like AEY, Inc.,

4   and the contract number looks to be the same.

5   Q.   If we could zoom back out, please.   And if we could now go

6   to 49.9, please.

7        Is this what appeared when you opened that pallet?

8   A.   Yes.   This is one of the boxes.   And, again, you can see

9   the multiple packets of ammunition.   This one didn't have any

10   string -- or some of them did.   Some of them didn't.   But

11   that's, again, the ammunition -- 7.62 x 39 ammunition.

12   Q.   Now let's turn to Container I16 and look at Government's

13   Exhibit 50.3.

14        What are we looking at here?

15   A.   This is a box that was on top of the pallet.   And the

16   pallet's a little bit in disarray.   But during the shipment,

17   during the movement, some of the pallets, I guess, were

18   damaged.   And so, you know, if they did fall apart, they were

19   put in other boxes.

20   Q.   Now let's go to Container I15 and Government's

21   Exhibit 51.4.

22        What are we looking at -- again, is that the same piece of

23   bond paper that we've seen previously?

24   A.   It does appear so.   Yes.

25   Q.   Let's zoom in and confirm that.

Wiesner - DIRECT - By Mr. Schwartz                    37

1        Is that so?

2   A.   Yes.  It identifies AEY, Inc., as the contractor and the

3   contract number.

4   Q.   And let's move on to Container I10 and Government's

5   Exhibit 52.5.

6        What are we looking at here?

7   A.   Here we're looking at the top of the pallet.  And we tore

8   open one of the boxes and took some ammunition from that box.

9   Q.   And looking to the far right-hand side, again, is that the

10  same piece of bond paper that we've looked at previously with

11  AEY listed as the contractor?

12  A.   Yes.

13  Q.   Zoom back out, please.

14       And let's skip ahead to Container I38 and Government's

15  Exhibit 54.5.

16       What are we looking at in this picture?

17  A.   This is the side of the pallet where we cut a box open and

18  collected some ammunition from the side of the box.

19  Q.   And below the side where you took a sample, is that the

20  same piece of bond paper that we've been talking about with AEY

21  listed as the contractor?

22  A.   I don't think I could actually read what the bond paper

23  says.  But it does appear to be similar to the other pieces of

24  paper.

25  Q.   Okay.  And let's move on to Container T6 and Government's

1    Exhibit 56.14.

2        Is that some of the ammunition that you took?

3    A.   Yes.

4    Q.   Could we then go ahead to Container F9 and Government's

5    Exhibit 57.3.

6    A.   This is the interior of the container.  I believe this is

7    the last container that we actually collected ammunition from.

8    Again, there's the wooden pallet with cardboard boxes wrapped

9    in cellophane and straps.

10   Q.   If we could zoom in on that piece of bond paper on that

11   pallet.

12       Now, does it list -- can you -- does it look familiar as

13   the other pieces of paper that we've seen with AEY listed as

14   the contractor?

15   A.   It does look similar.  But the actual ammunition is

16   different.  This is 7.62 x 54 millimeter ammunition.  But it

17   has the same format.

18   Q.   And can we go to Government's Exhibit 57.4.  Zoom in,

19   please, on that.

20       How about here?  Can you tell the contractor, based on

21   what's on that bond paper?

22   A.   Yes.  It's AEY, Inc.

23   Q.   This is also the 7.62 x 54 millimeter ammunition?

24   A.   Yes.

25   Q.   Now, when you were collecting all of this ammunition, was

Wiesner - CROSS - By Mr. Bieber                    39

```
 1   there any way for you to tell whether or not this ammunition
 2   was manufactured in China?
 3   A.  No, there wasn't.
 4          MR. SCHWARTZ:  One moment, your Honor.
 5          We tender the witness.
 6          MR. BIEBER:  Very briefly, Judge.
 7                      CROSS-EXAMINATION
 8   BY MR. BIEBER:
 9   Q.  Good morning, Agent Wiesner.  Is it "Wiesner" or "Wiesner"?
10   A.  Either will be fine.
11   Q.  Okay.  We'll go with "Wiesner," then.
12       My name is Brian Bieber.
13       We've never met before, have question?
14   A.  We have not.
15   Q.  We've never spoken about this case?
16   A.  No.
17   Q.  You said that, when you got to Afghanistan, it was a
18   dangerous environment.  Right?
19   A.  Yes.
20   Q.  It's a war zone?
21   A.  Yes.
22   Q.  This ammunition that you seized that we've been shown is
23   ammunition being used by our allies to fight against the
24   Taliban in Afghanistan.  Right?
25   A.  Yes.  That's what I was told.  Yes.
```

Wiesner - CROSS - By Mr. Bieber                    40

1   Q.   The war on terror that we read about in the papers.  Right?

2   A.   Yes.

3   Q.   And let's see.

4        22 Bunkers is where the ammunition is stored for our troops

5   and for our allies in Afghanistan.  Right?

6   A.   Actually, no.  It's just for the allies.

7   Q.   Just for the allies?

8   A.   Yes, sir.

9   Q.   And that would be the Afghanistan National Army?

10  A.   Police and National Army.

11  Q.   Okay.  And let's see.

12       If we can just look at a few photos.

13       Can we put up 43.7?

14          MR. BIEBER:  If we can switch to Mr. Merrill's

15  computer, Judge.

16          THE COURT:  Sure.

17  BY MR. BIEBER:

18  Q.   I believe you were shown this photograph.

19       You see the contractor, AEY.  Right?

20  A.   Yes.

21  Q.   And do you know what a certificate of conformance is?

22  A.   I've heard of it, but I've not -- I mean, I'm not familiar

23  with it.

24  Q.   Not the technicality of it.  But you're familiar with it.

25       What do you understand a COC, or certificate of

Wiesner - CROSS - By Mr. Bieber                41

 1   conformance, to be?

 2           MR. SCHWARTZ:  I'm going to object.  Beyond the scope

 3   of direct examination.

 4           THE COURT:  Sustained.

 5   BY MR. BIEBER:

 6   Q.   Do you know who at AEY caused this shipment of ammunition

 7   to be sent to Afghanistan?

 8   A.   I do not.

 9   Q.   At 22 Bunkers, not just AEY, the contractor, but other

10   contractors, ammunition is stored there.  Right?

11   A.   As far as I was told, yes.

12   Q.   And do you know if the cardboard packaging is acceptable by

13   the United States Government?

14           MR. SCHWARTZ:  Object.  Beyond the scope of direct

15   examination.  Lack of foundation.

16           THE COURT:  Sustained.

17   BY MR. BIEBER:

18   Q.   You don't have any area of expertise or knowledge with

19   respect to what the Government's requirements are for

20   packaging, do you?

21   A.   No.

22   Q.   And when you got to the bunkers, you were instructed where

23   to go?

24   A.   That is correct.

25   Q.   Nobody told you anything about packaging in cardboard boxes

 1  being improper, did they?

 2          MR. SCHWARTZ:  Objection.  Calls for hearsay.

 3          THE COURT:  Sustained.

 4  BY MR. BIEBER:

 5  Q.  Do you know Ralph Merrill?

 6  A.  I do not.

 7  Q.  Do you have any personal knowledge that Ralph Merrill

 8  caused any ammunition to be shipped to Afghanistan?

 9  A.  I do not.

10          MR. BIEBER:  Nothing else, Judge.

11          MR. SCHWARTZ:  Brief redirect, your Honor.

12          THE COURT:  Yes.

13                    REDIRECT EXAMINATION

14  BY MR. SCHWARTZ:

15  Q.  Now, Special Agent Wiesner, on cross-examination, you were

16  asked about whether other contractors supplied ammunition at

17  AEY -- other than AEY, at 22 Bunkers.  Correct?

18  A.  Yes.

19  Q.  Now, your task was to collect ammunition that was supplied

20  by AEY.  Is that correct?

21  A.  That is correct.

22  Q.  And are you confident or -- what indicators do you have to

23  believe that the ammunition that you so collected was, in fact,

24  from AEY?

25  A.  Because the person who was managing the site and managing

1    the ANP from which we collected the majority of the samples

2    indicated that the majority of the ammunition on hand came from

3    AEY.

4    Q.   Also, did you see sheets of bond paper with the AEY -- AEY

5    listed as the contractor?  Is that correct?

6    A.   Yes.

7    Q.   And did you also see pallets that appeared similar to the

8    ones that listed AEY as a contractor?  Is that correct?

9          MR. BIEBER:  Judge, just objection to leading.

10         THE COURT:  Sustained.

11         Rephrase your question.

12   BY MR. SCHWARTZ:

13   Q.   Did you -- now, some pallets didn't have -- did other --

14   other pallets did not have the AEY bond paper.  Is that

15   correct?

16   A.   That is correct.

17         MR. BIEBER:  Same objection, Judge.

18         THE COURT:  Sustained.

19         Rephrase your question.

20   BY MR. SCHWARTZ:

21   Q.   What type of pallets did you see when you were there?

22   A.   Wooden pallets with cardboard boxes wrapped in cellophane

23   and straps.

24   Q.   Did you see any of the pallets listing another contractor?

25   A.   I did not.

Wiesner - REDIRECT - By Mr. Schwartz          44

1   Q.   So the only -- so the only contractor you saw was AEY on

2   the -- on pallets.  Is that correct?

3   A.   That is correct.

4          MR. SCHWARTZ:  No further questions, your Honor.

5          MR. BIEBER:  Your Honor, may I request a brief recross

6   on two of those new questions?

7          THE COURT:  Come on up side-bar.

8          (Whereupon, the following proceedings were had at

9   side-bar outside the presence of the jury:)

10          THE COURT:  Yes.  What is the new area?

11          MR. BIEBER:  Your Honor, they put in two photographs

12   that contradict what Mr. Schwartz had just asked about, any

13   contractor other than AEY.  There's a photograph that doesn't

14   have any contractor.

15          So I would like to ask the witness one question:  Look

16   at this photograph that the Government admitted.  Can you tell

17   if it came from AEY or another contractor?

18          And the second area I would like to ask is with

19   respect to Mr. Schwartz's question about the packaging in

20   cardboard boxes, because there is packaging -- according to the

21   Government's evidence just introduced, packaging in tins.  The

22   photographs I'm referencing in the second one with the tins is

23   47.3.  The first one is 53.4.

24          MR. SCHWARTZ:  I'm going to object because I was

25   trying to elicit that certain boxes did not have AEY bond

1    paper; and Mr. Bieber kept objecting.  He wouldn't let me ask

2    the question.  So --

3              MR. BIEBER:  I objected on leading grounds.  It was

4    the form, because he ended with "Is that correct?"

5              THE COURT:  But these were introduced on direct, these

6    photographs.  Right?

7              MR. BIEBER:  Yes, Judge.

8              THE COURT:  So you would have had an opportunity to

9    cross regarding them on your cross-examination.

10             MR. BIEBER:  Yes.  But these issues were raised on

11   redirect, and that's why I'm asking for recross.  Two

12   questions.

13             MR. SCHWARTZ:  They were raised based on Mr. Bieber's

14   questions about other contractors supplying ammunition there,

15   your Honor.  So it was in direct response to a

16   cross-examination question.

17             MR. BIEBER:  I'm asking for literally two questions,

18   not a lawyer's two questions.  Two questions.

19             THE COURT:  Can I see the photographs, please?

20             MR. BIEBER:  (Tenders documents to the Court.)

21             THE COURT:  I'll allow it this time.  But the rules do

22   not provide for recross.  This is an area that you could have

23   gone into on cross.  I wouldn't allow it in the future.

24             Let me ask you a question as far as the introduction

25   of evidence.  I just want to make sure that I didn't miss

1   something.

2          Other than 55.6A and 55.11A and 55.15A, none of the

3   other 55 series have been moved into evidence.  Is that

4   correct?

5          MR. SCHWARTZ:  The 55 series -- I believe they're

6   photographs, your Honor.

7          THE COURT:  Right.

8          MR. SCHWARTZ:  I believe they have.

9          THE COURT:  The containers were moved in, but not the

10  photographs.

11         MR. SCHWARTZ:  Could we check, your Honor?

12         THE COURT:  Yes.

13         MR. SCHWARTZ:  Your Honor, we would also request a

14  brief redirect.

15         THE COURT:  Yes.  You get to redirect.

16         MR. SCHWARTZ:  Thank you.

17         MS. FERNANDEZ:  We show 5.6A, 55.11A --

18         THE COURT:  That I have.  55.6A, 55.11A, 55.15A,

19  55.18A.

20         MR. SCHWARTZ:  Your Honor, I believe --

21         THE COURT:  That's the containers.

22         MR. SCHWARTZ:  I believe that was an oversight on my

23  direct.  If I can move those in, if you'd like to recross on

24  those questions, I could re-re-call Special Agent Wiesner again

25  just to move those exhibits in.  These are just photographs.

1    They're just photographs.

2            MR. BIEBER:  Judge, we stipulate they can come in.  We

3    don't need to re-call the witness.

4            THE COURT:  Okay.  So it's 55 -- what are you moving

5    in now?

6            MR. SCHWARTZ:  55.1 through 55.18, excluding 55.10.

7            THE COURT:  Okay.

8            (Whereupon, the following proceedings were had in open

9    court:)

10           THE COURT:  Additional exhibits admitted into the

11   record are 55.1 through 55.18, excluding 55.10.  They are

12   Government exhibits.

13           (Whereupon, Government's Exhibit Nos. 55.1 through

14   55.18, excluding 55.10, was entered into evidence.)

15           THE COURT:  You may ask your questions, Mr. Bieber.

16           MR. BIEBER:  Thank you, Judge.

17                        RECROSS-EXAMINATION

18   BY MR. BIEBER:

19   Q.  Looking at 53.4, please, do you see this photograph,

20   Mr. Wiesner?

21   A.  I do.

22   Q.  Can you identify -- can you zoom in on the white piece of

23   paper.

24      Can you identify from the photograph the contractor who

25   sent this ammunition?

Wiesner - REDIRECT - By Mr. Schwartz                48

1    A.   No.

2    Q.   Can you put up 47.3, please.  Can you zoom in on the white

3    paper, please.

4         Can you identify above the numbers on the ammunition -- it

5    says "subcontract."

6         You can identify who sent this.  Right?

7    A.   Yes.

8    Q.   And it's AEY.  Correct?

9    A.   Yes.  AEY-MFS.  But the contract number is exactly the

10   same.

11   Q.   So it's AEY.  Right?

12   A.   Yes.

13   Q.   Can you zoom back, please.

14        Is this in tins?

15   A.   Yes, it is.  Those sardine cans.

16            MR. BIEBER:  Nothing else.

17            THE COURT:  Mr. Schwartz?

18            MR. SCHWARTZ:  Yes.

19                      REDIRECT EXAMINATION

20   BY MR. SCHWARTZ:

21   Q.   If we could bring up on the Government's computer

22   Exhibit 53.4.

23        This is the picture you were just shown on cross.  Is that

24   correct?

25   A.   That is correct.

Wiesner - REDIRECT - By Mr. Schwartz                    49

1   Q.   And you testified that, from this sheet of paper alone, you

2   couldn't identify the contractor.  Is that correct?

3   A.   That is correct.

4   Q.   It doesn't list the contractor.

5        Have you seen that sheet of paper in other -- on other

6   pallets?

7   A.   Yes.

8   Q.   Could we go to Government's Exhibit 46.3, please.

9        Now, this pallet has two labels.  Is that correct?

10  A.   Yes.

11  Q.   Let's look at the label on the top, if we could zoom in,

12  please.

13       Does that look similar to the label we just previously saw

14  in Exhibit 53.4?

15  A.   It does appear to be similar.  Yes.

16  Q.   Does that list AEY as the contractor?

17  A.   It's illegible.  But I do not believe so.

18  Q.   Could we zoom back out.  Could we zoom in on the other

19  sheet of bond paper in that exhibit.

20       Now, on this sheet of bond paper, which is on the same

21  pallet -- is that correct? --

22  A.   Yes.

23  Q.   -- what's the contractor listed?

24  A.   AEY, Inc.

25            MR. SCHWARTZ:  No further questions, your Honor.

```
 1                THE COURT:  You may step down, sir.

 2                (Witness excused.)

 3                      * * * * * * * * *

 4           DAVID BRIAN BLACK, GOVERNMENT WITNESS, SWORN

 5                THE COURT REPORTER:  Please state you full name for

 6     the record.

 7                THE WITNESS:  David Brian Black.

 8                           DIRECT EXAMINATION

 9     BY MS. FERNANDEZ:

10     Q.  Good afternoon, Mr. Black.

11     A.  Good afternoon.

12     Q.  And could you tell us, how are you currently employed?

13     A.  I am a nursing assistant.  I do home healthcare.

14     Q.  What is your educational background?

15     A.  I have a bachelor's degree in international relations, a

16     bachelor's degree in liberal studies, and I am currently

17     working on a master of public administration.

18     Q.  Do you have any licenses or certifications of any sort?

19     A.  In the healthcare field.  Yes.

20     Q.  How about in the field of ammunition or firearms?

21     A.  No.

22     Q.  Prior to your current employment, where were you employed?

23     A.  AEY, Incorporated.

24     Q.  When did you start working at AEY?

25     A.  July 11th, 2007.
```

Black - DIRECT - By Ms. Fernandez          51

1    Q.   Through what time period were you employed at AEY?

2    A.   Until the 31st of October, 2007.

3    Q.   Could you tell us, generally, what type of business was AEY

4    involved in?

5    A.   Government contracting for ammunition and weaponry.

6    Q.   And do you know any particular type of ammunition, if

7    you're aware?

8    A.   Particular type?  I don't understand the question.

9    Q.   Were there various types of ammunitions involved in those

10   contracts?

11   A.   Yes.

12   Q.   What specifically did you do at AEY?

13   A.   At first, I was selling domestically Lithuanian ammunition,

14   mostly over the phone.  After that, they asked me to work on

15   technical proposals, which, basically, it was in response to

16   Government solicitations for certain items.  So I would cut and

17   paste information from the Internet and make a Word document

18   and pass it on to the management.

19   Q.   And who did you report to while you were working at AEY?

20   A.   Efraim Diveroli, Daniel Doudnik, Levy Myer, another

21   gentleman named Joseph.  I don't know his last name.

22   Q.   And who was Efraim Diveroli?

23   A.   The president of AEY.

24   Q.   Now, when you were employed at AEY, were you asked to work

25   on a contract between AEY and the United States Army to deliver

1    ammunition to Afghanistan?

2    A.   Yes.

3    Q.   And what was your understanding of how that contract

4    worked?

5    A.   I believe it was accompanied by task orders, which was an

6    order that the Government put out, and AEY was required to

7    fulfill that order.

8    Q.   And what was your understanding of the total dollar value

9    of that contract?

10   A.   $298 million.

11   Q.   Now, did you know where AEY was getting most of the

12   ammunition that they were delivering under that contract, the

13   small-caliber ammunition?

14   A.   From Albania.

15   Q.   And while you were employed at AEY, did you learn whether

16   or not a search warrant was actually executed at the premises

17   of AEY?

18   A.   Yes, ma'am.

19   Q.   And do you remember roughly when that was?

20   A.   Early August of 2007.

21   Q.   Okay.  And how is it that you found out that the search

22   warrant had been executed at AEY?

23   A.   I was present in the office at that time.

24   Q.   Did you ever learn why that search warrant was executed at

25   AEY?

1    A.   No.

2    Q.   Do you recall being present with other AEY employees and

3    the president, Efraim Diveroli, discussed the search warrant?

4    A.   Yes.

5    Q.   And could you tell us, what do you remember about that?

6    A.   It was, I believe, a Friday right before we got paid.

7    Efraim basically told us that it was competition trying to boot

8    him out of business and we had nothing to worry about, that

9    we're great employees and he runs a legitimate company and so

10   we should have nothing to worry about.

11   Q.   Now, did there come a time when you were asked to travel to

12   the country of Albania while you were still employed at AEY?

13   A.   Yes, ma'am.

14   Q.   And when did that happen?  Do you remember?

15   A.   That was the 26th of August, 2007.

16   Q.   And could you tell us the circumstances under which you

17   were asked to travel to Albania.

18   A.   I was invited out by Efraim Diveroli.  It was a Friday or

19   Saturday night.  We went out.  I ended up sleeping on his

20   couch.  We went to South Beach.  He lived down there.  When I

21   woke up in the morning, he was running around, screaming

22   hysterically.

23        He said, "Black, I need you to do something for me."  And

24   he told me that he needed me to go to Albania to make sure that

25   the planes got off the ground and -- so the ammunition could

Black - DIRECT - By Ms. Fernandez                54

1    make it to Afghanistan.

2    Q.   And did you discuss your salary?  Did your compensation

3    change at that time?

4    A.   Yes.

5    Q.   What was your compensation before you agreed to go to

6    Albania?

7    A.   I was making $12 an hour.

8    Q.   What was it after that?

9    A.   It moved up to $1,000 a week, all expenses paid, and the

10   promise of a bonus.

11   Q.   Do you remember how much was the bonus for?

12   A.   After the first month of me being there, I was supposed to

13   receive $20,000.

14   Q.   Any particular reason why that figure came up or how they

15   arrived at that figure?

16   A.   It was the urgency of the situation.  I was asked to go on

17   the 26th and I left on the 27th.  So it was the urgency of the

18   situation, getting up and leaving on the spot.

19   Q.   Did Efraim give you any instructions as to what you were

20   going to be doing in Albania?

21   A.   Yes.

22   Q.   And do you remember what those instructions were?

23   A.   These instructions were to go, make sure that the planes

24   got off the ground, make sure that the cargo department at the

25   Tirana International Airport in Albania had their side together

Black - DIRECT - By Ms. Fernandez          55

1   in order to load the ammunition onto the plane and oversee the

2   repacking facility, make sure everything was being repacked,

3   the right stuff was getting loaded onto the plane for

4   Afghanistan.

5   Q.  Did Efraim tell you anything about the origin of the

6   ammunition in Albania?

7   A.  Yes.  The day before I left, as he -- in the conversation

8   where he asked me to go to Albania, he threw in there -- Efraim

9   has a very -- he's all over the place.  He jumps around

10  sometimes.

11      So in the middle of the conversation, he threw in there

12  that it was Chinese ammunition, but there's nothing to worry

13  about because it's from Albania.

14  Q.  Was it your understanding at the time whether or not you

15  were actually replacing another AEY employee who was stationed

16  in Albania?

17  A.  Yes.

18  Q.  And do you remember the name of that employee?

19  A.  Alex.

20  Q.  Did you ever find out why Alex -- why you were replacing

21  Alex?

22  A.  No.  But Efraim told me that his -- if anybody asked, to

23  tell them that his mother was sick and he needed to go home.

24  Q.  Now, could you tell us, then, what did you do when you

25  arrived in Albania?

Black - DIRECT - By Ms. Fernandez                    56

1   A.   On the 27th?

2   Q.   Yes.

3   A.   The first day -- the first day I slept like a baby.

4        The second day, I went to the -- I went to Ylli Pinari's

5   office in the Ministry of Defense in Tirana, Albania.

6        After that, I went to the airport to meet the cargo people

7   to introduce myself, to say that -- to tell them that I was

8   here to replace Alex, that his mother got sick.

9        And after that, I went down the street, still within the

10  airport, to the repacking facility, which was located inside a

11  military hangar.

12  Q.   Part of the airport -- the Tirana airport?

13  A.   Yes.

14  Q.   Now, could you tell us, was this area, the military hangar

15  where the repackaging operations was taking place -- was that

16  area secure?

17  A.   Yes.

18  Q.   Was it restricted access?  Did you have to get permission

19  to enter?

20  A.   Yes.

21  Q.   And could you tell us, were there, in fact -- did you

22  notice whether there were any military guards securing the

23  area?

24  A.   Yes.

25  Q.   And then, at the time while you were stationed in Albania,

1   were you aware of any security concerns with respect to theft

2   of the ammunition that was being stored at AEY's repackaging

3   area?

4   A.   Not to my knowledge.

5   Q.   Did you ever become aware of any concerns with anyone

6   actually visibly seeing markings on the ammunition -- the

7   crates of ammunition in that facility?

8   A.   Can you repeat that.  I'm sorry.

9   Q.   Did you ever become aware of any concerns with anyone being

10  able to see or visibly read the markings on the crates in that

11  facility?

12  A.   When -- not until Efraim Diveroli came to Albania.

13  Q.   Okay.  And we'll get to that.

14  A.   Yeah.

15  Q.   Were you ever asked to hide or throw anything over the

16  crates there that were being stored in the -- in that facility?

17  A.   No.

18  Q.   Did you actually see the repackaging operations at the

19  facility?

20  A.   Yes.

21  Q.   And could you tell us, who was doing the repackaging?

22  A.   A company -- an Albanian company, I believe.

23  Q.   And can you speak right into the microphone to make sure we

24  can hear --

25  A.   Yes.  A company -- a company in Albania.

1  Q.   And was that a company that, as far as you know, was hired

2  by AEY to do the repackaging?

3  A.   Yes.

4  Q.   And could you tell us, what did that repackaging involve?

5  A.   A delivery of the ammunition would come to the military

6  hangar.  This company would then -- it would come in wooden

7  crates.

8      Then the company would take tins out of the crates, which

9  contained the ammunition, and would eventually open the tins

10  and repackage them into cardboard and then palletize the

11  cardboard boxes filled with ammunition, which would then be

12  ready for shipment.

13  Q.   Was it -- what was your understanding as to why the

14  ammunition was being repackaged when you got there in Albania?

15  A.   To save on weight.  Therefore, it would save on shipping

16  costs.

17  Q.   Did you see any Chinese markings on the wooden crates

18  containing the ammunition?

19  A.   Yes.

20  Q.   Did you also see Chinese markings on the metal tins of the

21  ammunition?

22  A.   Yes.

23  Q.   Did you also see cartons or placards within the metal tins

24  that also had Chinese characters?

25  A.   Yes.

 1   Q.   Now, what made you think, in fact -- that, in fact, these

 2   markings were Chinese?

 3   A.   Well, the president of the company told me that it was

 4   Chinese.

 5   Q.   Now, what was happening with the tins as the ammunition was

 6   taken out of there?

 7   A.   They were being thrown into piles.

 8           MS. FERNANDEZ:  Your Honor, if we could have access to

 9   the Government's computer at this time.

10           THE COURT:  You have it.

11           MS. FERNANDEZ:  I'd like to publish Government's

12   Exhibit 40.2.

13   BY MS. FERNANDEZ:

14   Q.   Do you recognize what is, in fact, photographed in this

15   picture?

16   A.   Yes.

17   Q.   And could you tell us, what are we looking at?

18   A.   This is the military hangar with empty tins.

19   Q.   And on the far left-hand corner of that photograph, do you

20   see what's supposed to be a security guard, military guard?

21   A.   That's one of the -- I believe it's one of the Albanian

22   military officers.  Yes.

23   Q.   That you previously testified were securing the area?

24   A.   Yes.

25   Q.   And moving on to Government's Exhibit 40.4, tell us, what

 1   are we looking at here?

 2   A.   You're looking at one of the tops to the tins in which the

 3   ammunition came.

 4   Q.   Again, with the Chinese characters, as you previously

 5   testified?

 6   A.   Yes.

 7   Q.   And looking at Government's Exhibit 40.18, what are we

 8   looking at here?

 9   A.   This is one of the -- what do you call that? -- cardboard

10   sheets that came inside the tin with the ammunition.

11   Q.   And did you see similar placards like this with the Chinese

12   marking at AEY's repackaging operations?

13   A.   Yes, ma'am.

14   Q.   Looking at Government's Exhibit 40.15, what are we looking

15   at here?

16   A.   This is the ammunition that came inside the tins.

17   Q.   Is this the open package with the individually wrapped

18   ammunition?

19   A.   Yes.

20   Q.   And Government's Exhibit 40.21:  What are we looking at

21   here?

22   A.   This is a placard that would be, I guess, placarded on the

23   side of the final pallet of ammunition.  This was given to

24   me -- or given to AEY by Ylli Pinari's office.

25   Q.   Is it your understanding that this is the type of label

1    that would be placed on the pallets as the ammunition was then

2    ready to be transported to Afghanistan?

3    A.   Yes.

4    Q.   Now, looking at Government's Exhibit 40.22, is this an

5    example of how, in fact, the boxes were palletized and ready

6    for air transportation?

7    A.   Yes, ma'am.

8    Q.   Was it your understanding that this is how all the

9    shipments that were sent to Afghanistan were actually

10   palletized?

11   A.   Yes.

12   Q.   Now, while you were in Albania, did you also see papers or

13   wrappings within the individual rounds of ammunition inside the

14   original metal tins?

15   A.   Yes.

16   Q.   And did those papers also have Chinese markings?

17   A.   Yes.

18   Q.   And could you tell us, when did you first notice this when

19   you were in Albania?

20   A.   This, again, is when Efraim Diveroli came to oversee

21   operations.

22   Q.   In Albania?

23   A.   In Albania.

24   Q.   Do you recall roughly when that was?

25   A.   The middle of October, the 14th through the 16th, of 2007.

```
 1    Q.   Any particular incident that happened while Efraim was

 2    there in the facilities that brought up this issue with the

 3    papers?

 4    A.   Yes.

 5    Q.   Could you tell us about that.

 6    A.   Sure.

 7         We went to the military hangar after -- no.  Before we went

 8    to Ylli Pinari's office, we went to the military hangar.

 9         Efraim opened up one of the final pallets that you just

10    saw, and inside there he found a small pink piece of paper with

11    Chinese markings.

12         And he sort of became hysterical, irate, and asked me, "Why

13    are these in here?"

14         My response was, "I don't have any idea why those are in

15    there."

16         He then got on the phone for a while, constantly yelling at

17    people.  That's how I became aware.

18    Q.   Did you then at that point realize that there was a problem

19    with using the Chinese -- this ammunition with these Chinese

20    papers and they were intentionally being removed prior to

21    shipping?

22    A.   I thought there might be a problem as, you know, a small

23    piece of paper is not going to save you that much money on

24    shipping costs.

25         So I reiterated my concerns to Efraim.
```

 1      And his response was, "Black, look around you.  You're not
 2  in China.  You're in Albania.  Don't worry."
 3  Q.  Did you and Efraim also visit any other facilities while he
 4  was still there containing ammunition?
 5  A.  Yes.  After we went to Ylli Pinari's office, he had a
 6  driver drive us to a bunker.  In this bunker, there was a lot
 7  of ammunition.  Basically, it's a mountain filled with
 8  ammunition.
 9  Q.  And at that bunker that you went to, did you notice any
10  Chinese markings on any of the containers of that ammunition?
11  A.  Yes.
12  Q.  Now, I think you testified that Efraim was there about two
13  or three days.
14      After he left, did you then -- did there come a time where
15  you became suspicious about activity that you noticed at AEY's
16  repackaging operations?
17  A.  Yes.  Across the street from the military hangar as well as
18  a small military base, there is a hotel directly across the
19  airport, across the dirt road.
20      And this is where we had the pilots resting.  They would
21  get a few hours' rest and then they would leave for
22  Afghanistan.
23      I would hang out there, talk to the pilots, have some
24  dinner.
25      And I believe it was very soon after Efraim left that the

1    military hangar became -- there was more activity.  It was

2    usually a very quiet place, nothing going on.  But there was

3    American cars, embassy plates.

4        So I called Daniel Doudnik and told him what was going on.

5        He said, "I'll call you right back."

6        There's something wrong with this microphone, I think,

7    because I'm trying to speak into it but I -- don't worry.

8            THE COURT:  It's fine.

9    BY MS. FERNANDEZ:

10   Q.  We can hear you.

11   A.  All right.

12       I called Daniel.

13       He said, "I'll call you right back."

14       He did.  He said, "Continue operations.  There's nothing

15   wrong.  Don't worry about it."

16   Q.  Now, while you were in Albania, did United States federal

17   agents contact you about AEY?

18   A.  Yes.

19   Q.  And when did that happen, if you remember?

20   A.  This was the day before I left.  So the 30th of October,

21   2007.

22   Q.  So you left October 31st, 2007?

23   A.  Yes, ma'am.

24   Q.  And could you tell us, what happened with the agents?

25   A.  After talking with them, them interviewing me, I found out

1   that providing the Chinese ammunition under that contract was

2   not legitimate, legal.

3   Q.   And what did you do after you spoke with the agents?

4   A.   The next day, I left to Milan, Italy.

5   Q.   Did you notify Efraim Diveroli that you were leaving?

6   A.   No.

7   Q.   How long were you in Italy -- Milan, Italy?

8   A.   Until the 4th of November, 2007.

9   Q.   Where did you go from there?

10  A.   Where did I go from there?

11  Q.   Yes.

12  A.   I returned home.

13  Q.   To the United States?

14  A.   Yes.

15  Q.   And did you tell anyone -- once you were back in the United

16  States, did you tell anyone from AEY about your meeting with

17  the law enforcement agents in Albania?

18  A.   Yes.

19  Q.   And what did -- who did you meet with?  And tell us about

20  that.  And what did you say?

21  A.   I met with Daniel Doudnik and Levy Myer maybe the day after

22  I returned, and I told them what had happened and that

23  providing the Chinese ammunition is not legit.

24  Q.   And while you were still in Albania -- let me ask you:

25  Were you communicating with AEY and AEY employees through

Black - DIRECT - By Ms. Fernandez                66

1   e-mails?

2   A.   Yes.

3   Q.   Do you remember your e-mail address?

4   A.   dblack@aeyincorporated.com.

5   Q.   And, in fact, when you spoke with the officers, the federal

6   agents in Albania, did you give them access to your e-mail

7   account?

8   A.   Yes.

9   Q.   After you returned to the States, did you then return to

10  Albania at a later time?

11  A.   Yes.

12  Q.   When was that?

13  A.   February the 2nd, 2008.

14  Q.   And what was the purpose of that trip?

15  A.   To withdraw money from an account that was set up in my

16  name for operating and personal expenses.

17  Q.   Did you, in fact, withdraw money from that account?

18  A.   Yes.

19  Q.   And how much money?

20  A.   Around $10,000.

21  Q.   And what was the purpose of withdrawing this money?

22  A.   I was never paid the bonus that I was promised.  And my

23  furniture was all ruined, which Efraim told me that he would

24  put into storage, but left in Daniel's garage for three months.

25  Q.   Did you let Efraim Diveroli know that you were withdrawing

Black - CROSS - By Mr. Bieber                    67

1    this money?

2    A.   No.

3    Q.   Have you been charged with any crimes in connection with

4    this -- your involvement in this matter?

5    A.   No.

6    Q.   And did you, in fact, receive a subpoena to come and

7    testify here today?

8    A.   Yes, ma'am.

9    Q.   Are you testifying under any kind of agreement with the

10   United States, any kind of immunity agreement?

11   A.   No.

12   Q.   Have any promises been made to you regarding filing any

13   charges against you in exchange for your testimony before this

14   jury here today?

15   A.   No.

16        MS. FERNANDEZ:  The United States tenders this

17   witness, your Honor.

18        THE COURT:  Cross-examination.

19        MR. BIEBER:  Thank you, Judge.

20                    CROSS-EXAMINATION

21   BY MR. BIEBER:

22   Q.   Good afternoon, Mr. Black.

23   A.   Good afternoon.

24   Q.   My name is Brian Bieber.

25        We've never met before?

1   A.   No.

2   Q.   Never spoke about this case?

3   A.   No.

4   Q.   You actually received a subpoena to come here from my

5   office as well.  Right?

6   A.   Yes, sir.

7   Q.   Okay.  You told us a little bit about your education.

8        You have -- what was it?  Two bachelor's degrees?

9   A.   Yes.

10  Q.   And you were hired at AEY in July of '07.  Right?

11  A.   Yes.

12  Q.   Who hired you?

13  A.   Levy Myer, Daniel Doudnik.

14  Q.   And did you know Efraim Diveroli before that day?

15  A.   No.

16  Q.   You met him once you began working for AEY?

17  A.   Yes, sir.

18  Q.   And you believed that AEY was a legitimate operation.

19  Right?

20  A.   I did.

21  Q.   Did you know that they were under investigation -- "they"

22  meaning AEY and Diveroli -- since at least 2005?

23  A.   No.

24  Q.   You didn't find that out until later.  Right?

25  A.   Yes.

Black - CROSS - By Mr. Bieber          69

1    Q.   Had you known that, would you ever have accepted the job?

2    A.   Absolutely not.

3    Q.   Not a chance.  Right?

4    A.   Not a snowball chance, you know.  Yeah.

5    Q.   Okay.  Let's see.

6         When the search warrant was executed, that was August.

7    Right?

8    A.   Yes.

9    Q.   And you said that Diveroli said -- assured everyone, "Don't

10   worry.  It's something about my competition.  They have an axe

11   to grind with me.  They're trying to boot me out," I think you

12   said.  Right?

13   A.   Yes.

14   Q.   And you believed him?

15   A.   Yes.

16   Q.   He was charismatic?

17   A.   Charismatic.  Sure.

18   Q.   And, also, you described his demeanor before as -- I had a

19   note about it, but something about coming in and doing things

20   quickly.  Right?

21   A.   Yes.

22   Q.   And if he wanted something done, he might say, "I want this

23   done right now"?

24   A.   Yes.

25   Q.   You actually experienced him doing that with you.  Right?

Black - CROSS - By Mr. Bieber                    70

 1   A.   Sure.  Yes.

 2   Q.   "Black, I need you to go to Albania," that type of thing.

 3   Right?

 4   A.   Yes, sir.

 5   Q.   And you heard him do that on the phone as well?

 6   A.   Sure.  Yes.

 7   Q.   So the search warrant's executed.  He also assured everyone

 8   that AEY was a legitimate business.  Right?

 9   A.   Yes.

10   Q.   Running its operations legitimately.  Right?

11   A.   Yes.

12   Q.   And he also said that he had legal counsel.  Right?

13        MS. FERNANDEZ:  Objection, your Honor.  This is beyond

14   the scope of the direct testimony, and it is also hearsay.

15        THE COURT:  Sustained.

16   BY MR. BIEBER:

17   Q.   Well, you said on direct examination that Mr. Diveroli said

18   that he was running a legitimate company.  Right?

19   A.   Yes, I did.

20   Q.   And the legitimacy of that company involved his

21   representation of having attorneys dealing with that search

22   warrant.  Right?

23        MS. FERNANDEZ:  Objection, your Honor.  Again, this is

24   beyond the testimony.  There was no reference to attorneys.

25        MR. BIEBER:  You --

```
 1              THE COURT:  Sustained.

 2    BY MR. BIEBER:

 3    Q.  You went to South Beach with Mr. Diveroli shortly after the

 4    search warrant was executed.  Right?

 5    A.  Yes.

 6    Q.  And you witnessed him using drugs?

 7    A.  No.

 8              MS. FERNANDEZ:  Objection.

 9    BY MR. BIEBER:

10    Q.  Did you ever --

11              MS. FERNANDEZ:  Again, this is beyond the scope of the

12    direct testimony.

13              THE COURT:  Sustained.

14    BY MR. BIEBER:

15    Q.  You accepted his job offer to go to Albania.  Right?

16    A.  Yes.

17    Q.  And you were to -- part of your job duties were to oversee

18    the repackaging of the ammunition.  Right?

19    A.  Yes.

20    Q.  And you were told that the repackaging was to take the tins

21    out of the wood crates and -- not you, personally, but to

22    oversee it, taking the tins out of the wood crates, taking the

23    ammunition out of the tins.  Right?

24    A.  "To oversee" is a strong word.  It was more, "Make sure

25    that they have this packed at this time."
```

Black - CROSS - By Mr. Bieber                72

1    Q.   And Mr. Diveroli told you the reason why was to reduce the
2    costs for shipping weight.  Right?
3    A.   Yes.
4    Q.   And let's see.
5         He said to you -- oh.  Your quote before was he jumps
6    around sometimes, he's all over the place.  Right?
7    A.   Absolutely.
8    Q.   That's just your -- one of your impressions of his
9    demeanor?
10   A.   Excuse me?
11   Q.   That's one of your impressions of his demeanor.  Right?
12   A.   Yes.  Yes.
13   Q.   And let's see.
14        When did he come to Albania?
15   A.   The middle of October, 14th.
16   Q.   And he told you that, "There's nothing to worry about with
17   respect to the ammunition because it was manufactured in
18   Albania."  Right?  I'm sorry.  "Nothing to worry about the
19   ammunition because we're here in Albania"?
20   A.   Yes.  It was more buying from Albania.
21   Q.   And you believed him.  Right?
22   A.   He's -- he has -- he had huge contracts, you know.  He was
23   getting contracts from the Government so -- paying his
24   employees.  I believed it was a legit company.
25   Q.   And he asked you to lie about Alexander Podrizki and his

Black - CROSS - By Mr. Bieber                73

1   circumstances of leaving.  Right?

2   A.   I wouldn't say "lie."  It was a reason that he gave me to

3   give to other people.

4   Q.   All right.

5   A.   Yeah.

6   Q.   Did you later learn that that was a lie?

7   A.   Months later.

8   Q.   But you didn't intentionally say it as a lie.  You were

9   relying on Diveroli.  Right?

10  A.   Yes.

11  Q.   And you were shown a photograph of an armed guard at the

12  Air Force base.  Right?

13  A.   Military hangar.

14  Q.   At the military hangar.  Right?

15  A.   Yes.

16  Q.   Do you know if back in April it was not a secure facility

17  like that?

18  A.   Back in April of....

19  Q.   '07.

20  A.   I was not employed by AEY at that time.

21  Q.   So you don't know.  Right?

22  A.   I have no idea.

23  Q.   And do you know what Diveroli was telling people back in

24  April?

25  A.   I have no idea.

Black - CROSS - By Mr. Bieber                    74

1   Q.   And let's see.

2        The ammunition, you said, in -- we're in August and

3   September when you're there.  Right?  August, September,

4   October?

5   A.   The last two days of August, September, October.

6   Q.   And you were shown photographs of wood crates and tins.

7   Right?

8   A.   Yes.

9   Q.   And you saw Chinese markings on the tins?

10  A.   Yes.

11  Q.   And you also saw them on the wood crates.  Right?

12  A.   Yes.

13  Q.   Do you know if the wood crates in April, four months before

14  you got there, had Chinese markings on them?

15  A.   I have no idea.

16  Q.   So Diveroli tells you with respect to those papers that had

17  the Chinese markings on them, "Don't worry about it."  Right?

18  A.   I don't understand the question.

19  Q.   You saw those papers in the ammunition that had Chinese

20  markings on them.  Right?

21  A.   Yes.

22  Q.   And Diveroli assured you -- continued to assure you that

23  the operation that he was running was legal?

24  A.   Yes.

25  Q.   And you believed him?

Black - CROSS - By Mr. Bieber                    75

1    A.   My boss.

2    Q.   Your boss?

3    A.   Was my boss.

4    Q.   And he had the experience.  Right?

5    A.   From what I heard, yes.

6    Q.   But you started to become suspicious.  Right?

7    A.   Yes.

8    Q.   And at that point you started to become suspicious, you

9    still trusted him at that point?

10   A.   I can't really answer that question.

11   Q.   Okay.  Fair enough.

12        You went to the bunkers and you saw Chinese markings on

13   ammunition.  Right?

14   A.   Yes.

15   Q.   And you became even more suspicious about whether Diveroli

16   was telling you the truth?

17   A.   Truth about what?

18   Q.   About the legality of the situation.

19   A.   It wasn't really a central thought of mine, the legality of

20   the situation, at the time.

21   Q.   But then you saw all those cars from the United States

22   Embassy.  Right?

23   A.   Yes.

24   Q.   And then you became -- well, then you called Doudnik.

25   Right?

1    A.   Yeah.  Yeah.

2    Q.   And Doudnik said he'd call you back.

3         Did he talk to Diveroli?

4    A.   I -- he said he did.

5    Q.   He said he did?

6    A.   Yes.  I don't know for sure.

7    Q.   Okay.

8    A.   Yeah.

9    Q.   And Doudnik -- do you trust Doudnik, necessarily?

10   A.   More than anybody else there.  Yes.

11   Q.   Okay.  More than Diveroli?

12   A.   Yes.

13   Q.   And Doudnik told you, "Continue operations."  Right?

14   A.   Yes.

15   Q.   And then the agents met with you?

16   A.   Yes.

17   Q.   And this was, I think you said, on the 30th of October,

18   right, 30th of October, 2007?

19   A.   Yes.

20   Q.   You understand the contract in this case wasn't suspended

21   until March of the next year?  Did you learn that?

22   A.   No.

23   Q.   But the agents told you on October 30th that they believed

24   this was not a legal operation.  Right?

25   A.   Yes.

```
 1   Q.   That was the first time you found that out.  Right?
 2   A.   Yes.
 3   Q.   And you stopped assisting AEY when you found that out.
 4   Right?
 5   A.   Yes.
 6   Q.   You did the repackaging -- or oversaw the repackaging of
 7   this ammunition for -- what was it? -- three months, about?
 8   A.   Two months.
 9   Q.   Two months.
10        Then you found out from the agents, not legal?
11   A.   I -- the word "legal" is a -- I prefer the word "legit."
12   Q.   Legit.
13   A.   There you go.
14   Q.   You found out it wasn't legitimate?
15   A.   Yeah.
16   Q.   And had you known it wasn't legitimate from the beginning,
17   would you have gotten out?
18   A.   Absolutely.
19   Q.   Did you ever speak to Ralph Merrill with respect to
20   anything that was going on?
21   A.   No, sir.
22   Q.   Do you have any personal knowledge that Ralph Merrill knew
23   about the illegitimacy of what AEY and Diveroli were doing?
24   A.   No, sir.
25              MR. BIEBER:  May I have the witness step down, your
```

Black - CROSS - By Mr. Bieber                    78

 1   Honor, to review the exhibits?

 2            THE COURT:  Yes.

 3   BY MR. BIEBER:

 4   Q.  Would you mind stepping down one moment, Mr. Black.  I'd

 5   like to show you these two wood crates.  I'm going to identify

 6   the exhibit numbers:  42.23 and 42.24.

 7        If you could take a look at these two wood crates and tell

 8   us if there's any Chinese markings on these wood crates.

 9   A.  No.

10   Q.  You don't see any Chinese markings on these wood crates.

11   Right?

12   A.  No, I don't.

13   Q.  Oh.  Diveroli -- you withdrew that money from the account

14   because Diveroli owed you money.  Right?

15   A.  Yes.

16   Q.  Broke his promise?

17   A.  Yes.

18   Q.  He was promising to pay you a bonus and he never paid you

19   that money.  Right?

20   A.  Never paid me that money.

21            MR. BIEBER:  Nothing else, Judge.

22            THE COURT:  Redirect?

23            MS. FERNANDEZ:  Nothing, your Honor.

24            THE COURT:  You may step down, sir.

25            (Witness excused.)

```
 1                      * * * * * * * * * *

 2            KIM MACHELLE JONES, GOVERNMENT WITNESS, SWORN

 3            THE COURTROOM DEPUTY:  State your name and spell it

 4  for the record.

 5            THE WITNESS:  Kim Machelle Jones, K-i-m,

 6  M-a-c-h-e-l-l-e, J-o-n-e-s.

 7                      DIRECT EXAMINATION

 8  BY MS. FERNANDEZ:

 9  Q.  Good afternoon, Ms. Jones.

10  A.  Good afternoon.

11  Q.  If you would, speak right into the microphone so we can

12  hear your responses.

13  A.  Okay.

14  Q.  Thank you.

15       Would you tell us, how are you employed?

16  A.  I'm a civilian employee of the Department of Army.  I'm

17  assigned to the Army Contracting Command, formerly US Army

18  Sustainment Command.

19  Q.  And is the -- is that an agency of the United States?

20  A.  Yes, it is.

21  Q.  And what is your current position?

22  A.  I'm a procuring contracting officer.

23  Q.  And how long have you held that position?

24  A.  Within ASC, almost four years.

25  Q.  Prior to that, did you have any other Government
```

Jones - DIRECT - By Ms. Fernandez                    80

1  contracting experience?

2  A.  Yes.  11 years prior.

3  Q.  And are you assigned to work on any particular types of

4  contracts with respect to any particular types of goods?

5  A.  Yes.  Me and my team buy nonstandard ammunition for our

6  foreign allies, the nonstandard ammunition being ammunition

7  that is used in foreign weapons systems, for example, AK-47s,

8  PKM machine guns, not standard US force ammunition and weapons

9  systems.

10  Q.  Would you briefly describe your duties and responsibilities

11  as procuring contracting official in that capacity.

12  A.  As a requirement that's identified to us by the foreign

13  country, we put those requirements into what we call a

14  solicitation package.  That package would include the items,

15  the quantities, any delivery terms, mandatory provisions.

16      That solicitation then -- it would also include the country

17  that we're supporting.  That solicitation package is then

18  put -- issued for contractors who are interested in doing this

19  type of business to submit a proposal.

20      Once we put it out there, what we call put it out on the

21  street, the solicitation may be amended as any revisions,

22  changes, updates are made.

23      On the closing date, the contractors have to submit their

24  proposals back to the Government.  We review the proposals, in

25  particular, "Is all the information there?"

1      Then we do an evaluation of the information provided by the

2  contractors as to -- in accordance with the evaluation criteria

3  that would have been stated in the solicitation.

4      Based on that evaluation and the information, an award

5  decision is made.  And then we draft an award package to the

6  contractor -- to the successful contractor and then execute a

7  contract award.

8  Q.  So when you say a decision -- an award decision is made,

9  does that mean there's an evaluation of the information in the

10  solicitation responses by the contractors?

11  A.  Yes.

12  Q.  And at that point, a decision is made as to who's going to

13  get the contract?

14  A.  Yes.

15  Q.  And do you also get involved in actually writing the

16  contract, putting the contract -- reviewing the contract and

17  actually authorizing that the contract be issued?

18  A.  Yes.  Yes.  I review and approve all contract execution.

19  Q.  And do you have a certain limit amount as to how much money

20  for each contract that you're allowed to issue?

21  A.  Yes.  As a warranted contracting officer, I have an

22  execution of authority of 10 million without further approvals.

23  But it's unlimited if I get the appropriate supervisory

24  approvals.

25  Q.  Are you typically working on more than one solicitation or

1    contract at any one time?

2    A.   At all times, I'm working on more than one.  I currently

3    probably have nine active contracts and another six that we're

4    doing closeout actions, payments, stuff like that.

5    Q.   And can you tell us, after you've issued the contract,

6    you've awarded that contract, what are some of your primary

7    duties and responsibilities at that point?

8    A.   Post-award functions would include monitoring the contract

9    performance, deliveries, quality, noting any discrepancies, any

10   issues, handling those as they come along.

11        I also review and approve contract modifications,

12   additional task orders, any modifications to task orders that

13   would be issued, also.

14   Q.   Now, let me direct your attention to February, 2007.

15        At that time, were you asked to work on a contract that had

16   been issued to a contractor by the name of AEY, Incorporated?

17   A.   Yes, I was.

18   Q.   And did you at that point become the procuring contracting

19   official on the contract?

20   A.   Yes.

21   Q.   Do you recall, what was the contract number on that?

22   A.   W52P1J07D0004.

23   Q.   Did your work on that contract involve the duties and

24   responsibilities as you previously described?

25   A.   Yes.

Jones - DIRECT - By Ms. Fernandez                    83

1  Q.   And at that point, had a representative of AEY actually

2  accepted the contract?

3  A.   Yes.

4  Q.   And do you remember who that was?

5  A.   Efraim Diveroli, president of AEY, Incorporated.

6  Q.   I have placed before you exhibits that have been admitted

7  in evidence.  They are Government's Exhibits 1, 1-A through

8  1-D, 1-E through 1-O.

9       If I may ask you to please look at -- beginning with

10 Government's Exhibit 1 and 1-A through 1-D, could you look at

11 those exhibits and tell us, do you recognize those exhibits?

12 A.   Yes.  This is the contract modification between the Army

13 Sustainment Command and AEY, Incorporated, and the associated

14 modifications that I had administrative function duties over.

15 Q.   So for identification purposes, then, Government's

16 Exhibit 1 is the actual contract.  Is that correct?

17 A.   Yes, it is.

18 Q.   And then 1-A through 1-D are modifications to the contract?

19 A.   Yes.  P-1, -2, -3 and -4.

20 Q.   Could you tell us, who were the parties to that contract?

21 A.   Yes.  Headquarters Army Sustainment Command out of Rock

22 Island, Illinois and AEY, Incorporated out of Miami Beach,

23 Florida.

24 Q.   Who were the beneficiaries of this contract?  Who was this

25 intended for?

1    A.   The nonstandard ammunition procured under this contract was

2    to support the Afghanistan National Army and Afghanistan

3    National Police for combat and training purposes.

4    Q.   And what was the date of the contract?

5    A.   26 January, 2007.

6    Q.   If we could publish on the Government's computer

7    Government's Exhibit 1, the contract.

8         And let me ask you this:  This contract, was this what was

9    referred to as a prime contract between the Army and AEY?  And,

10   if so, would you explain that term.

11   A.   Yes.

12        The -- AEY was the prime contractor on this, meaning the

13   contract was between the two parties, being the Army

14   Sustainment Command and AEY.  AEY was responsible for the

15   performance under the contract.

16        We have something called privity of contract.  So the

17   privity would have been between those two parties only.  If AEY

18   had subcontractors, then their privity would have been between

19   them and their subcontractors.

20   Q.   And turning to Pages 2 through 3 of the contract at this

21   time, can you summarize for us the type of ammunition that was

22   actually being supplied to the Army under this contract.

23   A.   Yes.  There was -- we were procuring small-, medium- and

24   large-cal ammunition.  There were variations of 39 million

25   ammunition for the AK-47 assault rifle, variations of 7.62 x 54

Jones - DIRECT - By Ms. Fernandez                85

1    millimeter ammunition, also, for the PKM machine gun, as well

2    as various other types of ammunition.

3    Q.  Was it your understanding that this ammunition was, in

4    fact, on the United States Munitions List?

5    A.  Yes, it was.

6    Q.  And let me direct your attention to Page 3 of the contract,

7    Paragraph 3, specifically.

8    A.  Okay.

9    Q.  There is a reference that this is, in fact, a requirements

10   contract, a firm, fixed-price contract.

11       Would you explain those terms for us.

12   A.  Yes.  A requirements contract as opposed to just a contract

13   where you would be doing a single procurement -- a requirements

14   contract -- in this case, it was a two-year requirements

15   contract where we established a base contract and then were

16   able to issue task orders against that requirements contract

17   for any of the items listed in the contract during that period.

18       Firm, fixed price was we were looking for a unit price to

19   be associated with each of the contract line items as

20   designated in there, both for Year 1 and for Year 2.  We would

21   use those prices also to issue the task orders under the

22   requirements-type contract.

23   Q.  And let me ask you this:  With respect to the total dollar

24   value of this contract, can you tell us what that was.

25   A.  The total evaluated price of the contract was $298 million.

1    And that was based on AEY's fixed -- firm, fixed unit prices

2    for each of the items and for the two-year period.

3    Q.   Those were the prices that they represented in their

4    solicitation -- their response to the solicitation?

5    A.   Yes.  And the prices used to price out the orders.

6    Q.   Now, where was the money coming from to pay AEY for the

7    ammunition being delivered under this contract?

8    A.   All of the funding from this was congressionally

9    appropriated US funding.

10   Q.   Now, what specifically was included or part of the

11   contract?  We've been referring to Government's Exhibit 1, that

12   contract.  What documents were part of that contract?

13   A.   This document itself consists of the contract award

14   information.  The solicitation is incorporated.  And the -- it

15   also incorporates the offeror's proposal.

16   Q.   And is that referenced in the body of the contract itself?

17   A.   Yes.

18   Q.   Where is that?

19   A.   On the first page, in Block 18, it references the

20   solicitation number.  Would you like me to read that?

21   Q.   It's in Block 18.

22        Yes.  Would you read that into the record, please.

23   A.   Yes.  "Award:  Contractor is not required to sign this

24   document.  Your offer on Solicitation No. W52P1J06R0129,

25   including the addition or changes made by you, which additions

 1   or changes are set forth in full above, is hereby accepted as

 2   the items listed above and on any continuation sheets.  This

 3   award consummates the contract which consists of the following

 4   documents:  The Government's solicitation and your offer and

 5   this award/contract.  No further contractual document is

 6   necessary."

 7   Q.  And, also, if you would now look, in front of you we've

 8   placed Government's Exhibit 2 and 2-A.  Would you take a moment

 9   to look at those documents.

10   A.  Yes.

11   Q.  Could you tell us, what are these documents?

12   A.  This is the solicitation, W52P1J06R0129, and the seven

13   amendments associated with it.

14   Q.  This is the solicitation that's referenced that was

15   incorporated in the contract?

16   A.  Yes, it is.

17   Q.  And what was the date of that solicitation again?

18   A.  July 28th, 2006.

19   Q.  Now, let me direct your attention to Exhibit 2-A, which is

20   the amendments to the solicitation.

21        I'm going to ask you to look at specifically the second

22   amendment to the solicitation.

23        Can we bring those up on the computer.

24   A.  Okay.

25   Q.  And if we could turn to Question 10 that is referenced in

 1    this amendment.  And if we could zoom in on the question and

 2    the answer.

 3         Could you please read that into the record.

 4    A.  "Is ammunition from China acceptable for this contract,

 5    assuming it meets the technical specifications?

 6         "Answer:  The solicitation itself does not expressly

 7    prohibit any source of supply, but requires the ammunition be

 8    compatible with the identified weapon systems in good working

 9    order.

10         "However, any other statutory or regulatory restrictions,

11    such as exporting and importing licensing requirements that may

12    effectively prohibit supplies from any source, are the

13    responsibility of each offeror to identify and resolve."

14    Q.  And was this part of the question and answers as submitted

15    from the field during the solicitation process?

16    A.  Yes, it was.  It would come in from one of the contractors.

17    Q.  And in response -- the response to the question, in fact,

18    it's basically saying it's up to the offeror to determine

19    whether or not there's a prohibition?

20    A.  Yes.  The contractors are responsible for their own

21    suppliers.  They choose their own suppliers.  So we're not in a

22    position where we're going to tell them for each and every one

23    what they are.  So it's their responsibility to know what

24    regulations, what restrictions, are associated with any of

25    their suppliers.

Jones - DIRECT - By Ms. Fernandez                89

1   Q.   Now, if we could look at Amendment 4 to the solicitation --

2   if we could publish that.  And if we could turn to Page 2 of

3   that amendment.

4        First of all, can you tell us, what was the date of this

5   amendment?  I'm sorry.  On the very first page of the

6   amendment.

7   A.   September 12th, 2006.

8   Q.   And now, if you could turn to Page 2 of the amendment,

9   again, this is another amendment to that solicitation?

10  A.   Yes, it is.

11  Q.   And could you tell us -- read this into the record, Item 1.

12  A.   "The purpose of this amendment is to incorporate the

13  following DFAR clause into the subject solicitation:

14       "DFAR 252.225-7007, prohibition on acquisition of United

15  States Munitions List items from Communist Chinese military

16  companies, dated September, 2006."

17       Go on?

18  Q.   Yes.  Go on.

19  A.   "Paragraph A, Definitions.  As used in this clause,

20  'Communist Chinese military company' means any entity that is,

21  one, a part of the commercial or defense industrial base of the

22  People's Republic of China or, two, owned or controlled by or

23  affiliated with an element of the Government or Armed Forces of

24  the People's Republic of China.

25       "'United States Munitions List' means the Munitions List of

1    the International Traffic in Arms Regulation in 22, CFR,

2    Part 121."

3        Paragraph B:  "Any supplies or services covered by the

4    United States Munitions List that are delivered under this

5    contract may not be acquired, directly or indirectly, from a

6    Communist Chinese military company."

7        Paragraph C:  "The contractor shall insert the substance of

8    this clause, including this Paragraph C, in all subcontracts

9    for items covered by the United States Munitions List."

10       End of clause.

11   Q.  So as of September 12th, 2006, this prohibition was part of

12   the solicitation papers as you were receiving bids from

13   Government contractors?

14   A.  Yes, it was.

15   Q.  And is it your understanding that this is the same -- this

16   amendment gets incorporated into the final contract that is

17   issued to AEY?

18   A.  Yes, it was.

19           MS. FERNANDEZ:  Your Honor, may I approach the

20   witness?

21           THE COURT:  Yes.

22   BY MS. FERNANDEZ:

23   Q.  I've placed before you what's been marked as Government's

24   Exhibits 3, 3-A, 3-B and 3-C.  If you would, please first look

25   at the documents and tell us whether you recognize these

Jones - DIRECT - By Ms. Fernandez                91

1   documents.

2   A.   Yes, I do.

3   Q.   How is it that you recognize these documents?

4   A.   This is AEY's offer that was incorporated into the contract

5   that I monitored.

6           MS. FERNANDEZ:  Your Honor at this time the Government

7   moves into evidence Government's Exhibit 3 and 3-A through 3-C.

8           MR. BIEBER:  No objection.

9           THE COURT:  On the exhibit list that you provided,

10  there are three 3-As, two 3-Bs and two 3-Cs.

11          Is that a composite exhibit for --

12          MS. FERNANDEZ:  It is a composite exhibit.

13          THE COURT:  Okay.  So it will be admitted -- they will

14  be admitted as Government's Exhibits 3 -- Composite Exhibit 3,

15  Composite Exhibit 3-A, Composite Exhibit 3-B and Composite

16  Exhibit 3-C.

17          (Whereupon, Government's Composite Exhibit Nos. 3,

18  3-A, 3-B and 3-C were entered into evidence.)

19  BY MS. FERNANDEZ:

20  Q.   Could you tell us, what is the date of AEY's response to

21  that solicitation, the initial date?

22  A.   September 11th, 2006.

23  Q.   And was there a supplemental response provided by AEY?

24  A.   Yes.

25  Q.   And what is the date on that?

1    A.   The date of the final revisions is November 16th, 2006.

2    Q.   Did the Army rely on the representations made by AEY in

3    those submissions?

4    A.   Yes, we did.

5    Q.   And what type of information was included in AEY's response

6    to the solicitation?

7    A.   There was a copy of the solicitation -- a signed copy of

8    the solicitation, which included an acknowledgement of all of

9    the amendments.  There's a past performance proposal, a price

10   proposal and a small business utilization proposal.

11   Q.   Could you briefly explain those components, those factors,

12   that were evaluated by the Army.

13   A.   Yes.  The past performance proposal.  What we were looking

14   for was recent and relevant contracts where the contractor had

15   done same or similar work as to what we were requiring under

16   the solicitation.

17        We were looking for both the procurement from foreign

18   suppliers and the delivery of those items, being ammo -- or it

19   could have been weapons -- basically delivered to a foreign

20   destination, also.

21        The price proposal.  We were looking for -- to develop a

22   total evaluated price utilizing individual prices for each of

23   the line items for each of the two years.

24        Small business utilization.  The Government always has

25   goals for supporting small businesses.  So we evaluate how a

1    contractor plans to utilize small businesses.

2         In AEY's case, they were a small business themselves.  So

3    they -- some of that information was used to meet those goals

4    for them.

5    Q.  Of the three factors that you just referenced, what were

6    the most important in actually awarding the contract to AEY?

7    A.  Past performance followed by price, with small business

8    utilization being least.

9    Q.  Getting back to the contract, what, if any, specific

10   requirements -- and if we could bring up the contract on the

11   Government's computer -- what specific requirements were there

12   with respect to the ammunition that was being procured under

13   this contract?

14   A.  The ammunition was required to operate safely in the

15   intended weapons systems which were included in the contract,

16   solicitation and the resulting contract.  And the ammunition --

17   there was a prohibition from the ammunition being provided from

18   Communist Chinese military companies.

19   Q.  If I could direct your attention to Pages 10 through 11 of

20   the contract -- return to Page 10.

21        Starting at the bottom of Page 10 and continuing on Page --

22   on the top of Page 11 of the contract, is that an exact copy of

23   the same amendment that we just recently referred to,

24   Amendment 4 to the solicitation?

25   A.  Yes.  This is exactly what Amendment 4 stated.

1   Q.   And if you look at Page 11 -- the top of Page 11.  And if

2   you would again read into the record Section B.

3   A.   "Any supplies or services covered by the United States

4   Munitions List that are delivered under this contract may not

5   be acquired, directly or indirectly, from a Communist Chinese

6   military company."

7   Q.   What was your understanding of what that regulation

8   prohibited?

9   A.   The clause was implemented to support the US foreign policy

10  that we were not going to support any procurements from the

11  Communist Chinese industrial base.

12  Q.   Now, you previously mentioned that there were, in fact,

13  several modifications to this contract.  Is that correct?

14  A.   Yes, it is.

15  Q.   And who approved those modifications?

16  A.   As the procuring contracting officer on record, I did.

17  Q.   And did you ever authorize any modification with respect to

18  this regulation, this prohibition?

19  A.   No, I did not.

20  Q.   Now, let me direct your attention to February, 2007, and

21  ask you if you, in fact, participated in a meeting after the

22  award had been given to AEY.

23  A.   Yes, I did.

24  Q.   And could you tell us, what was the purpose of that

25  meeting?

Jones - DIRECT - By Ms. Fernandez                95

1    A.   It was a post-award meeting whereby we asked AEY to come up

2    to Rock Island and for the Government to lay out what their

3    expectations were of the contract, go over some of the unique

4    conditions of the contract and then for AEY to explain to us

5    how they were going to perform -- how they would successfully

6    perform the requirements of the contract.

7    Q.   And who was present at that meeting from AEY?

8    A.   Efraim Diveroli, president, AEY; and Ralph Merrill, senior

9    advisor to AEY.

10   Q.   You also previously testified that, as part of your duties,

11   you would issue -- you were authorized to issue task orders.

12        Did you issue task orders under this contract to AEY?

13   A.   Yes, I did.

14   Q.   And if you would now look at what's in front of you and

15   labeled as Government's Exhibit 1-E through 1-O.

16        And if you would then tell us, what are these documents?

17   A.   Yes.   These are the five task orders and their associated

18   modifications to the contract.

19   Q.   And starting with Government's Exhibits 1-E through 1-G,

20   could you tell us, what are these exhibits?

21   A.   This is Task Order 1.

22   Q.   And what was the date of that order?

23   A.   26 January, 2007.

24   Q.   And it's -- along with it is the accompanying modification

25   to the order?

1   A.   There are two modifications along with that, also.

2   Q.   And what was the dollar value -- how much ammunition was

3   being requested under this order?

4   A.   $678,347.87.

5   Q.   And was there a specific delivery date by which the amounts

6   had to be delivered -- I mean, due date on that order?

7   A.   Yes.  The ammunition -- 31 March, 2007, was the delivery

8   date.

9   Q.   Now if you would look at Government's Exhibit 1-H through

10  1-I.  And is this Task Order 2 with its accompanying

11  modification?

12  A.   Yes, it is.

13  Q.   And what is the date of that second task order?

14  A.   Task Order 2, 13 March, 2007, in the amount of 48,717,662,

15  I believe, and 78 cents.

16  Q.   And were there delivery dates specified in that order as

17  well for that ammunition?

18  A.   Yes.  Delivery staggered from May -- the end of April

19  through October of 2007.

20  Q.   And if you would look at Government's Exhibit 1-J through

21  1-K and tell us if this is, in fact, Task Order 3 with the

22  modifications to that order.

23  A.   -J is Task Order 3 and, yes, -K is the modification

24  associated.

25  Q.   And what is the date of that order?

1   A.   Dated 21 June, 2007, in the amount of $14,012,012.89.

2   Q.   And were there specific delivery dates specified on that

3   order for their deliveries?

4   A.   Yes.  They staggered between September of '07 and November

5   of '07.

6   Q.   And Government's Exhibit 1-L through 1-N:  Would you take a

7   look at those documents and tell us, is this actually Task

8   Order 4 with the modifications?

9   A.   Yes.  This is Task Order 4 dated 6 August, 2007, in the

10  amount of $69,307,268.91.

11  Q.   Were there also specified delivery due dates for the

12  deliveries under that order as well?

13  A.   Yes.  It started in November -- actually, it started in

14  October, and it ran through February of 2008.

15  Q.   I'm sorry.

16       When did you -- what's the first delivery dates?

17  A.   October through February.

18  Q.   2007?

19  A.   October of 2007 through February of 2008.

20  Q.   And now, lastly, if you would look at Government's

21  Exhibit 1-O.  And is that Task Order 5?

22  A.   Yes, it is, dated 17 December, 2007, in the amount of

23  22,560,384.69.

24  Q.   And are there specific dates on which deliveries were due

25  under that order?

1   A.   March of '08 through October of '08.

2   Q.   Now, did AEY deliver ammunition under all of those orders?

3   A.   No.   No deliveries were made under Task Order 5, but there

4   were some deliveries on all four of the other task orders.

5   Q.   What was the total amount that AEY received from the Army

6   pursuant to this contract?

7   A.   Just over 66 million.

8   Q.   Could you briefly explain to us the process of exactly how

9   the Army processed invoices from AEY and made payments on those

10   invoices.

11   A.   The contract included a provision for what's called a

12   certificate of conformance in lieu of Government inspection,

13   where AEY prepared and signed a certificate of conformance,

14   also known as a COC, and they certify that all of the

15   ammunition cited in that document conformed to all aspects of

16   this contract.

17       Then this document -- once they signed on that document --

18   it also included a signature line for the Government receiving

19   official in Kabul.   When the ammunition was delivered to Kabul,

20   Afghanistan, the receiving official would sign for receipt, an

21   assumption of movement.

22       Once AEY had those signed, got that signed COC back, the

23   document is loaded into an automated -- Government-automated

24   system called Wide Area Workflow.   So they would submit the COC

25   along with a receiving report and an invoice.

Jones - DIRECT - By Ms. Fernandez                99

1          Those documents went to a Government agency for review.  We

2     would -- the documents are reviewed for any inaccuracies to

3     make certain, "Are there any discrepancies noted?"  If there

4     are none, if everything is okay, they're approved for payment.

5     Q.   Now, you mentioned that the certificate of conformance was

6     in lieu of inspection.

7          Can you explain that.

8     A.   Yeah.  The Government uses various modes for inspection.

9     Contractors are required to do their own inspection no matter

10    what the mode is.

11         In this case, because the locations of the ammunition were

12    in such remote locations, there were safety and security

13    issues, we had limited resources, limited manpower, it was

14    determined that it was in the best interest to utilize a

15    certificate of conformance.

16    Q.   And in preparation for the first deliveries of ammunition

17    by AEY, did you, in fact, have communications with others at

18    AEY regarding what information you wanted on that certificate

19    of conformance?

20    A.   Yes, we did.

21    Q.   And can you tell us, what type of information would -- did

22    you ask for, if you remember?

23    A.   Information that would be needed for -- in particular, by

24    the Government receiving official in Afghanistan as well as

25    other purposes.

1      We needed the contract line item, the name of the item,

2   description of the item, quantity, number of pallets, year of

3   manufacture, manufacturer, tracking control numbers.

4   Q.   And if we could have Government's Exhibit EM 94 up.

5      And is this an e-mail -- for example, would you tell us, is

6   this an e-mail where you actually communicated with Efraim

7   Diveroli requesting that information?

8   A.   Yes, it is.  An e-mail sent on the 13th of April, 2007,

9   asking them to look at the references and the regulation for

10  use of a COC and the additional information that we wanted on

11  there, being ammunition -- ammo description, quantity,

12  certification of inspection, name of manufacturer of the ammo,

13  year of manufacture, lot number, if applicable, and ammo data

14  card, if available.

15  Q.   Also now in front of you have we've placed Government's

16  Exhibit No. 10.  If you would take a moment to look at that

17  exhibit and tell us if you recognize these documents.

18  A.   Yes, I do.  This is an example of the process that I was

19  talking about earlier in the Government's automated system with

20  Wide Area Workflow.  This package is a receiving report, a COC

21  and an invoice.

22  Q.   Is this an example of the documents that the Army

23  Sustainment Command, in fact, received with respect to every

24  shipment delivered under this contract by AEY?

25  A.   Yes.  This was required for each shipment.

1   Q.   And if we could then bring up Government's Exhibit No. 10

2   and specifically turn to the certificate of conformance.

3        If you would look at the certificate of conformance in that

4   exhibit, there is a section entitled "Quality Statement."

5   Could you read that into the record, please.

6   A.   "I certify that, on July 4, 2007, AEY, Inc., furnished

7   the supplies as listed below, called for by Contract

8   No. W52P1J07D0004, Task Order 2, via Ukrainian Cargo Airlines

9   on Bill of Lading 516-00028394 in accordance with all

10  applicable requirements.

11       "I further certify that supplies or services are of the

12  quality specified and conform in all respects with the contract

13  requirements, including specifications, drawings, preservation,

14  packaging, packing, marking requirements and physical item

15  identification (part number) and are in the quantities shown on

16  this or on the attached acceptance document."

17       Dated of execution:  July 4, 2007.

18       Signature:  Efraim Diveroli.

19  Q.   Now, did the Army typically rely on representations such as

20  this made by AEY on the certificates of conformance?

21  A.   Yes, we did.

22  Q.   So were this document and this -- these representations

23  what you referenced before that you authorized AEY to

24  self-certify with respect to the ammunition that they were

25  delivering under each of the shipments?

Jones - DIRECT - By Ms. Fernandez          102

1   A.   Yes.

2   Q.   What purposes do you recall in terms of the information

3   that you specifically requested to be included in this

4   certificate of conformance from AEY?  What was the purpose of

5   some of that information?

6   A.   We would have needed this information for monitoring

7   performance under the contract, for tracking of the ammunition,

8   for -- if there were any issues or nonconformities noted, we

9   would use this information.

10  Q.   And specifically, for example, in this certificate of

11  conformance, what was the information with respect to the

12  ammunition that was being delivered that was included?

13  A.   The contract line item number; the TCN, which is the

14  transportation control number; the item; the quantity; number

15  of pallets; year of manufacture; lot number; manufacturer

16  (point of origin); final destination; tracking number; invoice

17  number; shipment number.

18  Q.   And specifically on, I guess, the second page, the section

19  where it says "Manufacturer Or Point of Origin," what was the

20  information included there?

21  A.   Ministry of Defense of Albania, MEICO, Military Export and

22  Import Company, Road 4, Shkurti No. 5, Tirana, Albania.

23  Q.   What did you understand by -- Ministry of Defense, MEICO,

24  to be?  What did you understand that to be?

25  A.   The manufacturer, as stated.

```
 1    Q.   What would have you done if the certificate of conformance

 2    indicated that the manufacturer was a Communist Chinese

 3    military company or Communist China?

 4    A.   It would have been rejected.

 5    Q.   Why was that?

 6    A.   Because the contract prohibited the delivery of ammunition

 7    from Communist China, directly or indirectly.

 8    Q.   As you monitored the performance of this contract, was AEY

 9    on time in making deliveries under this contract?

10    A.   No.

11    Q.   When did you first note that they were late, if so --

12    A.   Pretty much right from the beginning.

13    Q.   From the beginning of the --

14    A.   From the initial deliveries.  They missed initial

15    deliveries.  Yes.

16    Q.   And did you have any communications with anyone from AEY

17    with respect to those late deliveries?

18    A.   Yes, we did.  We had daily communications.  They were

19    required to submit status reports outlining the deliveries and

20    the anticipated availability dates.  We requested revised

21    deliveries.

22    Q.   Do you recall what, if any, reasons they gave for the late

23    deliveries?

24    A.   There were issues with -- because of the receipt of the end

25    user certificate in getting export licenses, country
```

Jones - DIRECT - By Ms. Fernandez                    104

 1   clearances, availability of the ammunition.  They lost a couple

 2   of their suppliers.

 3   Q.  Now, let me direct your attention to February of 2008.

 4        Did you around that time receive copies of reports of

 5   discrepancies indicating poor packaging of the ammunition that

 6   AEY was delivering to Afghanistan?

 7   A.  Yes, we did.  We received 41 reports that were coded

 8   improper packaging.

 9   Q.  Did those reports reference which deliveries, if any, or

10   the time frame of the deliveries of those packages?

11   A.  Yes.  They were for deliveries made in the beginning of

12   June, 2007, through November of 2007.

13   Q.  And did the reports indicate what exactly was the problem

14   with the packaging?

15   A.  The ammunition had -- was -- had been packed in cardboard

16   boxes and the cardboard boxes were just deteriorating.  They

17   weren't holding up through both transport and for storage

18   purposes.

19   Q.  What, if any, steps did you take in response to the

20   information in these reports?

21   A.  AEY was called immediately to come up to Rock Island to sit

22   down and have a face-to-face and tell us how they were going to

23   fix this.

24   Q.  When you say Rock Island, that's Rock Island --

25   A.  Where ASC is, our offices.

Jones - DIRECT - By Ms. Fernandez                    105

Q.   And did, in fact, someone from AEY come and meet with you
all about this packaging problem?

A.   Yes, they did.

Q.   Who came?

A.   Efraim Diveroli and Joseph Wachtel.

Q.   Were you present at that meeting?

A.   Yes, I was.

Q.   And as a result of that meeting, what, if anything, did you
learn about the problem with the poor packaging of the
ammunition?

A.   That -- in order to reduce shipping costs and they were
having -- AEY had problems with wooden crates and tins
deteriorating, falling apart.

So they were putting the ammunition -- they were
loose-packing the ammunition into plastic liners, which were
then placed into corrugated boxes.

The corrugated cardboard boxes were placed on pallets and
wrapped with shrink wrap, and that's the way they were shipped
to Afghanistan.

Q.   What, if any, corrective measures did you -- did AEY take
with respect to these packaging problems?

A.   They told us that they would be implementing more stringent
packaging, that they would be sending in any changes to their
packaging requirements for Government approval and they would
not -- no longer loose-pack ammunition.

1    Q.  And did that -- after that meeting, did you later receive

2    any additional reports of discrepancies noting more packaging

3    problems?

4    A.  Yes.  A couple weeks later, first part of March, we

5    received additional reports of discrepancy also coded for

6    improper packaging.

7    Q.  Could you repeat your response again.

8    A.  Yes.  The first part of March, we received a couple more,

9    and they were coded with improper packaging, also.

10   Q.  At that point, what, if any, steps did you take with

11   respect to these new reports of discrepancies noting the

12   packaging problems?

13   A.  I issued a corrective action letter in which AEY was then

14   required to provide a response as to what they were going to

15   do, what were they going to implement so that this would not

16   continue happening.

17   Q.  And do you recall what was -- what was AEY's response to

18   that corrective action letter?

19   A.  Yes.  Once again, they told us that they would no longer --

20   no longer put loose ammunition in cardboard boxes and they

21   would be using tins; if they used cardboard boxes, they'd be

22   put in tins prior to that; they would implement with all their

23   suppliers more stringent packaging requirements.

24   Q.  As far as you know, did that happen?

25   A.  No, it did not.

1  Q.  And did you then issue a suspension of this contract in

2  March, 2008?

3  A.  Yes, I did.  On the 31st of March, I issued a letter

4  suspending all deliveries -- future deliveries under the

5  contract.

6  Q.  And let me ask you:  From the time that you were designated

7  procuring contracting official on this contract to the time

8  that you then suspended, did anyone at -- or from AEY ever tell

9  you or notify you that they were, in fact, delivering

10  ammunition from Communist China under this contract?

11  A.  No, they did not.

12  Q.  If anyone had, in fact, told you that, what would you have

13  done with respect to their contract?

14  A.  The determinations would have been made and the contract

15  would have been terminated.

16        MS. FERNANDEZ:  We tender this witness for

17  cross-examination, your Honor.

18            (End of requested excerpts.)

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3            I hereby certify that the foregoing is an accurate

4    transcription of the proceedings in the above-entitled matter.

5

6

7    _____          /s/Lisa Edwards
          DATE                LISA EDWARDS, CRR, RMR
8                             Official United States Court Reporter
                              400 North Miami Avenue, Twelfth Floor
9                             Miami, Florida 33128
                              (305) 523-5499
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25