```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION
                 CASE NO. 08-20574-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,          Miami, Florida

 5                 Plaintiff,           December 3, 2010

 6          vs.                         9:11 a.m. to 9:36 a.m.

 7   RALPH MERRILL,

 8                 Defendant.           Pages 1 to 22
     _____

 9

10      EXCERPTED TESTIMONY OF KIM JONES FROM THE JURY TRIAL
      HELD BEFORE THE HONORABLE JOAN A. LENARD, UNITED STATES
11                      DISTRICT JUDGE

12
     APPEARANCES:
13

14   FOR THE GOVERNMENT:      ELOISA FERNANDEZ, ESQ.,
                              ADAM SCHWARTZ, ESQ., and
15                            FRANK TAMEN, ESQ.
                              ASSISTANT UNITED STATES ATTORNEYS
16                            99 Northeast Fourth Street
                              Miami, Florida 33132
17
     FOR THE DEFENDANT:       BRIAN H. BIEBER, ESQ.,
18                            HIRSCHHORN & BIEBER, PA
                              550 Biltmore Way
19                            Penthouse Three A
                              Coral Gables, Florida 33134
20                                  -and-
                              NATHAN A. CRANE, ESQ.
21                            STIRBA & ASSOCIATES
                              215 South State Street, Suite 750
22                            Salt Lake City, Utah 84111

23   REPORTED BY:             LISA EDWARDS, CRR, RMR
                              Official Court Reporter
24                            400 North Miami Avenue
                              Twelfth Floor
25                            Miami, Florida 33128
                              (305) 523-5499
```

```
 1                           I  N  D  E  X

 2

 3                                          Direct   Cross   Red.

 4

 5      WITNESSES FOR THE GOVERNMENT:

 6
        Kim Machelle Jones                            4       20
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE COURT:  Good morning.

 2            United States of America versus Ralph Merrill, Case

 3  No. 08-20574.

 4            Counsel, state your appearances, please, for the

 5  record.

 6            MS. FERNANDEZ:  Good morning, your Honor.

 7            Eloisa Fernandez, Adam Schwartz and Frank Tamen.

 8            THE COURT:  Good morning.

 9            MR. BIEBER:  Good morning, Judge.

10            Brian Bieber and Nathan Crane on behalf of Ralph

11  Merrill, who is present.

12            THE COURT:  Good morning.

13            All the jurors are here.

14            Are we ready to proceed?

15            Okay.  Bring your witness in and we can bring the

16  jurors in.

17            (Whereupon, the jury entered the courtroom at

18  9:10 a.m. and the following proceedings were had:)

19            THE COURT:  You may be seated.

20            Good morning, ladies and gentlemen.

21            THE JURY:  Good morning.

22            THE COURT:  You are still under oath, Ms. Jones.

23            You may proceed, Mr. Bieber.

24            MR. BIEBER:  Thank you, Judge.

25
```

```
 1                        CROSS-EXAMINATION

 2   BY MR. BIEBER:

 3   Q.   Good morning, Ms. Jones.

 4   A.   Good morning.

 5   Q.   My name is Brian Bieber.

 6        We've never met or spoken about this case, have we?

 7   A.   No, we have not.

 8   Q.   All right.  You testified yesterday that AEY was already

 9   awarded the contract by the time you got involved with it.

10   Right?

11   A.   Yes.

12   Q.   All right.  Can you put up the calendar, please.

13        And the contract was awarded in January, 2006, and -- I'm

14   sorry --

15   A.   '7.

16   Q.   January, 2007.

17        -- and you got involved in February, 2007.  Right?

18   A.   Correct.  Yes.

19   Q.   And the contract amount was $298 million.  Right?

20   A.   Potential amount was 298 million.

21   Q.   That's the amount that was bid by AEY.  Right?

22   A.   If all items had been awarded at the unit prices, yes.

23   Q.   That --

24   A.   Yeah.  The way the prices were developed, it would have

25   been all of the items at the maximum quantity for the two years
```

Jones - CROSS - By Mr. Bieber                 5

1   total, the 298 million.

2   Q.   If all items ordered and delivered and paid for.  Right?

3   A.   Yes.

4   Q.   And that 298-million-dollar figure was proposed by AEY.

5   Right?

6   A.   Correct.

7   Q.   And yesterday, you said AEY -- you have knowledge that

8   AEY's president is Efraim Diveroli.  Right?

9   A.   Yes.

10  Q.   Can we go, please, to Government's Exhibit 2-A, Page

11  ASC 00733.

12       Do you remember being shown this excerpt of the

13  Government's exhibit yesterday.  Right?

14  A.   Yes, I do.

15  Q.   And this is a question that was proposed by a defense

16  contractor during the solicitation phase?

17  A.   Yes, it was.

18  Q.   And when a question is posed by a defense contractor, the

19  Government then puts it out on the Internet for all other

20  defense contractors to see.  Right?

21  A.   That's true.

22  Q.   And the question posed by a defense contractor was:  Is

23  ammunition from China acceptable for this contract, assuming

24  that it meets technical specifications?  Right?

25  A.   Yes.

1    Q.   And the answer by the Government was:  The solicitation

2    itself does not expressly prohibit any source of supply, but

3    requires the ammunition be compatible with the identified

4    weapon system in good working order.  Right?  That's part of

5    the answer?

6    A.   That's part of the answer.

7    Q.   And that part of the answer means the bullets have to fit

8    into the guns.  Right?

9    A.   Yes.

10   Q.   And there was no age restriction for this contract.  Right?

11   A.   Correct.

12   Q.   And when I say "age restriction," do you understand what I

13   mean?  No -- the bullets don't have to be a certain amount of

14   years old or can't be a certain amount of years old.  Right?

15   A.   Correct.

16   Q.   And then the answer by the Government continues and goes on

17   to say:  However, any other statutory or regulatory

18   restrictions, such as exporting and importing licensing

19   requirements, that may effectively prohibit supplies from any

20   source are the responsibility of each offeror to both identify

21   and resolve.  Right?

22   A.   Right.

23   Q.   The offeror was, in this case, AEY.  Right?

24   A.   Among others, yes.

25   Q.   I'm sorry?

1    A.   Among others, yes.

2    Q.   And then, after the contract is awarded, there's only one

3    contractor.  Right?

4    A.   Correct.

5    Q.   And that company was AEY.  Right?

6    A.   Yes.

7    Q.   And its president Efraim Diveroli.  Right?

8    A.   Efraim Diveroli.  Yes.

9    Q.   And did Mr. Diveroli tell you about his efforts with his

10   attorneys to identify and resolve any issues --

11        MS. FERNANDEZ:  Objection, your Honor.  This question

12   is calling for facts that are not in evidence --

13        THE COURT:  Sustained.

14        MS. FERNANDEZ:  -- and hearsay.

15   BY MR. BIEBER:

16   Q.   You had conversations with Mr. Diveroli?

17   A.   Prior to contract award, no.

18   Q.   No.  No.  No.

19        I mean, in this -- in your dealings --

20        MS. FERNANDEZ:  Objection, your Honor.  This question

21   calls for hearsay.

22        THE COURT:  Well, he can ask if she had conversations.

23        Overruled.

24   BY MR. BIEBER:

25   Q.   Did you have conversations with Mr. Diveroli after

Jones - CROSS - By Mr. Bieber                8

1    February, 2007, when you got involved in this?

2    A.  Yes.

3    Q.  And did Mr. Diveroli -- after those conversations, did you

4    learn -- after those conversations, did you speak with anyone

5    from AEY about any -- identifying any issues that they were

6    having?

7    A.  No, I didn't.

8         MS. FERNANDEZ:  Objection.  That question is vague,

9    your Honor.  I don't know what issues he's referring to.

10        THE COURT:  Sustained.

11        Rephrase your question.

12   BY MR. BIEBER:

13   Q.  Let's go to -- well, actually, let's go to Government's

14   Exhibit 1.  You were shown this document yesterday, also, I

15   believe.  And if we can go to -- if we can highlight that

16   provision.  We're on Page 10 -- the bottom of Page 10.

17        It's kind of a bad copy there, but it starts out "DFARS..."

18   Do you see that?

19   A.  Yes.

20   Q.  You're familiar with the DFARS.  Right?

21   A.  Yes, I am.

22   Q.  And that stands for -- let's see --

23   A.  Defense Federal Acquisition Regulation.

24   Q.  And those are the regulations that -- what?

25   A.  Those are the regulations.  They are the -- the Federal

Jones - CROSS - By Mr. Bieber                                    9

```
 1    Acquisition Regulation -- Defense Federal Regulation --
 2    Acquisition Regulation and the Army Federal Acquisition
 3    Regulations are basically the guidelines that we follow in
 4    determining our contracts.  They're the terms and conditions of
 5    the contract.  They implement statutes, policies, regulations.
 6    Q.  And when you say implement statues --
 7    A.  Statutes.
 8    Q.  -- statutes -- one of those statutes are the prohibition on
 9    acquisition of United States munitions from Communist Chinese
10    military companies.  Right?
11    A.  True.
12    Q.  And what that means -- not in legal language, but in plain
13    English -- is you can't source this contract with ammunition
14    from Communist Chinese military companies.  Right?
15    A.  Correct.
16    Q.  That's one of the statutes from this DFARS provision.
17    Correct?
18    A.  Yes.
19    Q.  And if we turn to the next page in this document, this
20    statute continues on the upper left-hand corner there with the
21    definitions.  Right?  Do you see that?
22    A.  Yes, I do.
23    Q.  And then, if you continue and go down to B and highlight
24    that portion, the statute continues and goes on to say that any
25    supplies or services covered by the United States Munitions
```

1    List that are delivered under this contract may not be

2    acquired, directly or indirectly, from a Communist Chinese

3    military company.  Right?

4    A.  Right.

5    Q.  And you're familiar with this DFARS statute.  Right?

6    A.  Yes, I am.

7    Q.  And you're also familiar with -- that's A, the definitions

8    section.  You're also familiar with the other sections of this

9    statute that talk about the waiver of this prohibition on a

10   case-by-case basis.  Right?

11   A.  Yes.

12   Q.  And you're aware that secretaries of military departments

13   can waive that provision if a contractor or a contractor's

14   attorneys consult --

15        MS. FERNANDEZ:  Objection, your Honor.

16   BY MR. BIEBER:

17   Q.  -- with them and get that waiver.  Right?

18        MS. FERNANDEZ:  Objection.  It's beyond the scope of

19   direct.

20        MR. BIEBER:  Your Honor, it's a follow-up question to

21   my last question.

22        MS. FERNANDEZ:  It's calling for a legal opinion on

23   this case.

24        THE COURT:  Sustained.

25

 1   BY MR. BIEBER:

 2   Q.   In your opinion -- or based on your knowledge, are you

 3   aware of this waiver provision?

 4   A.   Yes.

 5   Q.   And did you learn in your dealings with AEY of any efforts

 6   they had made about obtaining a waiver?

 7   A.   No.

 8   Q.   And were you ever present during Mr. Diveroli's

 9   conversations with Ralph Merrill other than when they came to

10   Rock Island in February of 2007?

11   A.   No, I was not.

12   Q.   And there was no conversation -- can we go to the master

13   calendar, please.

14        You said that that meeting was February, '07.  Right?

15   A.   Yes.

16   Q.   The contract was awarded in January.

17        Are you aware of any issues that came up in April, two

18   months later, regarding Chinese ammunition?

19            MS. FERNANDEZ:  Objection, your Honor.  The question

20   is vague.

21            THE COURT:  Sustained.

22            Rephrase your question.

23   BY MR. BIEBER:

24   Q.   Do you know if any issues came up at AEY with Chinese

25   ammunition two months after your meeting?

1   A.   None that I'm aware of.

2   Q.   And you weren't aware of any efforts by Diveroli or AEY to

3   have that waiver of prohibition enacted in April of 2007, were

4   you?

5   A.   No.

6   Q.   So in February, that meeting occurs at Rock Island, and

7   Mr. Merrill was present.  Right?

8   A.   Yes.

9   Q.   Was that the first time you met him?

10  A.   Yes.

11  Q.   And the only time you met him with the exception of in this

12  case, right -- or saw him?

13  A.   Mr. Merrill?

14  Q.   Yes.

15  A.   Yes.

16  Q.   The only time you saw him with the exception of court

17  proceedings?

18  A.   Correct.

19  Q.   And at that meeting in February, you were satisfied, based

20  on what you knew at that time -- or -- let me rephrase that.

21       At that meeting in February of 2007, you were satisfied,

22  based on what you were told, that AEY would be able to perform

23  under this contract.  Right?

24  A.   Yes.

25  Q.   And perform successfully?

1   A.   Yes.

2   Q.   And let's see.

3        In fact, you said yesterday that -- I believe you said

4   approximately $66 million of product was delivered by AEY under

5   this contract.  Right?

6   A.   They were paid approximately $66 million, yes, for product

7   delivered.

8   Q.   For product delivered.

9        Do you know the exact amount?

10  A.   66 million and something.

11  Q.   If I showed you a document with the exact amount, would

12  that help refresh your recollection?

13  A.   It may.  It may not.  I would probably need the compilation

14  of all the documents in order to see what the amount was.

15            MR. BIEBER:  Your Honor, may I approach?

16            THE COURT:  Yes.

17            Show the --

18            MS. FERNANDEZ:  May we see the document?

19            THE COURT:  Show the Government, please.

20            MR. BIEBER:  Yes.

21            I'm showing you what's been marked as Defense Proposed

22  Exhibit 103-1.

23            MR. BIEBER:  May I approach?

24            THE COURT:  No.  Wait for the Government to look at

25  it.

```
 1              You may proceed.
 2              MR. BIEBER:  Thank you, Judge.
 3              May I approach?
 4              THE COURT:  Yes.
 5    BY MR. BIEBER:
 6    Q.  I put a Post-It on Page 3.  Do you see the page with the
 7    Post-It?
 8    A.  Yes, I do.
 9    Q.  And does this document -- by the way, if you flip to
10    Page 1, you're cc'd on this document.  You're that Kim Jones.
11    Right?
12    A.  Yes.
13              MS. FERNANDEZ:  Objection, your Honor.  This document
14    is not in evidence.
15              THE COURT:  Sustained.
16    BY MR. BIEBER:
17    Q.  Does that document refresh your recollection as to exactly
18    how much money -- how much the delivered value of product by
19    AEY was and how much money AEY was paid?
20    A.  It's not my document.  So I cannot account for the
21    differences between the two totals.  We have a delivered value
22    and an amount paid --
23              THE COURT:  Ma'am, the only question is:  Does it
24    refresh your recollection?
25              THE WITNESS:  No.
```

1    BY MR. BIEBER:

2    Q.   Are you aware of AEY delivering $66 million of product and

3    getting paid $55 million?

4    A.   My records show 66 million.

5    Q.   Your records show 66 million what?  Delivered or paid?

6    A.   Paid.

7    Q.   Okay.  So they got paid every nickel of what they said?

8    A.   No.

9    Q.   They didn't?  Can you clear this up?  I guess I'm a bit

10   confused.

11   A.   There are four outstanding invoices that have not been

12   paid.

13   Q.   And for those four outstanding invoices, the Government has

14   that product?

15   A.   In various modes, yes.  Part of it were those items for

16   which we had requested a corrective action plan.

17   Q.   Okay.  Is the Government ahead 10 million dollars' worth of

18   product, approximately?

19        MS. FERNANDEZ:  Objection, your Honor.  This question

20   is confusing and argumentative.

21        THE COURT:  Sustained.

22   BY MR. BIEBER:

23   Q.   Does the Government have $10 million more of ammunition

24   than it paid for?

25   A.   I don't believe so.  No.  They were paid -- the amount --

1    they were paid 66 million.  The amount that -- the four

2    invoices that they were not paid for are not included in that

3    66 million.

4    Q.  And not included in the documents that have been shown to

5    refresh your recollection?

6    A.  Correct.

7    Q.  So your testimony is there is not a 10-million-dollar

8    shortfall?

9    A.  Correct.

10          MR. BIEBER:  May I approach and take the document

11   back?

12          THE COURT:  Yes.

13   BY MR. BIEBER:

14   Q.  You testified yesterday that the COCs, or certificates of

15   conformance, were signed by Mr. Diveroli?

16   A.  Yes.

17   Q.  None of them were signed by Ralph Merrill, right, that you

18   saw?

19   A.  Not that I recall.

20   Q.  After that meeting in February of 2007, I think you already

21   said you never met Ralph Merrill again.  Right?

22   A.  Right.

23   Q.  And did you ever speak to him on the telephone?

24   A.  No, I did not.

25   Q.  Let's see.

1          Now, in February of 2008, you had met with Mr. Diveroli

2    about packaging problems.  Right?

3    A.   Correct.

4    Q.   And you testified that, had you known -- I guess, in

5    response to the prosecutor's question, had you known that AEY

6    was shipping ammunition from a CCMC, the Government wouldn't

7    have accepted it.  Right?

8    A.   True.

9          MS. FERNANDEZ:  Objection.  Your Honor, that's not the

10   question that was asked yesterday.

11         THE COURT:  Overruled.

12   BY MR. BIEBER:

13   Q.   Your answer was true.  Right?

14   A.   Could you re-ask the question again?  Because I was -- I

15   had more to say.

16   Q.   Oh, okay.  Yes.

17         My question was:  You testified yesterday that, if you knew

18   that AEY was shipping ammunition from a CCMC, you, meaning the

19   Government, wouldn't have accepted it?

20   A.   That's --

21         MS. FERNANDEZ:  Objection, your Honor.  Calls for

22   evidence that is not on the record.

23         THE COURT:  Overruled.

24         THE WITNESS:  Those invoices would have been rejected.

25

1   BY MR. BIEBER:

2   Q.   And when you met with Mr. Diveroli in February of 2008 to

3   discuss the packaging problems, you met with him in person.

4   Right?

5   A.   Yes.

6   Q.   And at that point in time, you discussed with him the

7   corrective action that AEY needed to take.  Right?

8   A.   Yes, in part.  We discussed the issues for the most part

9   and then asked them what they were going to do about it.

10  Q.   And in February of 2008, you were already aware that AEY

11  was shipping ammunition from a CCMC.  Right?

12          MS. FERNANDEZ:  Objection, your Honor.  Assumes facts

13  not in evidence.

14          THE COURT:  Sustained.

15  BY MR. BIEBER:

16  Q.   Were you aware in February of 2008 that AEY was shipping

17  ammunition from a CCMC?

18          MS. FERNANDEZ:  Same objection, your Honor.  Also,

19  this line of questioning is irrelevant, your Honor.

20          THE COURT:  Sustained.

21  BY MR. BIEBER:

22  Q.   Did you discuss anything about ammunition from a CCMC in

23  February, 2008?

24          MS. FERNANDEZ:  Same objection, your Honor.

25          THE COURT:  Sustained.

1   BY MR. BIEBER:

2   Q.   So you met with the AEY representatives February, 2008,

3   discussed the repackaging issues.  Right?

4   A.   Yes.

5   Q.   And you issued a corrective letter.  Right?

6   A.   After the second round of reports of discrepancy, then the

7   request for corrective action letter was sent.  Yes.

8   Q.   And no one at AEY told you about the delivery of CCMC

9   ammunition.  Right?

10  A.   No.

11  Q.   You only found out after they had done it.  Right?

12          MS. FERNANDEZ:  Objection, your Honor.  It's a vague

13  question.  He needs to pin it down.  We're talking about

14  hearsay here.  I don't know who he's referring to.

15          THE COURT:  Sustained.

16          Rephrase your question.

17  BY MR. BIEBER:

18  Q.   You only found out that AEY had shipped ammunition from a

19  Communist Chinese military company after they had done it.

20  Right?

21          MS. FERNANDEZ:  Again, assumes facts not in evidence,

22  your Honor.  I object to that.  And irrelevant.

23          THE COURT:  Sustained.

24  BY MR. BIEBER:

25  Q.   Do you have any personal knowledge that Ralph Merrill knew

1    AEY was shipping ammunition from a Communist Chinese military

2    company when they shipped it to the Government?

3            MS. FERNANDEZ:  Objection, your Honor.  Again, she

4    just -- this line of questioning is irrelevant.

5            THE COURT:  Sustained.

6    BY MR. BIEBER:

7    Q.  When was the earliest time you found out about the

8    ammunition being shipped from a CCMC?

9            MS. FERNANDEZ:  Same objection, your Honor.

10           THE COURT:  Sustained.

11           MR. BIEBER:  I don't have any other questions, Judge.

12           THE COURT:  Redirect.

13                      REDIRECT EXAMINATION

14   BY MS. FERNANDEZ:

15   Q.  Ms. Jones, yesterday and again today you were shown the

16   question and answers on both -- Amendment 2, which asked if

17   there was any prohibition from countries like China.  Is that

18   correct?

19   A.  Yes.

20   Q.  And then you also were shown Amendment 4 that included the

21   actual DFARS production.  Is that correct?

22   A.  Yes, it is.

23   Q.  And is it your testimony that Amendment 4 came after

24   Amendment 2 chronologically in time?

25   A.  Yes.

1   Q.   And certainly by the time that the contract was accepted by

2   AEY, that prohibition was included in there.  Is that correct?

3   A.   Yes, it was.

4        Can I follow up on that a little bit or is that enough?

5   Q.   Yes.  Go ahead.

6   A.   It would be -- say Amendment 2 may have also revised

7   quantities.  It may have reestablished a closing date.  Well,

8   when you -- as you further amend a solicitation, it's always

9   the latest information.

10       So even though the response in Amendment 2 considered the

11  statutes and the regulations that may or may not have

12  prohibited ammunition from Communist Chinese military

13  companies, also, just the way that an amendment works, it's

14  going to be your latest information.

15       So if Amendment 4 implemented the clause, if it had also

16  changed the closing date to two weeks later, had further

17  revised quantities, that's the information that's pertinent and

18  that's the information that's your up-to-date information when

19  you're doing an amendment.

20            MS. FERNANDEZ:  Thank you.

21            That's all, your Honor.

22            THE COURT:  You may step down, ma'am.

23            (Witness excused.)

24            (End of requested excerpt.)

25

```
1                      C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an accurate

4    transcription of the proceedings in the above-entitled matter.

5

6

7    _____        /s/Lisa Edwards
          DATE               LISA EDWARDS, CRR, RMR
8                            Official United States Court Reporter
                             400 North Miami Avenue, Twelfth Floor
9                            Miami, Florida 33128
                             (305) 523-5499
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```