```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                    CASE NO. 08-20574-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,          Miami, Florida

 5                  Plaintiff,          December 10, 2010

 6         vs.                          11:26 a.m. to 11:57 a.m.

 7   RALPH MERRILL,

 8                  Defendant.          Pages 1 to 25

 9   _____

10    EXCERPTED TESTIMONY OF FERDINAND VAZQUEZ FROM THE JURY TRIAL
              HELD BEFORE THE HONORABLE JOAN A. LENARD,
11                   UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13

14   FOR THE GOVERNMENT:      ELOISA FERNANDEZ, ESQ.,
                              ADAM SCHWARTZ, ESQ., and
15                            FRANK TAMEN, ESQ.
                              ASSISTANT UNITED STATES ATTORNEYS
16                            99 Northeast Fourth Street
                              Miami, Florida 33132
17
     FOR THE DEFENDANT:       BRIAN H. BIEBER, ESQ.,
18                            HIRSCHHORN & BIEBER, PA
                              550 Biltmore Way
19                            Penthouse Three A
                              Coral Gables, Florida 33134
20                                   -and-
                              NATHAN A. CRANE, ESQ.
21                            STIRBA & ASSOCIATES
                              215 South State Street, Suite 750
22                            Salt Lake City, Utah 84111

23   REPORTED BY:             LISA EDWARDS, CRR, RMR
                              Official Court Reporter
24                            400 North Miami Avenue
                              Twelfth Floor
25                            Miami, Florida 33128
                              (305) 523-5499
```

1                              I N D E X

2

3                                        Direct    Cross    Red.

4

5    WITNESSES FOR THE GOVERNMENT:

6    Ferdinand Vazquez                      3        13

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      DIRECT EXAMINATION

 2   BY MR. TAMEN:

 3   Q.    Tell us your name, please, and spell your last name for

 4   our court reporter.

 5   A.   It's Ferdinand Vazquez, V-a-z-q-u-e-z.

 6   Q.   And how are you employed?

 7   A.   I'm employed with the United States Army, Criminal

 8   Investigation Division.

 9   Q.   What are your responsibilities with the Army Criminal

10   Investigation Division?

11   A.   I'm assigned to a unit that's called the major procurement

12   fraud unit.  It's responsible for investigating allegations of

13   contract fraud and any contracts over a million dollars and

14   where the Army is a victim.  And I am the resident agent in

15   charge of the Florida Fraud Resident Agency, which is located

16   in Melbourne, Florida.

17   Q.   How long have you been an agent with the Army Criminal

18   Investigation Division?

19   A.    Thirteen and a half years.

20   Q.   And were you assigned to work on the investigation of AEY,

21   Incorporated, and its various employees and people working

22   at -- in conjunction with that company?

23   A.   Yes.

24   Q.   When was it that you were first assigned and began work on

25   this case?
```

1    A.   In October of 2007.

2    Q.   Were you present here in Miami on May 7th of 2008 for an

3    interview of the Defendant in this case, Ralph Merrill?

4    A.   Yes, I was.

5    Q.   Were you present at the -- for the entire interview or did

6    you come in at some point when it was already underway?

7    A.   Yes.  I drove down from my office that morning.  I had

8    other things that I was doing for the case, and I came in the

9    US Attorney's Office that afternoon.  I joined the interview

10   about -- at about 3:00 in the afternoon.

11   Q.   And who were the people that were present at the interview

12   when you joined?

13   A.   People present were Agent Luis Perez from the Defense

14   Criminal Investigative Service, DCIS; Agent Dave Dietrich from

15   ICE; and Special -- Assistant US Attorney James Koukios.

16   Q.   While you were present, was Mr. Merrill asked whether or

17   not he knew the ammunition that AEY was sending to Afghanistan

18   was Chinese-manufactured?

19   A.   Yes.

20   Q.   And how did he respond to that inquiry?

21   A.   Can I --

22   Q.   Do you need to explain?

23   A.   Yes.

24   Q.   Go ahead.  Explain how you learned --

25   A.   When I joined the interview, I asked Mr. Merrill to explain

1    to me how the idea of the concealment of the Chinese ammunition

2    came about.

3        And can I proceed with --

4    Q.   Yes.  Go ahead.

5        Explain what he told you about that in response to that

6    inquiry.

7    A.   Okay.  When I solicited that information, Mr. Merrill told

8    me that, on or about April of 2007, he had received a phone

9    call from Efraim Diveroli and that Efraim Diveroli told him

10   they had a big problem because the ammunition that they were

11   intending to deliver from Albania was Chinese-manufactured.

12       Mr. Diveroli wanted to know suggestions on how to scrape

13   the markings -- Chinese markings off the original packaging of

14   the ammunition.

15       He told us that he had some Chinese ammunition -- or some

16   crates that he had purchased for unrelated reasons at his shop

17   in Utah and that he had some of his employees take some

18   photos -- grab some tools and take some photos on suggestions

19   how to scrape these markings off of this packaging.

20   Q.   Were there any photographs on display in front of you or

21   Mr. Merrill at the time of this discussion?

22   A.   No.

23   Q.   Continue.

24   A.   He then said Mr. Diveroli also told him that he was going

25   to check with the State Department to see if he could actually

1  deliver the ammunition legally because the ammunition -- the

2  ban on the ammunition had been recently enacted and so he

3  wanted to check with the State Department and that Mr. Diveroli

4  checked with several people from the State Department and

5  everybody told him that delivering Chinese ammunition was

6  prohibited.

7  Q.  Let me stop you at this point.

8  A.  Yes.

9  Q.  At some point during the course of this interview, were you

10  shown or was Mr. Merrill shown photographs that are marked as

11  Government's Exhibit EM 37 with a crate that says "Made in

12  China" on it?

13  A.  Those had already been shown.

14  Q.  They had already been shown?

15  A.  Yes.

16  Q.  Did you discuss those photographs with Mr. Merrill or was

17  he -- did he talk about them in your presence?

18  A.  What -- he discussed what I just said.  Yes.  He said that

19  he had his employees take some tools and take some photos and

20  that he e-mailed those photos to Mr. Diveroli.

21  Q.  Could we have EM 137 on the Government's computer, please.

22  The next page.

23      And what -- was this the photograph that was discussed?

24  A.  Correct.

25  Q.  What did Mr. Merrill say was the purpose for which he took

1    this photograph and sent it to Mr. Diveroli?

2    A.   The purpose of that was to conceal the origin of the

3    ammunition.

4    Q.   Okay.  You also have just testified that Mr. Merrill told

5    you that Diveroli said he was going to check with the State

6    Department to find out if there was any way to send this

7    ammunition.

8         And what did Mr. Merrill relate to you about Diveroli's

9    response as to whether that could take place?

10   A.   He said that Mr. Diveroli checked with several people from

11   the State Department and that everybody told him that

12   delivering Chinese ammunition was prohibited.

13   Q.   And what did he tell you after relating that?

14   A.   He told us that, at that time, they reached a decision to

15   just clean the crates, meaning -- what he meant by cleaning the

16   crates, he said to rid the packaging of any Chinese markings

17   and continue on to deliver the Chinese ammunition to the

18   Government.

19   Q.   And did he have a description for what they were doing once

20   they decided to send this ammunition to the Government?

21   A.   Yes, he did.

22   Q.   What was that?

23   A.   He said that, at that time, it was like high-stakes poker.

24   Q.   Did he explain why he decided to play this game of

25   high-stakes poker with the Government?

1   A.   He did.

2   Q.   What did he say?

3   A.   There was -- at this time, he said it was like high-stakes

4   poker because they had decided to conceal the ammunition and

5   risk it, conceal the ammunition, deliver it to the Government,

6   rather than reporting it to the Government and risking losing

7   the contract or getting a termination for default, which would

8   have seriously affected their ability to secure future

9   contracts with the Government.

10  Q.   Did Mr. Merrill identify what specific type or caliber of

11  ammunition was Chinese-manufactured?

12  A.   7.62-millimeter ammunition.

13  Q.   And was he asked if there was any other type of ammunition

14  delivered under this contract that was of Chinese origin?

15  A.   I asked him.  There was several types of nonstandard

16  ammunition required under the contract.  Now, I asked him if

17  there was any other type of ammunition under that contract that

18  was of Chinese origin.  He told me "no" and that only the

19  7.62-millimeter ammunition was of Chinese origin.

20  Q.   And did Mr. Merrill explain how they got into this

21  situation?

22  A.   As far as --

23  Q.   As far as having Chinese-made ammunition and not being able

24  to legally sell it to the Government.

25  A.   Can you explain that question, please.

Vazquez - DIRECT - By Mr. Tamen                    9

1    Q.   What did he say about how this happened?

2    A.   Well, one of the things that he said was that Mr. Diveroli

3    painted himself against the wall when they found out that the

4    ammunition in Albania was Chinese-manufactured.  That's one of

5    the things that he said.

6    Q.   And did he say whether or not he decided to go along with

7    Diveroli's plan to clean the ammunition of Chinese markings and

8    ship it anyway?

9    A.   Correct.  He said -- he told me that he had made some bad

10   decisions to decide to go with Diveroli's decision, basically,

11   and continue on to deliver this Chinese ammunition under this

12   contract.

13   Q.   Did he indicate that there would be any problems if he

14   tried to find some other sources of ammunition that was not

15   Chinese in manufacture?

16   A.   No.

17   Q.   Did he ever say that he had told Diveroli that he was

18   questioning the wrong agency, that the State Department was not

19   the people who he should be inquiring of?

20   A.   No, sir.

21   Q.   Did he ever tell you that he thought that the State

22   Department was looking at the wrong regulations and that

23   somebody should be looking at the DFARS regulations rather than

24   the ITAR regulations?

25   A.   No.

Vazquez - DIRECT - By Mr. Tamen                    10

1    Q.   Did he ever question or express any lack of acceptance of

2    the State Department's opinion that this ammunition could not

3    be legally sold?

4    A.   No.

5    Q.   Did he ever tell that you Mr. Diveroli had told him he had

6    attorneys working on this problem to try to find a way around

7    the DFARS regulation?

8    A.   The comment about the lawyers came in the context when we

9    were discussing the search warrant.

10   Q.   But in terms -- if you move the microphone about an inch

11   away from your mouth, it helps.

12   A.   I'm sorry.

13   Q.   In connection with trying to find out if there was some way

14   they could ship this ammunition legally, did Mr. Merrill ever

15   say that Diveroli had put his lawyers to work on this?

16   A.   No.  No, sir.

17   Q.   Did he ever say he had told Diveroli he needed to put his

18   lawyers to work on this?

19   A.   No.

20   Q.   Did he ever in any way say that he questioned the authority

21   of the State Department when they said, "No.  You can't do

22   this"?

23   A.   No, sir.

24   Q.   Did he ever express the belief that, at the time, he

25   thought it was legal for him to participate in selling

```
 1   Chinese-manufactured ammunition to the Government?
 2   A.  No, sir.
 3   Q.  Did he ever talk about a problem with the ammunition in
 4   Albania being corroded?
 5   A.  No, sir.
 6   Q.  Did he ever say that there were security issues with the
 7   way the crates were being left on the tarmac in Albania?
 8   A.  No.
 9   Q.  Did he ever say there was any reason for cleaning the
10   crates other than to remove Chinese markings?
11   A.  No.
12   Q.  And why did he say he decided to go along with Diveroli's
13   plan to clean the crates and ship the Chinese ammunition to the
14   Government?
15   A.  They decided to go -- he decided to go along, basically, to
16   save the investment that he had in the contract.
17   Q.  And did he make any reference to the size of the contract
18   and the potential profits?
19   A.  He made a reference to the size of the contract.  He did
20   say that that was the largest contract that Diveroli had ever
21   landed.  Yes.
22           MR. TAMEN:  If I may have one moment, your Honor.
23           THE COURT:  Yes.
24   BY MR. TAMEN:
25   Q.  Now, you mentioned that Mr. Merrill engaged in some
```

 1   conversation about a lawyer in connection with the search

 2   warrant.

 3       Tell us what Mr. Merrill said when the subject of lawyers

 4   came up.

 5   A.   Right.

 6       He said -- when Mr. Diveroli informed him that there had

 7   been a search warrant conducted at the AEY premises,

 8   Mr. Merrill told Diveroli that perhaps he could contact the

 9   Government and apply for a variance or a modification of some

10   sort to deliver this ammunition and that Mr. Diveroli told him

11   that he would discuss it with his lawyers.  I asked him who

12   these lawyers were, and he told me he did not know.

13   Q.   And was it his statement to you that the first time he had

14   a discussion with Diveroli about using lawyers to try to find a

15   way around this prohibition was after the Government served a

16   search warrant at AEY's premises?

17   A.   Correct.

18   Q.   In connection with the time that he learned about the fact

19   that this ammunition was of Chinese manufacture in April, did

20   he say anything about Diveroli having lawyers to try to find a

21   way around the problem?

22   A.   No.

23   Q.   Did he ever say that he thought Diveroli was going to use

24   his lawyers to find a way around the problem?

25   A.   No.

Vazquez - CROSS - By Mr. Bieber          13

1   Q.   Did he ever indicate to you that he thought that what they

2   were doing at that time in selling the Government Chinese

3   ammunition was legal?

4   A.   Could you repeat the question, please.

5   Q.   Did he ever say to you that, at that time in April, he

6   thought what they were doing in selling the Government Chinese

7   ammunition was legal or permissible or subject to any kind of

8   exception in the rules of embargo on Chinese ammunition?

9   A.   No.

10          MR. TAMEN:   I tender the witness.

11          THE COURT:   Cross-examination.

12                         CROSS-EXAMINATION

13   BY MR. BIEBER:

14   Q.   Put up EM 137.   That was just on the screen.

15        Agent Vazquez, no matter what I ask you, your testimony

16   isn't going to change regarding Mr. Merrill's admissions that

17   you say he made.   Right?

18          MR. TAMEN:   Objection, your Honor.   It's

19   argumentative.

20          THE COURT:   Sustained.

21   BY MR. BIEBER:

22   Q.   Is there any document or anything I could show you that

23   would change your testimony regarding what you --

24          MR. TAMEN:   Objection.

25

1    BY MR. BIEBER:

2    Q.   -- say Mr. Merrill admitted to?

3             THE COURT:   Sustained.

4    BY MR. BIEBER:

5    Q.   When you saw the e-mail and the photographs -- well, before

6    you saw the e-mails and the photographs, you were working that

7    day.  Right?

8    A.   Yes, sir.

9    Q.   This is May 7, 2008?

10   A.   Yes.

11   Q.   And you -- let's see -- you got to the US Attorney's Office

12   at 3:00 -- 2:30, 3:00?

13   A.   Around that time.

14   Q.   You don't know exactly what time, do you?

15   A.   Around that time.

16   Q.   Okay.  My question was:  You don't know exactly what time,

17   do you?

18   A.   Between 2:30 and 3:00.  It was before 3:00, because I

19   joined the interview at 3:00 exactly.

20   Q.   I'm sorry.  What was that?

21   A.   It was before 3:00, because I joined the interview at 3:00.

22   Q.   And you don't know specifically what Mr. Merrill said

23   before 3:00, do you?

24   A.   When I got there, no.  No, I did not.

25   Q.   Well, you wouldn't know before you got there, would you?

1   A.   Can you explain that question, please.

2   Q.   You know what?  I'm sorry.  I'm going to withdraw the

3   question.

4        How long had Mr. Merrill been speaking with the agents and

5   the prosecutor before you got there?

6   A.   He had been speaking with the agents throughout the morning

7   and up until the time that I got there.

8   Q.   And that was a voluntary interview, wasn't it?

9   A.   Yes.

10  Q.   And you never saw Mr. Merrill ever put his hands up, did

11  you, when he looked at any of the e-mails?

12  A.   No.

13  Q.   And you never heard Mr. Merrill let out a sigh, did you?

14  A.   No.

15  Q.   And you said the interview was going on how many hours?

16  About six -- is that about right? -- before you got there?

17  A.   Since the morning.  Whatever that makes it.  Six hours

18  or....

19  Q.   You were sitting here throughout the entire trial.  Right?

20  A.   Yes, sir.

21  Q.   Most of the trial, not every second.  Right?

22  A.   Most.  Yes.

23  Q.   And you heard Mr. Perez -- Agent Perez testify.  Right?

24  A.   Yes.

25  Q.   And you heard him say that the day was confusing for him.

 1   Right?

 2   A.   Yes.

 3   Q.   Was it confusing for you?

 4   A.   No.

 5   Q.   And you heard this high-stakes poker comment.  Right?

 6   A.   Yes.

 7   Q.   You didn't prepare a report from the case on the interview,

 8   did you?

 9   A.   No, I did not.

10   Q.   Can you explain why this high-stakes poker comment comes in

11   before 3:00, if you got there at 3:00?

12   A.   The high-stakes poker -- I don't know if it came up before

13   3:00.  I think in the report it's during the time that I'm

14   present in the interview.

15   Q.   And that was Mr. Merrill's explanation as to what was going

16   on with the contract.

17        Is that what you were telling us?

18   A.   No.  That was Mr. Merrill's explanation as to what had

19   turned into -- what the risk -- the risk -- I'm sorry -- the

20   risks that they were taking as far as shipping this Chinese

21   ammunition was turning into.

22   Q.   The risks that they were taking or the risks that Diveroli

23   was taking?

24   A.   He said that he and Diveroli reached a decision to conceal

25   the ammunition and to deliver it to the Government.

1    Q.   And he told you that specific day.  Right?

2    A.   Yes, sir.

3    Q.   What -- no.  No.  Not on that day.

4         Did he tell you the date they reached that decision?

5    A.   He was talking about -- he started relating the events.

6    And the day that he told me was on or about 24 April of 2007.

7    Q.   Did he say it like that?  On or about 24 April, 2007?

8    That's what he said?

9    A.   He said he couldn't remember the date exactly; so, it was

10   on or about that day.

11   Q.   And those are his words.  Right?

12   A.   I -- I would assume.  Yes.

13   Q.   You would assume.

14        You're not sure of that, are you?

15   A.   Well, perhaps not the exact words.  But if somebody doesn't

16   remember the exact date, it's on or about.  It's an estimate.

17   Q.   No.  No.  No.  We're not talking about that.  I'm talking

18   about your recollection of his exact words.

19        You just said he said on or about.  But you're not sure

20   that he actually said that.  Right?

21   A.   I'm saying that he didn't recall the exact date.

22   Q.   Not what I'm asking you, sir.

23        You said Merrill said on or about this day.  And now I'm

24   asking you:  Did he actually say on or about?  He didn't.

25   Right?

 1  A.   I don't know if he said on or about.

 2  Q.   You don't know.  Right?

 3  A.   No, I don't.

 4  Q.   And Merrill explained -- go to that first photograph,

 5  please.

 6       Merrill explained in your presence that this photograph was

 7  actually his hands and an employee took that photo.  Right?

 8  A.   He didn't tell me that those were his hands.  No.

 9  Q.   Okay.  So what you're saying is you recall him telling you

10  he took the photograph of an employee's hands?

11  A.   No.  What he told me was that he had some employees grab

12  some tools and take some photos.  And I don't remember any

13  specifics as to whose hands they were or who took the photos.

14  Q.   But he did tell you these photos were taken to demonstrate

15  how to clean or scrape wood crates.  Right?

16  A.   He said that Diveroli was looking for suggestions on how to

17  clean the -- how to rid the ammunition of Chinese markings --

18  the ammunition packaging of Chinese markings.

19       And Mr. Diveroli -- or Mr. Merrill -- I'm sorry --

20  asked some of his employees and took some of the crates that he

21  had in his shop and grabbed some tools and he had them take

22  these photos -- or they took these photos and he e-mailed them

23  to Mr. Diveroli pursuant to his request for suggestions on how

24  to clean the Chinese markings off the packaging of the

25  ammunition.

Vazquez - CROSS - By Mr. Bieber          19

1  Q.   Okay.  I heard your entire answer there.

2       Do you remember what my question was?

3  A.   If he told me that -- what -- this picture was intended to

4  remove Chinese markings.

5  Q.   No.  That wasn't my question.

6       Isn't the reason why you just gave that entire answer so

7  that the jury will believe your testimony?

8            MR. TAMEN:  Objection.  Argumentative.

9            THE COURT:  Sustained.

10 BY MR. BIEBER:

11 Q.   My question was:  Didn't Mr. Merrill explain that this

12 photograph, the scraping tools, was to demonstrate how to clean

13 or scrape markings off of wood crates?  Isn't that what he

14 explained during the interview when you were present?

15 A.   I think I just answered what he explained to me.

16 Q.   So what's your answer?  Is it "yes" or "no"?

17           MR. TAMEN:  Objection, your Honor.  He answered the

18 question.

19           THE COURT:  Sustained.

20 BY MR. BIEBER:

21 Q.   And Mr. Merrill explained that he understood the wood

22 crates were being discarded.  Right?

23 A.   He didn't discuss that with me.  No.

24 Q.   But you don't know if that was said before you got there.

25 Right?

Vazquez - CROSS - By Mr. Bieber          20

1   A.   I'm testifying to what he told me.  Is that correct?

2   Q.   Well -- no.  No.  Whoa.  Whoa.  Whoa.

3        I'm asking you:  Did he -- you don't know if he said that

4   before you got there, do you?

5   A.   No, I don't.

6   Q.   And you don't know if there are numerous e-mails that he

7   sent talking about discarding wood crates, do you?

8   A.   Could you repeat that question, please.

9   Q.   You don't know if he sent numerous e-mails regarding

10  discarding the wood crates, do you?

11  A.   He sent -- there were numerous e-mails being sent back and

12  forth.  And without having -- or reviewing those e-mails or

13  having them in front of me, I'm -- I don't feel comfortable

14  about discussing whether they were or not.

15  Q.   My question was:  Do you know if he sent numerous e-mails

16  regarding discarding the wood crates?  That was my question?

17           MR. TAMEN:  Objection.

18           First of all, he's already answered that he doesn't

19  feel comfortable answering that question without having them in

20  front of them.

21           Secondly, it exceeds the scope of direct.

22           THE COURT:  Sustained.

23  BY MR. BIEBER:

24  Q.   Mr. Merrill explained -- did Mr. Merrill explain in your

25  presence how he got involved in this contract?

1   A.   He explained that Mr. Diveroli had called him and told him

2   that he had received a task order and asked him if he was

3   interested in investing in the contract.  Yes.

4   Q.   Okay.  He received a task order.

5        Are you as sure of that answer as you are of all of your

6   testimony?

7   A.   That's what I answered.  Yes.

8   Q.   Your answer is "yes."  Right?

9   A.   Yes.

10  Q.   And that's when Merrill got involved?

11  A.   That's what he told me.  Yes.

12  Q.   That's what he told you.  Right?

13  A.   Yes.

14  Q.   And he also told you that he was aware Chinese ammunition

15  was being shipped.  Right?

16  A.   Yes.

17  Q.   Did he tell you that he became aware of Chinese ammunition

18  being shipped in September of 2007?

19  A.   He told me what I stated earlier.

20       When I asked him about his involvement, he said that he

21  received a phone call on or about -- or words to that effect --

22  24 April of 2007 from Diveroli that the Chinese -- that the

23  ammunition that they were intending to ship from Albania was

24  Chinese-manufactured.

25       He didn't say that the ammunition was being shipped at that

Vazquez - CROSS - By Mr. Bieber                22

1    time.

2    Q.   Not what I asked you.

3         Did he tell you when he learned Chinese ammunition was

4    actually shipped?

5    A.   No.

6    Q.   But he said he learned Chinese ammunition was shipped.

7    Right?

8    A.   Yes.

9    Q.   And he also -- by the way, you interviewed Mr. Podrizki.

10   Right?

11   A.   (No response.)

12   Q.   You don't remember?

13   A.   I don't recall.

14   Q.   You know who Alexander Podrizki is, don't you?

15   A.   Yes.

16   Q.   And you know who David Packouz is, don't you?

17   A.   Yes.

18   Q.   And you know who Efraim Diveroli is, don't you?

19   A.   Yes.

20   Q.   And you're aware all three have pled guilty in this case.

21   Right?

22   A.   Yes.

23   Q.   And you don't recall if you interviewed Podrizki.

24        Do you recall interviewing Packouz?

25   A.   I didn't interview Mr. Packouz.  No.

1    Q.   That interview you recall.   Right?   Is that what you just

2    said?

3    A.   You asked me if I interviewed Mr. Packouz.   I said I did

4    not.

5    Q.   You did not.

6         Were you present when he was interviewed by someone else?

7    A.   I don't think I was.

8    Q.   Do you have any information that -- oh, no.   I'm going to

9    withdraw that.

10        Were you present when Mr. Merrill explained that he thought

11   Diveroli was contacting the wrong division of the State

12   Department?

13            MR. TAMEN:   Objection.   It assumes facts not in

14   evidence.   It's a misleading question.

15            THE COURT:   Sustained.

16            Rephrase your question.

17   BY MR. BIEBER:

18   Q.   Mr. Tamen asked you questions about Merrill's statements to

19   you regarding Diveroli contacting the State Department.   Right?

20   A.   Correct.

21   Q.   Did Merrill explain to you -- well, he had a conversation

22   with you about those e-mails.   Right?

23   A.   Yes.

24   Q.   And you say that Merrill mentioned attorneys.   But that

25   didn't happen until after the search warrant.   Right?

 1   A.   It was in that context, yes.

 2   Q.   In that context.

 3        Isn't it true Merrill also explained that Diveroli had

 4   attorneys in the context of the State Department issue?

 5   A.   No.

 6   Q.   And you're sure of that answer.  Right?

 7   A.   Yes.

 8   Q.   So you're telling us that Mr. Merrill said Diveroli had

 9   attorneys dealing with the search warrant issue.  Right?

10   A.   Yes.

11   Q.   And did you ask Mr. Merrill the names of those attorneys

12   who were dealing with it for Diveroli?

13   A.   Yes.

14   Q.   And what did he tell you?

15   A.   He said he didn't know.

16   Q.   And did Merrill tell you that, at the time Diveroli told

17   him about the attorneys dealing with the search warrant issue,

18   that Merrill believed Diveroli was telling him the truth?

19   A.   He didn't say one way or the other.  He just said that he

20   had some lawyers and he didn't know who they were.

21   Q.   You didn't tape-record or videotape any of the statements

22   that you say Mr. Merrill made.  Right?

23   A.   No, sir.

24   Q.   You just took handwritten notes.  Right?

25   A.   That's correct.

1    Q.   And you heard Agent Perez testify that the -- that hands-up

2    issue was said or was done by Merrill, but didn't make it into

3    his notes.  Right?

4    A.   I heard that.

5             MR. BIEBER:  Nothing else, Judge.

6             (End of requested excerpt.)

7

8                     C E R T I F I C A T E

9

10            I hereby certify that the foregoing is an accurate

11   transcription of the proceedings in the above-entitled matter.

12

13

14   _____        /s/Lisa Edwards
          DATE               LISA EDWARDS, CRR, RMR
15                           Official United States Court Reporter
                             400 North Miami Avenue, Twelfth Floor
16                           Miami, Florida 33128
                             (305) 523-5499
17

18

19

20

21

22

23

24

25